UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO. 18-21753-CIV-GAYLES/OTAZO-REYES

**IDENTIDAD IOT, LLC**, a Florida
Limited Liability Company;
and **IDENTIDAD ADVERTISING
DEVELOPMENT LLC**, a Florida
Limited Liability Company d/b/a
IDENTIDAD TELECOM; and
**INFOMOVIL TELEVISION &
SYSTEMS CORP.**, a Florida
Corporation.

   Plaintiffs,

vs.

**HEWLETT PACKARD ENTERPRISE
COMPANY**, a Delaware Corporation,

   Defendant.

_____/

## AMENDED COMPLAINT

### (Jury Trial Demanded)

  Plaintiffs, Identidad IoT, LLC ("Identidad IoT"), Identidad Advertising Development,

LLC d/b/a Identidad Telecom ("Identidad Telecom") and Infomovil Television & Systems Corp.

("Infomovil") (collectively, "Plaintiffs") hereby sue Defendant, Hewlett Packard Enterprise

Company ("HPE"), and allege as follows:

### INTRODUCTION

  1.  In this case, Plaintiffs, three closely-held businesses, seek remedies for HPE's false

advertising of an "innovative" product and its persistent and purposeful scheme to ensnare

Plaintiffs in a costly, unending commitment to HPE and its affiliate, Hewlett Packard Financial Services Company ("HPFS"). HPE undertook this effort, knowing at all times that it lacked the products and technology that it was offering to Plaintiffs, and lacking the ability, organizational structure and market position to deliver on its partnership promises, while it, continued to demand payment for the defective product and inadequate services, causing Plaintiffs, collectively, to suffer millions of dollars in damages and to lose their position in a developing technology niche, which positioning was the principal motivation for their decision to enter the business of the Internet of Things.

<u>**JURISDICTION, VENUE, AND PARTIES**</u>

2.      This is an action for damages in excess of $75,000, exclusive of interest, fees, and costs. There is complete diversity among the parties, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1332.

3.      Identidad IoT is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. As such, Identidad IoT is a citizen of the State of Florida.

4.      Identidad Telecom is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. As such, Identidad Telecom is a citizen of the State of Florida.

5.      Infomovil is a Florida corporation with its principal place of business in Miami-Dade County, Florida. As such, Infomovil is a citizen of the State of Florida

6.      At all relevant times, HPE was a citizen of the State of Delaware, being incorporated in Delaware, and having its principal place of business in the State of California. At all relevant times, HPE was and is authorized to conduct business in the State of Florida and has conducted, engaged in, and/or carried on a business venture in Miami-Dade County, Florida.

7.      Venue is appropriate in this District because (i) the causes of action accrued in this District, (ii) the Platform (as defined below) at issue is located in this District, (iii) the tortious conduct by HPE occurred in this District, and (iv) the transactions complained of herein occurred within this District.

8.      This Court has personal jurisdiction over HPE because, at all relevant times, HPE operated, conducted, engaged in, or carried on a business or business venture in Miami-Dade County, Florida, and have engaged in substantial and not isolated activity in Miami-Dade County, Florida.

9.      All conditions precedent to bringing the instant action have occurred, have been performed, and/or have otherwise been excused, satisfied, or waived.

## BACKGROUND

### *The Internet of Things ("IoT")*

10.      The IoT is the technological network of physical devices, vehicles, home appliances and other items embedded with electronics, software sensors, actuators, and connectivity. The sensors are integrated with network systems, enabling these objects to connect and exchange data. Each "thing" is uniquely identifiable through its embedded computing system but is able to inter-operate within the existing internet infrastructure.

11.      The IoT allows objects to be sensed or remotely controlled across existing network infrastructures, creating opportunities for more direct integration of the physical world into computer-based systems, and resulting in improved efficiency, accuracy and economic benefit in addition to reduced human intervention.

12.      "Things", in the IoT sense, can refer to a wide variety of devices such as heart monitoring implants, biochip transponders on farm animals, live streaming cameras, automobiles

with built-in sensors, DNA analysis devices for environmental/food/pathogen monitoring, or field operation devices that assist firefighters in search and rescue operations.

***Plaintiffs***

13.     Founded in 2002, Identidad Telecom is a telecommunications company that specializes in providing international communications services in the Americas, the Caribbean, Latin America, and emerging markets.

14.     Identidad Telecom provides, among other things, complete international voice carrier solutions and international Application to Person (A2P) Short Message Service (SMS) services. A2P and SMS are critical components of Identidad Telecom's business and Plaintiffs possess intricate and specialized knowledge of these services and the business of providing these services to customers.

15.     On or about July 19, 2016, Identidad Telecom established a subsidiary, Identidad IoT, for the purpose of entering the IoT market by providing IoT solutions and technological innovations such as smart parking, in-home tracking and monitoring, vehicle connectivity, and precision farming. While this business plan constituted a logical development in Identidad Telecom's operations, it would require a substantial investment in new infrastructure, hardware, software, training, and personnel.

***The HPE Universal IoT Platform (the "Platform")***

16.     According to HPE, the Platform was a scalable, modular, versatile software platform that accelerated, simplified, and connected the IoT.[1]

17.     In marketing and promoting the Platform, and at all times material hereto, HPE represented to its clients, potential clients, the public in general, and Plaintiffs specifically, that the

---

[1] *See* https://www.hpe.com/us/en/solutions/iot-platform.html

Platform "features one standard alignment, device and vendor independence, and abstraction of the underlying network…[and] incorporates key IoT attributes that offer ease of use for end developers and helps reduce infrastructure costs with proven low Total Cost of Ownership (TCO) and high scalability."

18.      HPE also represented to its clients, potential clients, the public in general,  and Plaintiffs specifically, that the Platform provides the following "solutions":

### Platform architecture

The HPE Universal IoT Platform provides a unique, single vendor and single point of responsibility to manage and connect heterogeneous sets of IoT devices and operate vertical applications on machine-to-machine (M2M) devices from multiple countries.

### Data analytics

The focus now is on collecting data, validating it, enriching it with analytics, mixing it with other sources, and then exposing it to the applications that enable customers to derive business value from these services.

## Secure monetization

HPE accelerates the path to data monetization in the IoT market with pre-defined oneM2M use cases for quick iteration and a data-centric application enablement platform that helps manage and analyze collected data.

## Simultaneous management

The HPE Universal IoT Platform supports simultaneous management of heterogeneous sets of IoT gateways, devices, and sensors. The platform is sensor- and device-agnostic and offers the scalability to manage millions of devices.

## Application designer and marketplace

The built-in application designer enables rapid IoT app development on web and mobile channels to create new service offerings. The application designer features API monetization and policy enforcement and includes a partner-oriented layer for securely managing partners and developers.

## Cross-vertical operations

With oneM2M compliance, the HPE Universal IoT Platform allows you to operate applications from different verticals with total security and deploy server IoT use cases on a customer basis with specific privileges.

### *HP's Proposal to Plaintiffs*

19.     On or about March 21, 2016, Identidad Telecom and HPE began discussions regarding the Platform. During extensive and detailed negotiations, Identidad Telecom explained to HPE that its interests in IoT and the HPE Platform would be to utilize IoT in improving, developing and increasing its telecom services, while also marketing the Platform for the various uses that customers might have.

20.     In connection therewith, the principals of Identidad Telecom would cause to be formed Identidad IoT, which would deliver IoT products and services for its enterprise, small and medium businesses, and telecommunications customers, as well as enabling Identidad Telecom, through Identidad IoT, to connect and manage heterogenous IoT and Machine-to-Machine (M2M) devices and applications across multiple verticals.

21.     While Plaintiffs did have extensive technical experience and success in the telecom field with the services Identidad Telecom and Identidad Infomovil had provided over the years, they did not have, and explained to HPE that they did not have, substantial experience in the IoT field. Accordingly, Plaintiffs and HPE discussed, not only the purchase of the Platform, but also a "go to market" teaming effort in which HPE would provide sales personnel and resources, and the use of its famous name and intellectual property, in order to attract customers, primarily in Latin America, who would use Plaintiffs' HPE Platform for their IoT needs.

22.     On or about June 28, 2016, HPE sent Identidad Telecom a proposal for the Platform, in which HPE, among other things, indicated that the Platform would provide for licenses for 1,000,000 devices (the "HPE UIoT Proposal"). A copy of the HPE UIoT Proposal is attached hereto as Exhibit "1."

23.     HPE promoted and represented its Platform as device "agnostic," meaning that it was able to accept and operate with any manufacturer's devices. In fact, HPE named its IoT Platform the "Universal IoT" Platform, to emphasize its versatility with any device.

24.     On or about June 29, 2016, HPE representatives demonstrated its Platform to Identidad Telecom's CEO, Andres Sanchez, claiming it to be fully operational.  In point of fact, at the time of the demonstration, the Platform was not "agnostic" or Universal and was only inter-operational with a limited number of devices. It was unable to operate at the levels represented, could not function with one million devices, or even half that number, and could not operate with SMS services that were critical to Plaintiffs' operations. At the time HPE was lauding and promoting its Platform to Plaintiffs, vaunting the Platform's enormous capabilities and representing that HPE was a key provider of IoT technology, unbeknownst to Plaintiffs, HPE had not sold a single IoT platform in the United States and had only sold, or was in the process of selling, one in Latin America.

25.     Subsequently, on July 14, 2016, HPE sent Identidad Telecom a Power Point presentation, identifying purported current users of the Platform, potential customers through the Platform with 1,280,000 possible devices, and three options for payment schedules (the "HPE – Identidad Presentation"). A copy of the HPE – Identidad Presentation is attached hereto as Exhibit "2."

26.     On or about July 26, 2016, HPE sent a "Statement of Work to Identidad IoT for Universal IoT Platform from Hewlett Packard Enterprise" (the "Statement of Work"), which, among other things, stated the "objective of this project to install, configure, and test HPE's UIoT Platform 1.2 solution on Identidad IoT's lab and production systems."

### *The Agreements*

27.    On or about July 27-28, 2016, HPE, HPFS and Plaintiffs executed the following documents in order to implement and launch the Platform, as well to secure customers for Identidad IoT concerning IoT projects:

a.    Alliances Teaming Agreement between HPE and Identidad IoT, dated July 27, 2016 (the "Teaming Agreement"), a copy of which is attached hereto as Exhibit "3";

b.    Master Lease & Financing Agreement between HPFS and Identidad Telecom, dated July 27, 2016 (the "Master Lease"), a copy of which is attached hereto as Exhibit "4";

    i.    Master Lease and Financing Agreement Schedule 5348857849USA000001 between HPFS and Identidad IoT, dated July 27, 2016 ("Schedule 1"), a copy of which is attached hereto as Exhibit "5";

    ii.    Master Lease and Financing Agreement Schedule 5348857849USA000002 between HPFS and Identidad IoT, dated July 27, 2016 ("Schedule 2"), a copy of which is attached hereto as Exhibit "6"[2]

    iii.    Amendment No. 1 to Master Lease between HPFS, on one hand, and Identidad Telecom and Infomovil, on the other hand, dated July 27, 2016 (the "Co-Lease Amendment"), a copy of which is attached hereto as Exhibit "7"; and

---

[2] Although the Master Lease was between HPE, as Lessor, and Identidad Telecom, as Lessee, Schedule 1 and 2 listed Identidad IoT as the Lessee.

  c. Statement of Work and Purchase Order from Identidad IoT to HPE, dated July 28, 2016 (collectively, the "Platform Order"), a copy of which is attached hereto as Exhibit "8."

The above described agreements are collectively referred to herein as the "Agreements."

  28. The Agreements provided that HPE would install and configure the Platform, including all necessary hardware and software.  The Platform equipment itself was to be working, functional equipment, suitable for its specified purposes and would be leased through HPFS.  Presumably, HPFS would acquire the Platform from HPE so that HPFS would have the product to lease to Identidad Telecom.

  29. As it would turn out, there was never a functional product that was made available to Plaintiffs, but instead HPE provided worthless, unusable equipment that failed of its essential and necessary purposes.

  30. The Platform was promised by HPE to be a "turn-key solution" for Identidad.

  31. On August 31, 2016, shortly after the execution of the Agreements, HPE issued a press release, which stated:

> [T]he Platform will help Identidad IoT develop new products and services across multiple industry verticals using a variety of connectivity options, protocols and interfaces. Identidad IoT solution capabilities will span across simple Subscriber Identity Modules (SIM) and smart device management, local and global device and network connectivity and data analytics through personalized applications.  HPE offers a single horizontal platform with common features and functions that leverage an open and standardized architecture in alignment with the oneM2M specification, allowing Identidad IoT to streamline onboarding of IoT devices, protocols and applications by removing complexities and reducing costs. It will also help Identidad with managing device connectivity and supporting application development and deploying those on Identidad IoT network.[3]

---

[3] https://news.hpe.com/identidad-iot-selects-hewlett-packard-enterprise-to-deliver-iot-products-and-services/

32.     HPE projected the time period from issuance of the purchase order (July 28, 2016) to completion at approximately three months.

33.     IoT, in the summer of 2016, was a new but rapidly developing technology. It was quickly gaining traction among various businesses seeking to enter that market. The appeal to Plaintiffs and a major selling point that HPE offered was Plaintiffs' ability to secure a pioneering foothold as a provider of a universal IoT platform for Latin American companies interested in the advantages of utilizing IoT devices in their businesses. Therefore, it was extremely important to Plaintiffs to complete the installation and mobilization of the Platform and to bring the services to market as soon as possible.

### *The Failed Installation of the Platform*

34.     In August 2016, HPE began installing the Platform at Identidad IoT's headquarters in Miami, Florida, with a scheduled completion date of October 26, 2016 (the "Initial Project Plan"). A copy of the Initial Project Plan is attached hereto as Exhibit "9."

35.     Shortly after the installation process began, HPE began requesting that Identidad IoT purchase additional software and hardware, plus more personnel, to implement the Platform, even though the Agreements made clear that HPE would provide all components necessary for the Platform to operate 500,000 devices, including but not limited to hardware and software, to implement a fully operational Platform.

36.     By way of example, following execution of the contract documents, HPE advised Identidad IoT that it (Identidad IoT) would need to purchase Load Balancers and Data Switches. This was only the tip of the iceberg, as, over the ensuing weeks and months, HPE would advise Identidad of the need for Identidad IoT to acquire additional hardware, software and updates, in addition to providing more personnel, in order to have a fully operational Platform.

37.     On or about August 30, 2016, Identidad IoT asked HPE, via email, (i) why the Load Balancers and Data Switches were needed; and (ii) why Identidad IoT was responsible for purchasing the equipment when HPE represented and agreed that all hardware was included in the Agreements.

38.     Subsequently, between September 6 and 9, 2016, HPE and Identidad IoT's representatives met at Identidad's offices in Miami, Florida to discuss, among other things, the Load Balancers and Data Switches.

39.     In response to Identidad IoT's concerns regarding the Load Balancers and Data Switches, HPE ultimately agreed to absorb the cost for the Data Switches. With respect to the Load Balancers, HPE proposed a software solution to replace the Load Balancers, despite knowing that the proposed software would negatively impact the Platform's performance. When Identidad IoT expressed its concern regarding the non-viability of the "software solution", HPE could not provide an adequate response.  So, HPE did the only thing it apparently could - it presented Identidad IoT with a quote for Identidad IoT to purchase the additional hardware, again without a rational explanation as to why Identidad IoT was responsible for purchasing the hardware. A copy of the hardware quote is attached hereto as Exhibit "10."

40.     The additional hardware cost would have increased Identidad IoT's investment in the hardware expenses with HPE by approximately 20% over the sums originally contemplated by the Agreements.

41.     Reluctantly, and with the hope and objective of avoiding any further delays, Identidad IoT purchased the additional hardware in order to facilitate the implementation of the Platform. However, Identidad IoT did not purchase the Loan Balancers through HPE, but rather

through a third-party vendor, who offered the equipment at a lower cost.  A copy of the invoice paid by Identidad IoT is attached hereto as Exhibit 11.

42.      Identidad IoT also provided HPE a network engineer, on short notice, to assist with the installation of the Platform. The need for the additional engineer resulted in Identidad IoT having to spend more money in travel expenses and overtime payment which was neither disclosed in nor contemplated by the parties' Agreements.

43.      The installation and attempted implementation of the Platform continued to drag on over the course of the next sixteen months, without any success. These delays resulted from the inherent failure of the Platform to perform its most basic functions. When devices were connected to the Platform, the system would repeatedly and routinely fail or crash, would not record or retain information, would erase data, or would stop working, in part or in whole.  The Platform was unable to work with key devices and systems that were integral to Plaintiffs' operations.  Identidad IoT, through its principals and representatives, constantly made HPE aware of problems, concerns, and dissatisfaction, only to receive assurances and promises that all problems would be resolved.

44.      On multiple occasions, HPE assured Plaintiffs that updates to the system would resolve existing problems. Delays ensued as Plaintiffs awaited updates that ultimately failed to correct the problems.

45.      On November 9, 2016, relatively early during the course of these repeated protractions, Identidad IoT's Director of Project Development, Santiago Sanchez, again expressed Identidad IoT's serious concern to HPE regarding the continuing delay in delivering and installing the Platform. In response, HPE claimed the Initial Project Plan was a "draft" and provided Identidad IoT with an updated project plan, indicating the new deadline for the Platform's

installation would be January 16, 2017—approximately 3 months behind schedule (the "Second Project Plan"). A copy of the Second Project Plan is attached hereto as Exhibit 12."

46.     On December 6, 2016, Identidad IoT's CEO once again expressed concern to HPE that the implementation of the Platform was two and a half months delayed, and that Identidad IoT could not afford to delay the process any longer. In response, HPE sent a "final" project plan, now stating that the completion date was January 27, 2017 — more than 3 months behind schedule. (the "Third Project Plan"). A copy of the Third Project Plan is attached hereto as Exhibit "13."

47.     On December 20, 2016, Identidad IoT's CEO, with growing frustration regarding the continued delay in the progress of the installation of the Platform and lack of response from HPE regarding key components of the Platform, emailed HPE regarding its inability to deliver on its contractual commitments. In response, HPE informed Identidad IoT, among other things, that the Platform would support *approximately* 1,000,000 devices, that HPE was determining if any additional hardware was needed, and, if so, HPE would accommodate the cost of the hardware. A copy of the email chain between Identidad IoT and HPE is attached here to as Exhibit "14."

48.     Despite HPE promoting its 24/7 support for its Platform customers, HPE continually delayed the installation of the Platform and technical support to Identidad IoT.

49.     On December 24, 2016, Identidad IoT's CEO again emailed HPE regarding HPE's failure to respond or to provide solutions regarding implementation of the Platform, including, but not limited to, the sizing of the server and SIS, and delivery of the Platform capable of supporting 1,000,000 devices, as agreed upon between HPE and Identidad IoT.

50.     On or about January 13, 2017, HPE stated to Identidad IoT that "HPE has completed the theoretical performance analysis and determined that [it] can support 1,000,000 devices on Identidad's existing hardware." HPE represented that the Platform's ability to support

1,000,000 devices is "not a supposition," but based on the facts of Identidad IoT's hardware and HPE's analysis.

51.     Between January 13, 2017 and January 27, 2017, HPE and Identidad IoT conducted various user acceptance tests regarding the installation of the Platform.

52.     At the end of the tests, at the urging of HPE and with HPE's promise and assurance that Identidad's acceptance would neither be unconditional nor irrevocable, Identidad IoT conditionally accepted the installation of the Platform, with the mutual understanding that the installation was not yet operational or functional, but simply a preliminary first step. As Identidad IoT had explained in an email to HPE on December 22, 2016:

> We understand and agree that Identidad will accept the platform based on the ATP document attached in your email, which include implementation and testing of Smart Parking and Fleet Management use cases only. Always having in consideration the commitment from HPE that training and personal tracking use case implementation will be completed consecutively.

53.     Identidad IoT thus accepted the installation of the Platform the following month subject to the above understandings and with the agreement that HPE would provide a backup system to the Platform since HP did not install a back-up system.

54.     In fact, HPE knew at all times that the Platform was nonfunctional and would not perform. It had artfully crafted the acceptance language to create a means to receive and recognize the revenue for the Platform without having to provide the product that it was in fact unable and unqualified to deliver.

55.     Meanwhile, HPFS, the theoretical lessor and owner of the hardware, was taking not a solitary step or action to provide a product that had any value or use to justify the inordinate lease payments it would insist upon collecting and that it continues to insist upon collecting, notwithstanding its ongoing awareness that there was no consideration to support such payments.

56.     Following the acceptance of the Platform's installation that HPE deceptively manipulated from Identidad based upon false representations and incomplete information, HPE remained obligated, *inter alia*, to test the Platform, to train Identidad IoT's employees, and to onboard the production systems. And, of course, the Platform was required to work properly and to be able to function with up to 1,000,000 devices.

### *Problems with the Platform*

57.     Despite the Platform being "installed," Identidad IoT continually faced significant issues with the Platform, causing Identidad IoT to expend significant resources without being able to monetize the Platform at all.

58.     At every turn, with HPE promises that completion was imminent and that all issues would be resolved, the Platform sustained setback after setback. It never worked.

59.     On or about February 20, 2017, Identidad IoT informed HPE that the backup and restore process made the Platform completely unstable and did not allow Identidad IoT to work on any "use cases" in the Platform. The instability caused multiple complete failures.

60.     HPE responded that it had "many worldwide engineers checking the Platform."

61.     Meanwhile, unbeknownst to Plaintiffs, HPE was well aware from prior experience that the Platform was unable to perform when the volume of devices connected to it was augmented.

62.     HPE was further aware, but concealed from Plaintiffs, that the Platform was unable to function and to accommodate SIS devices that were a critical component of the Plaintiffs' operations, an express item included within the Statement of Work, and unequivocally promised by HPE to be within the scope of the Platform's universality.

63.     However, HPE never advised Plaintiffs that the Platform could not accommodate SIS devices. Rather, HPE plotted behind the Plaintiffs' backs to drag the Plaintiffs forward until the system updates might be able to meet this need and to find a way to increase Plaintiffs' purchase obligations at that time.

64.     On or about March 3, 2017, Identidad IoT requested an update on the implementation of the "use case 3," which was already a month behind schedule on the Third Project Plan and more than 5 months behind schedule from the Initial Project Plan.

65.     Because of HPE's complete failure to implement the use cases, as required by the Agreements, Identidad IoT was unable to use the "use cases," thereby causing Identidad IoT significant damages and lost opportunity in the marketplace.

66.      Shortly thereafter, recognizing that HPE had failed to perform its obligations vis-à-vis the Platform and that the Platform was not stable, HPE and Identidad IoT met in Miami, Florida to discuss a "recovery plan."

67.     On or about March 8, 2017, HPE sent Identidad IoT a proposed "recovery plan," which included a short-term plan, as well as a week-long meeting between HPE and Identidad IoT (the "Recovery Plan"). A copy of the Recovery Plan is attached hereto as Exhibit "15."

68.     Shortly after the Recovery Plan meeting, HPE implemented the "use cases" on the Platform. However, Identidad IoT discovered major issues on each and every one of the use cases.

69.     HPE informed Identidad IoT that most of the "use case" issues would be resolved with the *next version* of the Platform. In other words, HPE told Identidad IoT that the current version of the Platform was unable to meet the reasonable and contracted-for requirements of Identidad IoT.

70.     Because Identidad IoT now had to wait for the "next version" to fix the use case issues, Identidad IoT was still unable to commercialize the Platform.

71.     In addition to the use case issues, the Platform was repeatedly unavailable because of, but not limited to, the following problems which were solely the responsibility of HPE:

a.   A structural component of the Platform did not work correctly (case no. 5317219436);

b.   An incorrect sizing and rotation policy (case no. 531838369);

c.   HPE component failures during the synchronization process (case no. 5317173212);

d.   The Platform did not have any startup scripts (case no. 5318476103);

e.   Objects in the database unexpectedly disappeared (case no. 5317900669);

f.   The Platform did not have any method to remove devices that needed to be removed (case no. 5318668937); and

g.   The disk petitioning was not usable (case no. 5318667829).

72.     Severely frustrated with the plethora of problems surrounding the Platform and HPE's ongoing failure/inability to solve them, Identidad IoT's CEO, Andres Sanchez, emailed HPE's Vice President & General Manager, David Sliter, on April 18, 2017, in an appeal to HPE to solve these issues promptly. Specifically, Mr. Sanchez stated as follows:

Hello David,

I'm sorry to escalate this to you, but right now we are in a very complicated situation.

Today I had a very stressful conversation with my developers and platform engineers that are saying the platform is still not suitable to have clients on it, and that every day we found more and more errors. Yesterday the platform was down most of the day, and today is not completely stable. In top of that, we were supposed to have the new version installed on the 15th of April, that supposedly will solve most of the problems, but today we received an email that the release is still been tested, and that we will be able to have it installed in about two weeks.

We have been patient, and have work with what we got so far, but at this point I cannot allow HPE to continue spending time trying to solve something that Identidad IOT is already paying for. We started this project on September, and signed the delivery of the platform on February without knowing all the issues it had, and as of today, the platform is still not usable.

As you know, we are now paying 50k per month for this platform, plus our regular expenses that add up more than 100k per month in costs, and so far, we have not been able to start generating any revenue, and not even have a light that we will be able to do it soon. Having this in mind, I need HPE to stop charging us for this platform, hardware and services until all the issues are resolved and we have a stable platform in which we can work, and it's been tested and pass all the required standards. At this point, we are not comfortable with just upgrading to the new version, we need to install it, and be able to test it thoroughly before continuing with the payments.

I have a meeting tomorrow in the morning with my developers, and will have an entire list of the issues we have found in the platform so far, and would like to have a call with you to discuss further. Please let me know if you have available time tomorrow in the afternoon EST.

Best Regards,

— Andrés S



73.     A day later, Identidad IoT emailed HPE a complete description of the problems

Identidad IoT was facing with the Platform, including a report by Identidad IoT's development

and engineering team (the April 19, 2017 Email"). A copy of the April 19, 2017 Email is attached

hereto as Exhibit "16."

74.     On or about April 20, 2017, HPE responded to the April 19, 2017 Email, assuring

Identidad IoT that HPE was committed to making Identidad IoT a success, and that HPE's team

was working around the clock to get the new Platform version into production (the "April 20, 2017

Email"). However, HPE did not provide any specifics as to how it would resolve the issues

surrounding the Platform, and the significant losses Identidad IoT was suffering because of HPE's

(in)actions. A copy of the April 20, 2017 Email is attached hereto as Exhibit "17."

75.     On or about May 5, 2017, HPE proposed an "implementation plan" to stabilize the

Platform, with a scheduled completion date of June 26, 2017 — more than 5 months after the

Platform was installed and more than 8 months after it was originally supposed to be delivered.

76.     Recognizing these delays, and the damage HPE caused Identidad IoT in its failure

to provide a stable and operational Platform, HPE agreed to make payments on behalf of Identidad

IoT, for the next three months[4]  to HPFS for the defective and useless equipment for which HPFS

was still demanding payment,

77.     On or about May 10, 2017, in an effort to expedite the stabilization of the Platform

and to decrease the go-to market time for Identidad IoT, Identidad IoT requested that it be

permitted to internally develop and program the Device Controllers (the "DC's").

78.     However, HPE informed Identidad IoT of yet another delay, the result of which

was that HP's team could not provide the necessary training and materials to Identidad IoT's team

---

[4]   Despite the non-functioning Platform, the continuing problems and HPE's inability to solve them,
Identidad IoT continued to timely meet all of its payment obligations that would have been due under the
Agreements as if they were valid and binding and supported by genuine consideration.

until mid-to-late July 2017, thereby compounding the already extensive delays in Identidad IoT going to market with the Platform.

79.     On or about July 17, 2017, HPE and Identidad IoT again met in Miami regarding training for the DC's. HPE informed Identidad IoT that the current version of the Platform would not allow Identidad IoT to develop its own DC's, and, as such, HPE *proposed* a set of generic DC's that would give Identidad IoT the autonomy to onboard any device. However, HPE never actually developed or made available to Identidad IoT any such generic DC's, and at this time, Identidad IoT remains completely dependent on HPE for such issues.

80.      On or about July 20, 2017, Identidad IoT had no choice but to upgrade to version 1.2.4.2 of the Platform.

81.     Despite being upgraded, the Platform was still unstable and unusable. Thus, Identidad IoT could not go to market with any commercial IoT solutions.

82.     On or about September 1, 2017, HPE provided Identidad IoT a timeline on the *next* upgrades to the Platform with a target release date of October/November 2017.

83.     On or about December 14, 2017, Identidad IoT requested an update on the generic DC's that had still not been delivered, as well as the upgrade to the newer Platform version that HPE still had not released.

84.     On or about January 28, 2018, HPE informed Identidad IoT that there were two options to upgrade to yet the **next Platform version** (1.4). However, according to HPE, both options required Identidad IoT to invest in updating its system's infrastructure yet again, that is to say, HPE was **again requiring additional money from Identidad IoT** in order to acquire this upgrade.

85.     By March 2018, nearly two years after HPE's initial meetings with Plaintiffs, with the promise of giving them a technologically sophisticated, "state of the art" Platform that would enable Identidad IoT to secure a leading place in the Latin American IoT marketplace, Plaintiffs had no working system and only demands from HPE and HPFS for more money.

86.     As such, despite countless delays, errors, and misrepresentations by HPE, Identidad IoT has yet to receive a fully operational Platform. HPE failed to deliver what was agreed upon, but never had any intention or ability to deliver —a turn-key solution in the form of the Platform. HPE continually failed at every attempt and misrepresented that it would fix the issues surrounding the Platform causing Identidad to suffer significant damages.

### *The Customer Leads, Teaming and Business Development Assistance (or Lack thereof)*

87.     As part of the IoT business development project, Identidad IoT and HPE executed the Teaming Agreement (see Paragraph 26a, above).

88.     Exhibit A to the Teaming Agreement sets out the role that HPE agreed to undertake in helping Identidad IoT develop business. As set forth therein, HPE was to provide personnel and to act as hands-on participants in the efforts to secure customers. HPE was obligated to provide leads and to introduce potential customers to the benefits that Identidad IoT could bring them through Identidad IoT's Platform enabled technology and services.

89.     The Teaming Agreement was a major and material component of Identidad IoT's relationship with HPE.  HPE, under the Teaming Agreement, was not supposed to simply provide some general sales leads or marketing assistance. The Teaming concept was to make HPE and Identidad IoT "go to market" partners.  HPE was to participate at all levels with the development of customers. HPE promised to use its name recognition, and reputation as a technology giant, to bring customers to Identidad IoT's Platform so that Identidad IoT could provide the services these

customers required using HPE licenses on the Platform to both companies' mutual advantage as it would enable Identidad IoT to target customers in CSP (Communications Service Providers) and SME (Small & Medium Enterprises) segments in North America, South America and Caribbean.

90.     HPE represented that it had leads to such customers that would require millions of devices over the next few years. HPE presented revenue and income projections to Identidad IoT that reflected profits in the millions of dollars over the ensuing five years.

91.     HPE's contractual obligations required full time on-site sales support and additional ongoing participation in sales efforts

92.     The Teaming Agreement was not a stand-alone, isolated contract between the parties, but rather was an integral and critically important aspect of the relationship that the Plaintiffs attempted to solidify with HPE so that Plaintiffs would be positioned as a strategic and influential IoT service provider in the Latin American marketplace.

93.     In a meeting with Identidad IoT on July 14, 2016, HPE represented that, through the Teaming Agreement, HPE would provide the inclusion and direct support of an HPE IoT specialist and its CMS sales team in Latin America and the United States.

94.      In an email dated December 20, 2016, seeking assurances from HPE in the face of the ongoing problems, Identidad IoT CEO Andres Sanchez wrote to HPE:

> We need to have the certainty that there will be an internal launch of the teaming agreement between HPE and Identidad IoT, as a go to market tool for the developing countries.

95.     The following day, Luke McDonald, HPE's North America GM of Communications and & Media Solutions, responded:

> German [Castro] is running point on this topic. I understand that the discussions are on-going, and we're presently awaiting any questions or concerns you may have with the documents which need to be completed in order to establish your partner/service provider status

96.     Notwithstanding the continuing problems that rendered the Platform unready, unusable, and unmarketable, Identidad IoT attempted during the time that the Platform was in development to promote the new services it was making available. HPE, however, failed to provide the support it had promised and committed to under the Teaming Agreement, including, without limitation:

    a.   Sales and marketing personnel;

    b.   Participation in the sales, marketing and promotional efforts;

    c.   Meaningful leads to realistic business opportunities; and

    d.   Demonstrative and other promotional tools.

97.     HPE knew but failed to disclose to Plaintiffs, while it was negotiating the agreements with Plaintiffs, at the time it entered the agreements with the Plaintiffs, during the period leading up to the period of acceptance of the installation of the Platforms, and during the subsequent period when HPE was stringing Plaintiffs along for nearly two years without successfully initiating an operating Platform, that: (a) that the Platform was unable to meet the needs and demands of Plaintiffs; (b) that it was unable and unwilling to provide the sales personnel, resources and influence HPE had represented it could and would provide; (c) that it was not going to provide the product with the specifications it had promised to Plaintiffs, but instead was going to trap Plaintiffs into a continuing need to purchase additional hardware and software from HPE; (d) that it had not sold and begun operating any other operating Platforms in the United States or in Latin America; and (e ) that HPE had not and was not able to secure a foothold in IoT technology; and (f) that HPE's "ecosystem of partners," which it vaunted as a strong network of corporate ties for the worldwide sale and distribution of IoT services, was completely illusory.

98.     To the contrary, HPE expressly, and falsely, represented to Plaintiffs, in order to induce Plaintiffs to enter into the agreements with HPE, to conditionally accept the installation, and to agree to acquire additional hardware and software and to secure updates to the Platform, that it was an industry leader in IoT, that the Platform was universal and could and would accommodate any and all devices, including SIS devices, that it had the knowledge to provide the Platform product that it advertised, that its updates would resolve and correct any deficiencies, and that it was ready, willing and able to provide the sales resources and personnel necessary to be a "go to market" partner with Identidad IoT.

## COUNT I
### FRAUD

99.     Plaintiffs re-alleges paragraphs 1 through 98 of the Amended Complaint as if restated herein in full, and allege further:

100.     HPE made false statements of material fact to Plaintiffs, including, but not limited to all those set forth hereinabove, and:

a.   That the Platform would support 1,000,000 devices;

b.   That the Platform would be a "turn key solution" to Identidad IoT's lab and production systems;

c.   That the Platform would be fully operational by October 26, 2016;

d.   Consistently providing Identidad IoT false and misleading completion deadlines, while Identidad IoT continued to pay for the Platform and technical support;

e.   Informing Identidad IoT that the issues with the Platform were not critical, when in fact the issues affecting the Platform were causing the Platform to completely and continuously crash;

f.   Assuring Identidad IoT that HPE would provide 24/7 support, when in fact HPE was unable to solve or otherwise even answer Identidad IoT's concerns for months at a time;

g.   Continually promising Identidad IoT that the Platform would be fixed;

h.   Falsely advertising the capabilities of the Platform to Identidad IoT via HPE's website, promotional materials, proposals, and promises to Identidad IoT;

i.   After assuring Plaintiffs at the time the Agreements were executed that Identidad IoT did not need any additional hardware such as Load Balancers and Data Switches to implement the Platform, informing Identidad IoT, in a bait and switch maneuver, that the Platform would need additional hardware after Plaintiffs had already executed the Agreements and Identidad IoT had expended significant resources;

j.   Assuring Identidad IoT that its staff would be appropriately trained on using, developing, and programing the Platform for Identidad IoT's future use; and

k.   Representing to Identidad IoT that HPE had researched and identified specific leads for customers to whom Identidad IoT could directly market the Platform.

101.   The representations that HPE made were false and deceptive at the time they were made, and HPE knew, or reasonably should have known the representations were false and deceptive at the time that they were made.

102.   The representations and concealments were material to Plaintiffs and HPE knew, or should have known, them to be material.

103.   HPE made the representations with an intentional disregard for the truth and with the motive of garnering as much revenue from the Plaintiffs as possible despite not having earned

the revenue and despite not being able to fulfill its obligations. HPE's fraud was further motivated by a selfish desire to promote and protect its own reputation and standing in the industry without any regard for the impact on Plaintiffs.

104.    HPE made its representations with malicious disregard for Plaintiffs, knowing that its continuing deceptions would wreak financial havoc upon Plaintiffs, destroy Identidad IoT's ability to proceed with its commercial plans, and would leave Plaintiffs financially obligated to HPE's affiliate, HPFS, on a wholly worthless lease.

105.    Plaintiffs' injuries were preventable and resulted directly from HPE's failure and refusal to conduct itself fairly and forthrightly with Plaintiffs, not disclosing candidly the limits of the Platform's capabilities and the realistic timeframes that might be necessary before it could fulfill the purposes for which it was intended and that Plaintiffs required. HPE's conduct and material concealments and misrepresentations were willful and wanton and were the direct and proximate cause of Plaintiffs' injuries.

106.    HPE's intentional misconduct warrants the imposition of punitive damages.

107.    HPE made the representations to Plaintiffs intending that Plaintiffs would rely upon them.

108.    Plaintiffs reasonably relied, to their detriment, on the representations made by HPE.

109.    As a direct and proximate result of HPE's false representations and Plaintiffs' reasonable reliance thereupon, Plaintiffs have sustained and continue to sustain damages in excess of the jurisdictional minimum of this Court, and HPE, and its affiliate HPFS, continue to benefit from the wrongful conduct.

WHEREFORE, Plaintiffs, Identidad IoT, LLC, Identidad Advertising Development, LLC d/b/a Identidad Telecom, and Infomovil Television & Systems, Corp. (i) request that the

Agreements described above be rescinded, and declared as void, (ii) demand judgment for compensatory damages against Defendant Hewlett Packard Enterprise Company, plus pre and post-judgment interest and costs; (iv) demand punitive damages against Hewlett Packard Enterprise Company; and (v) request such further relief as this Court deems just and proper.

## COUNT II
## FRAUDLENT INDUCEMENT

110.  Plaintiffs re-allege Paragraphs 1 through 98 of the Amended Complaint as if restated herein in full, and allege further:

111.  Prior to the execution of the Agreements, HPE  made material misrepresentations of fact to Plaintiffs regarding the Platform, time to completion of installation and implementation of the Platform, cost of the Platform, and HPE's intention to provide marketing and promotional support, sales team personnel, active participation in sales efforts and meaningful customer leads.

112.  The misrepresentations, both verbal and in writing, included all those set forth hereinabove. In addition:

a.  HPE falsely represented that the Platform would support 1,000,000 devices;

a.  HPE falsely represented that the Platform would be a "turn key solution" to Identidad IoT's lab and production systems;

b.  HPE falsely represented that the Platform would be fully operational by October 26, 2016;

c.  HPE provided Identidad false and misleading completion deadlines;

d.  HPE falsely advertised the capabilities of the Platform to Plaintiffs via HPE's website, promotional materials, proposals, and promises to Identidad;

e.  After assuring Identidad at the time the agreements were entered that Identidad did not need any additional hardware such as Load Balancers and Data Switches

to implement the Platform, in a bait and switch maneuver, HPE informed Identidad that the Platform would need additional hardware after Identidad had already entered into the Agreements and expended significant resources;

f.   HPE falsely represented that Identidad IoT's staff would be appropriately trained on using, developing, and programing the Platform for Identidad's future use;

g.   HPE falsely represented to Identidad IoT that HPE had researched and identified specific leads for customers to whom Identidad IoT could directly market the Platform; and

h.   HPE falsely represented the costs of the Platform and the benefit that Identidad IoT would receive by incurring those costs.

113.    The representations that HPE made were false and deceptive and HPE knew, or reasonably should have known them to be false and deceptive at the time that they were made.

114.    HPE made the foregoing representations with the intent to induce Plaintiffs into executing the Agreements, and to induce Identidad IoT to incur expenses in excess of $1,000,000 in connection with the Platform.

115.    HPE made the representations with an intentional disregard for the truth and with the motive of garnering as much revenue from the Plaintiffs as possible despite not having earned the revenue and despite not being able to fulfill its obligations.  HPE's fraud was further motivated by a selfish desire to promote and protect its own reputation and standing in the industry without any regard for the impact on Plaintiffs.

116.    HPE made its representations with malicious disregard for Plaintiffs, knowing that its continuing deceptions would wreak financial havoc upon Plaintiffs, destroy Identidad IoT's

ability to proceed with its commercial plans, and would leave Plaintiffs financially obligated to HPE's affiliate, HPFS, on a wholly worthless lease.

117.    Plaintiffs' injuries were preventable and resulted directly from HPE's failure and refusal to conduct itself fairly and forthrightly, not disclosing candidly the limits of the Platform's capabilities and the realistic timeframes that might be necessary before it could fulfill the purposes for which it was intended and that Plaintiffs required. HPE's conduct and material concealments and misrepresentations were willful and wanton and were the direct and proximate cause of Plaintiffs' injuries.

118.    HPE's intentional misconduct warrants the imposition of punitive damages.

119.    Plaintiffs justifiably relied to their detriment on the above referenced misrepresentations by entering into the Agreements, and, with respect to Identidad IoT, incurring expenses in excess of $1,000,000 in connection with the Platform.

120.    Plaintiffs also justifiably relied to their detriment on HPE's fraudulent representations after execution of the Agreements, in which HPE represented that HPE would fix the issues surrounding the Platform. As a result of such representations, Plaintiffs delayed taking action with respect to the Agreements because HPE repeatedly promised it was fixing the Platform.

121.    As a direct and proximate result of HPE's false representations, and Plaintiffs' reasonable and detrimental reliance thereupon, Plaintiffs have sustained and continue to sustain damages in excess of the jurisdictional minimum of this Court, while HPE and HPFS continue to benefit.

WHEREFORE, Plaintiffs, Identidad IoT, LLC, Identidad Advertising Development, LLC d/b/a Identidad Telecom, and Infomovil Television & Systems, Corp. (i) request that the Agreements described above be rescinded, and declared as void, (ii) demand judgment for

compensatory damages against Defendant Hewlett Packard Enterprise Company, plus pre and post-judgment interest and costs; (iv) demand punitive damages against Hewlett Packard Enterprise Company; and (v) request such further relief as this Court deems just and proper..

## COUNT III
## BREACH OF EXPRESS WARRANTY

122.    Identidad IoT re-alleges Paragraphs 1 through 98 of the Amended Complaint as if restated herein in full, and alleges further:

123.    Prior to and after the execution of the Agreements, HPE made affirmations of fact with respect to the Platform intended to induce the sale of the Platform to Identidad IoT.

124.    Such affirmations related to the quality and characteristics of the Platform, including the Platform's capabilities, design, capacity, features, potential, and monetization ability.

125.    The affirmations became part of the basis of the bargain involving the sale of the Platform to Identidad IoT.

126.    HPE breached its express warranty relating to the Platform, in that the above described affirmations were not true and the Platform failed to conform to HPE's affirmations and descriptions.

127.    As a direct and proximate result of HPE's breach of its express warranty, Identidad IoT has sustained and continue to sustain damages in excess of this jurisdictional minimum of this Court.

WHEREFORE, Plaintiff, Identidad IoT, LLC, demands judgment against Defendant, Hewlett Packard Enterprise Company, for compensatory damages in an amount to be determined at trial, plus pre and post-judgment interest, costs, and such other and further relief as this Court deems just and proper.

## COUNT IV
## <u>BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY</u>

128.   Identidad IoT re-alleges Paragraphs 1 through 98 of the Amended Complaint as if restated herein in full, and alleges further:

129.   At all relevant times, HPE was a merchant with respect to the Platform.

130.   At all relevant times, Identidad IoT was a foreseeable user of the Platform.

131.   HPE sold and installed the Platform into Identidad IoT's lab and production systems in Miami, Florida.

132.   HPE warranted that the Platform was reasonably fit for its intended use as a scalable, modular, versatile software platform to accelerate, simplify, and connect the IoT.

133.   At all relevant times, the Platform was defective, unstable, unusable, and/or not properly installed and tested.

134.   HPE breached its implied warranty of merchantability in that the Platform was and is unfit for its ordinary purposes of (i) connecting 1,000,000 devices to Identidad IoT (ii) providing Identidad IoT with a turn-key solution to Identidad IoT's lab and production systems, and (iii) enabling Identidad IoT to connect and to manage heterogenous IoT and Machine-to-Machine (M2M) devices and applications across multiple verticals.

135.   As a direct and proximate result of HPE's breach of its implied warranty of merchantability, Identidad IoT has sustained and continues to sustain damages in excess of this jurisdictional minimum of this Court.

WHEREFORE, Plaintiff, Identidad IoT, LLC, demands judgment against Defendant, Hewlett Packard Enterprise Company, for compensatory damages in an amount to be determined at trial, plus pre and post-judgment interest, costs, and such other and further relief as this Court deems just and proper.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSES

136.    Identidad IoT re-alleges Paragraphs 1 through 98 of the Amended Complaint as if restated herein in full, and alleges further:

137.    At all relevant times, HP was a merchant with respect to the Platform.

138.    At all relevant times, Identidad IoT was a foreseeable user of the Platform.

139.    At the time Identidad IoT purchased the Platform from HPE, Identidad IoT informed HPE that it intended to use the Platform in its services for its enterprise, small and medium businesses, and telecommunications customers, as well as enabling Identidad IoT to connect and manage heterogenous IoT and Machine-to-Machine (M2M) devices and applications across multiple verticals.

140.    In purchasing the Platform, Identidad IoT relied upon HPE's skill and judgment in selecting the Platform for the purposes mentioned above.

141.    HPE impliedly warranted that the Platform was suitable for Identidad IoT's intended usage as described above.

142.    HPE breached the implied warranty of fitness of particular purposes in that the Platform provided by and installed by HPE failed to connect Identidad IoT to 1,000,000 devices or enable Identidad IoT to connect and manage heterogenous IoT and M2M devices and application across multiple verticals.

143.    As a direct and proximate result of HPE's breach of its implied warranty of fitness for particular purposes, Identidad IoT has sustained and continues to sustain damages in excess of this jurisdictional minimum of this Court.

WHEREFORE, Plaintiff, Identidad IoT, LLC, demands judgment for compensatory damages against Defendant, Hewlett Packard Enterprise Company, in an amount to be determined

at trial, plus pre and post-judgment interest, costs, and such other and further relief as this Court

deems just and proper.

## COUNT VI
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

144.    Plaintiffs re-allege Paragraphs 1 through 98 of the Amended Complaint as if

restated herein in full, and allege further:

145.    This is an action for damages under the Florida Deceptive and Unfair Trade

Practices Act ("FDUTPA"), contained in Sections 501.201 through 501.213, *Florida Statutes*.

146.    Section 501.202(2) of FDUTPA establishes among the purposes and objective of

FDUTPA: "To protect the consuming public and legitimate business enterprises from those who

engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices

in the conduct of any trade or commerce."

147.    HPE's deceptive and improper acts, concealments, manipulations, frauds, and

misuse of Plaintiffs' trust, constitute fraudulent and unconscionable business practices and have

enabled HPE to unfairly profit at Plaintiffs' expense and loss.

148.    HPE's actions were willful, wanton, and malicious.

149.    The wrongful and deceptive acts as set forth herein constitute violations of

FDUTPA.

150.    As a direct and proximate result of the wrongful and deceptive acts set forth herein,

Plaintiffs have sustained and continue to sustain damages in excess of the jurisdictional minimum

of this Court.

WHEREFORE, Plaintiffs, Identidad IoT, LLC, Identidad Advertising Development, LLC

d/b/a Identidad Telecom, and Infomovil Television & Systems, Corp., demand judgment for

compensatory damages, together with attorney's fees and costs pursuant to FDUTPA, against

Defendant, Hewlett Packard Enterprise Company, in an amount to be determined at trial, and for such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues triable as of right by a jury.

Respectfully submitted,

**MARKO & MAGOLNICK, P.A.**
*Attorneys for Plaintiffs*
3001 S.W. 3rd Avenue
Miami, Florida 33129
Telephone: (305) 285-2000
Facsimile:   (305) 285-5555

By: /s/ Joel S. Magolnick
**Joel S. Magolnick, Esq.**
Florida Bar No. 776068
Magolnick@mm-pa.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 15, 2019, a true and correct copy of the foregoing document was filed electronically with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/Joel S. Magolnick
Joel S. Magolnick

# Exhibit

## "1"



**Hewlett Packard**
Enterprise

**Identidad Telecom**
**IoT Platform**

# Solution Overview

## UIoT Platform 1.2 Baseline

### Assumptions:

- In-site deployment (customer site Miami FL)
- Licenses for 1M devices
- Standard Integration points
- Use case implementation presented as an optional additional component based on Identidad's requirements.
- Licenses and Solution Support included
- Hardware for 1 HA production site and one non-HA lab included
- On-site Training included

Sales | Solution SA | Delivery | GSCS | Finance | Legal

Confidential

**Hewlett Packard**
Enterprise

# Pricing Structure

This proposal is divided into the following components:

- A financing proposal from Hewlett Packard Financial Services (HPFS) including Hardware, Professional Services and licenses for 500k devices

  - One time special discount for additional 500k devices to reach 1M devices.

  - Ongoing Product Support

  - Ongoing Solution Support

  - Optional additional use case deployment.

**Hewlett Packard**
Enterprise

# Summary of Payment Schedule

| Monthly Payment | | | | | |
|---|---|---|---|---|---|
| ITEM | Month 1 | Month 2-4 | Month 5 - 12 | Months 13-36 | Comments |
| HPFS Contract | $43,150.00 | $43,150.00 | $43,150.00 | $10,720.20 | HW, 500k SW Licenses, Deployment Services |
| Discounted 500k licenses | $200,000.00 | | | | 500k additional licenses |
| Product support | | | $14,142.75 | $14,142.75 | |
| Solution Support | | | $8,991.66 | $8,991.66 | |
| Monthly Payment | $243,150.00 | $43,150.00 | $66,284.41 | $33,854.61 | |

**Onboarding of a new use case: $82,400 at the moment it is implemented.**

- The solution will be deployed in the initial 4 months.
- The total payment from month 1 to month 4 is $372,600.
- From month 5 and onwards the payment includes Product and Solution support.

Private

4

**Hewlett Packard**
Enterprise

# HPFS Financial offer

| ITEM | Price (USD) |
|---|---|
| Professional Deployment  Services | 370,000 |
| SW Licenses (500k under HPFS agreement) | 255,318 |
| Hardware | 99,654 |
| TOTAL | 724,972 |

**Lessor:** HP Financial Services
**Lessee: Identidad Telecom**
**Supplier/Vendor:** HPE: Hardware, Software (500K licenses) and Professional Services
**Lease Plan/Type:** $1.00 Buyout– Monthly Payments in Advance
**Lease Term:** 36 months
**Professional Services to be paid in the initial 12 months**
**Payment Structure: Payment**
**Platform Cost: $724,972 (Excluding Taxes)**
Months 1-12 $43,150
Months 13-36 $10,720.20

Hewlett Packard
Enterprise

Private

5

# SW License special price

– Special discount for additional 500k device licenses to reach 1M devices.

| ITEM | Price (USD) |
|------|-------------|
| SW Licenses (500K devices) | 200,000 |

Private

Hewlett Packard
Enterprise

# SW and Solution Support

| ITEM | Price (USD) |
|---|---|
| Product Support (yearly, 1M devices) | 169,713 |
| Solution Support (yearly, 1M devices) | 107,900 |

- SW Support and Solution Support to be paid monthly
- SW Support description provided in annex document.

**Hewlett Packard**
Enterprise

Private

7

# Deployment and onboarding of a new use case (optional)

| ITEM | Price (USD) |
|---|---|
| Use case enablement (1 device, 1 controller, 1 application) | 82,400 |

Optional for any new use case to be implemented. This price includes:

- Onboarding of 1 new device
- Development of 1 new device controller
- Onboarding of 1 vertical application

This optional component will be evaluated based on the Identidad Telecom's customer requirements.

**Hewlett Packard**
Enterprise

Private

8

# Terms and Conditions

– Purchase of the HPE Hardware and OS, HPE Software Licenses and the HPE Support, Services and SMS Services listed above will be subject to a mutually agreed and executed Statement of Work, governed by the HPE's Standard Terms and Conditions for Hardware (both Nonstop and ISS), Software, Support and Services, as applicable.

– Proprietary Rights Statement. The offer of Licenses and Services under this Quote consist of installation and/or mere reconfiguration of HPE commercial software and the testing thereof. The amounts quoted consist, as applicable, of standard Hardware purchase price, standard Software license fees, or standard Software or Hardware maintenance and support fees, or man time charges for provision of Services. No modification or enhancement of HPE Software is quoted hereunder, and HPE retains all intellectual property rights in the features and functionality represented thereby.

– Price is US dollars for purchase and shipment within US. If purchased outside US, or if purchased in US and shipped outside US, additional charges may apply including local adjustments, taxes, shipping, etc.

– Taxes and other fees excluded

**Hewlett Packard**
Enterprise

9

10

Private

# Thank You



**Hewlett Packard**
Enterprise

# Hardware BOM

## HP BL460c Gen9 Servers

### Hardware

| | | | Qty |
|---|---|---|---|
| 681844-B21 | | HP BLC7000 CTO 3 IN 1LCD Plat Enclosure | 1 |
| 727021-B21 | | HP BL460c Gen9 10Gb/20Gb FLB CTO Blade | 11 |
| 726992-L21 | | HP BL460c Gen9 E5-2640v3 FIO Kit | 11 |
| 726719-B21 | | HP 16GB 2Rx4 PC4-2133P-R Kit | 40 |
| 652503-B21 | | HP 600GB 6G SAS 10K 2.5in SC ENT HDD | 22 |
| 700074-B21 | | HP FlexFabric 20Gb 2P 630FLB FIO Adptr | 11 |
| 749437-B21 | | HP Smart Array P246br/1G FIO Controller | 11 |
| 339778-B21 | | HP Raid 1 Drive 1 FIO Setting | 12 |
| 726992-B21 | | HP BL460c Gen9 E5-2640v3 Kit | 7 |
| 691367-B21 | | HP BLc VC FlexFabric-20/40 F8 Module | 7 |
| AJ716B | | HPE D2D (Short Valve B-Series SFP+ 1 Pack | 4 |
| 455883-B21 | | HP BLc 10G SFP+ SR Transceiver | 10 |
| 733460-B21 | | HP AX 2650W Plat Ht Plg FIO Pwr Sply Kit | 1 |
| 456204-B21 | | HP BLC7000 DDR2 Enc Mgmt Option | 1 |
| 677595-B21 | | HP BLc 1PH Intelligent Power Mod FIO Opt | 1 |
| 517520-B21 | | HP BLc 6X Active Cool 200 FIO Fan Opt | 1 |
| 755258-B21 | | HP DL360 Gen9 E5PF CTO Server | 1 |
| 755384-L21 | | HP DL360 Gen9 E5-2630v3 FIO Kit | 1 |
| 755384-B21 | | HP DL360 Gen9 E5-2630v3 Kit | 1 |
| 781518-B21 | | HP 1.2TB 12G SAS 10K 2.5in SC ENT HDD | 2 |
| 665243-B21 | | HP Ethernet 10Gb 2P 560FLR-SFP+ Adptr | 1 |
| 749974-B21 | | HP Smart Array P440ar/2G FIO Controller | 1 |
| 734807-B21 | | HP 1U SFF Easy Install Rail Kit | 1 |
| 720478-B21 | | HP 500W FS Plat Ht Plg Pwr Supply Kit | 2 |

### Software

| | | | Qty |
|---|---|---|---|
| E5Y41A | | HPE OV 3yr 24x7 Encl FIO Phys 16 Svr Lic | 1 |
| G3J30A | | RHEL Svr 2 Sckt/2 Gst 3yr 24x7 LTU | 1 |
| G3J30A | | RHEL Svr 2 Sckt/2 Gst 3yr 24x7 LTU | 7 |
| P8B31A | | HPE OV w/o iLO 3yr 24x7 FIO Phys 1 LTU | 1 |
| BD505A | | HPE iLO Adv incl 3yr TSU 1-Svr Lic | 1 |

### Maintenance

| | | | Qty |
|---|---|---|---|
| H1K92A3 | | HPE 3Y Proactive Care 24x7 Service | 1 |
| H1K92A3 | 7FX | HPE C7000 Enclosure Support | 1 |
| H1K92A3 | 5YG | HPE One View for Blades Support | 1 |
| H1K92A3 | T7S | HPE BH Svr 2 Sckt/2 Gst 3yr 24x7 SUPPORT | 11 |
| H1K92A3 | TG8 | HPE VC FlxFbrc Support | 2 |
| H1K92A3 | TT8 | HPE BL460c Gen9 Server Blade Support | 11 |
| H1K92A3 | | HPE 3Y Proactive Care 24x7 Service | 1 |
| H1K92A3 | R2H | HPE iLO Advanced Non Blade - 3yr Support | 1 |
| H1K92A3 | SVP | HPE One View w/o iLO Support | 1 |
| H1K92A3 | TT5 | HPE ProLiant DL360 Gen9 Support | 1 |

### Installation

| | | | Qty |
|---|---|---|---|
| HA114A1 | 5FY | HP Startup BladeSystem C7000 Infrast SVC | 1 |
| HA114A1 | 5GH | HPE Blad Sys c7000 Encl HiwK Startup SVC | 1 |
| HA114A1 | 5A0 | HPE Startup Entry 300 Series OS SVC | 1 |

**Hewlett Packard**
Enterprise

# Solution Support Services

The Solution Support includes one Named Response Center Engineer (NRCE) and one Account Support Manager (ASM)

**NRCE [Named Response Center Engineer]/Technical Lead** (50% for 3 months, 100% for 6 months) in Y1, 100% in Y2-3

Description:

Provides a reactive engineer who will acquire a deep knowledge of the customer environment and work directly on support incidents and problems.

Customer Benefits:

Named support engineer with in-depth knowledge of customer environment

Deliverables:

- SE startup
- Named primary contact for all cases - Enhanced technical escalation management - Remote reviews

Private

**Hewlett Packard**
Enterprise

# Solution Support Services

**ASM [Account Support Manager] (25% for 3 months, 30% for 6 months) in Y1, 30% in Y2-3**

Description:

The client's support business focal point for ongoing HPE support

Customer Benefits:

The HPE ASM acts as the lead for the HPE support team and works closely with the client team with the objective of meeting the customer's support business needs.

Deliverables:

- Ensuring HPE exceeds Service Level Agreements (SLA's) and objectives.
- Manage system trouble escalations, drive corrective action resolutions, conduct Root Cause Analysis (RCA) investigations with HPE support engineers and provide regular reporting.
- Chair regular case review sessions and matrix manage both onsite and offsite support engineers including ensuring the development and training of HPE support engineer resources.
- Plan and host regular scheduled weekly / monthly sessions as well as Quarterly Business Report (QBR) forums with the client to review service related issues, support cases, service metrics/Key Performance Indicator (KPI) statistics and measures of client satisfaction.
- Manage and report budgetary financial analysis of all HPE team activity.
- Ensure a smooth transition of new system development and enhancements from production development and deployment to ongoing support.
- Arrange for client training as needed pertaining to ongoing system operational support.
- Be a trusted advisor for our clients in the operational support environment and ensure customer satisfaction.

**Hewlett Packard**
Enterprise

# Exhibit

# "2"



**Hewlett Packard**
Enterprise

**Internet of Things**

HPE Communications & Media Solutions, 2016

# Partners – summary profile

## trackimo
always there

**Track & Trace**

– 3G / LTE systems



'The most economical, competitive, small, light device in the mar…'

Vehicles (trucks, cars & motorbikes), Luggage, Packages, Kids, Elderly, Pets, Drones





**Hewlett Packard**
Enterprise

## trinetra

**GPS vehicle tracking, Fleet Managt**

– GSM/GPRS / GPS devices



- Position and sensor information in real-time
- Speed, Idling, acceleration and braking events
- Support for custom Geozones and Landmarks
- Odometer Calculation
- Engine Hours Calculation
- Main Battery Voltage Sensing of the Vehicle

– Fleet management application

- Vehicle tracking
- Digital mapping
- Fleet maintenance
- Driver management
- Route optimization
- …

## ATrack

**Asset tracking, ODB II devices**

– GSM/GPRS/CDMA/HSPA GPS/GLONASS devices





# Partners – summary profile

## Smart Parking



**IEM**

– LoRa devices (integrated with Sagemcom)

– Presto Park – parking application



payments   mobile   guidance

backend

## Waste Management



**BH** technologies

– LoRa devices (integrated with Sagemcom)

– Syren – waste management app

Waste overflow detection

Optimization of waste collection

Statistics & analytics

## Smart lighting



**BH** technologies

– LoRa devices (integrated with Sagemcom)











– Lucenergie – smart lighting app

Public lighting supervision, remote control, energy management

3

**Hewlett Packard**
Enterprise

# Partners – summary profile

## SAGEMCOM

### LoRa Networks

– LoRa gateways



## libelium

### ZigBee & LoRa Networks & sensors

– Multiprotocol Gateways



– Meshlium: Multipurpose sensors

## Digi

### ZigBee Networks

– ZigBee gateways



– Zigbee sensors & modules



Temperature, ambient light, humidity

**Hewlett Packard**
Enterprise

4

# Partners – summary profile

## FINSECUR
Solutions de sécurité incendie

### Fire systems

– LoRa devices (integrated with Sagemcom)



– iSecur – home management




Fire status, temperature, humidity

## abeeway

### Track & Trace

– LoRa devices



geolocation




**Hewlett Packard**
Enterprise

5

# Potential IoT Customers to consume Identidad's UIoT Platform.

| Customer | Country/region | Description | Vertical | Devices |
|---|---|---|---|---|
| Digicel | Caribbean | Provider of mobile services, enterprise solutions, cloud compu | Smart Meetering aaS | 200,000 |
| Avantel | Colombia | Provider of wireless services | Smart Home, Personal Tracking | 50000 |
| RACSA | Costa Rica | Public sector and corporate customers arm for ICE Costa Rica | Smart Buildings, Fleet Management | 50000 |
| Millicom | Caribbean | Service Provider | Fleet management, Banking | 240000 |
| ETB | Colombia | 4-play operator in Colombia | Smart Home, Personal Tracking | 320000 |
| Enlace TP | Mexico | Corporarte connectivity and government | Smart Building, Fleet management, | 230000 |
| Internexa | Latam | Transport network and IP transport provider | Smart Buildings, Fleet Management | 20000 |
| Widetech | Latam | Satellite Geo-location provider | 3G/4G based LBS | 110000 |
| Azlogica | Latam | Telematics and IoT developer | Telematics | 10000 |
| Coordinadora | Colombia | Logistic Group | Fleet management | 10000 |
| 4-72 | Colombia | Postal, Logistic and Messanging Company | Fleet management | 20000 |
| Servientrega | Colombia | Logistic and Messanging Company | Fleet management | 7000 |
| Sistemas Integrados de Transporte | Colombia | Logistic and Messanging Company | Fleet management | 15000 |
| | | | Total | 1,282,000 |

6

**Hewlett Packard**
Enterprise

# Summary of Payment Schedule
## Option 1

| Option 1: | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 - 12 | Month 13- 36 |
|---|---|---|---|---|---|---|
| HPFS Contract | $20,138.00 | $20,138.00 | $20,138.00 | $20,138.00 | $20,138.00 | $20,138.00 |
| Implementation Services | | $111,150.00 | | $259,350.00 | | |
| Product support | | | | | $12,312.00 | $12,312.00 |
| Solution Support | | | | | | $16,771.00 |
| **Monthly Payment** | **$20,138.00** | **$131,288.00** | **$20,138.00** | **$279,488.00** | **$32,450.00** | **$49,221.00** |

.
- New Device / Use case bundle: $67,000
\* For devices using drivers/protocols not currently supported by the platform.

- HPFS Financing Services
  - **1M Device licenses**
  - HW
- Deployment Services to be invoiced:
  - 30% upon HW delivery
  - 70% upon deployment
- From month 5 and onwards the payment includes Product Support
- Solution Support starting in Y2

- First year investment: $710,652

**Hewlett Packard**
Enterprise

Private

7

# Summary of Payment Schedule
## Option 2

| Option 2: | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 - 12 | Month 13- 36 |
|---|---|---|---|---|---|---|
| HPFS Contract | $43,150.00 | $43,150.00 | $43,150.00 | $43,150.00 | $43,150.00 | $10,720.00 |
| Product support | | | | | $8,991.00 | $8,991.00 |
| Solution Support | | | | | | $16,771.00 |
| Monthly Payment | $43,150.00 | $43,150.00 | $43,150.00 | $43,150.00 | $52,141.00 | $36,482.00 |

- New Device / Use case bundle: $67,000
* For devices using drivers/protocols not currently supported by the platform.

- HPFS Financing Services
  - **500k** Device licenses (36 months)
  - HW (36 Months)
  - Implementation Services  (12 Months)
- From month 5 and onwards the  payment includes Product Support
- Solution Support starting in Y2

- First Year Investment: $589,728

**Hewlett Packard**
Enterprise

# Summary of Payment Schedule
## Option 3

| Option 3 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 - 12 | Month 13- 36 |
|---|---|---|---|---|---|---|
| HPFS Contract | $36,441.00 | $36,441.00 | $36,441.00 | $36,441.00 | $36,441.00 | $5,608.00 |
| Product support | | | | | $3,515.00 | $3,515.00 |
| Solution Support | | | | | | $12,463.00 |
| **Monthly Payment** | **$36,441.00** | **$36,441.00** | **$36,441.00** | **$36,441.00** | **$39,956.00** | **$21,586.00** |

.

- New Device / Use case bundle: $67,000
* For devices using drivers/protocols not currently supported by the platform.

- HPFS Financing Services
  - **200k** Device licenses (36 months)
  - HW (36 Months)
  - Implementation Services  (12 Months)
- From month 5 and onwards the payment includes Product Support
- Solution Support starting in Y2

- First Year Investment $465,412

**Hewlett Packard**
Enterprise

Private

9

# Exhibit

# "3"



**Hewlett Packard**
Enterprise

ALLIANCES TEAMING AGREEMENT

between

HEWLETT PACKARD ENTERPRISE COMPANY

and

IDENTIDAD IOT

**Hewlett Packard
Enterprise**

This Alliances Teaming Agreement ("Agreement") is made by and between HEWLETT PACKARD ENTERPRISE COMPANY, a Delaware corporation, having its principal place of business at 3000 Hanover Street, Palo Alto 94304 ("HPE") and IDENTIDAD IOT, a Limited Liability Corporation having its principal place of business at 7950 NW 53rd Street, Suite # 132, Doral, FL 33166   ("ALLIANCE PARTNER"), as of July 27, 2016 (the "Effective Date").

The purpose of this Agreement is to set forth the terms and conditions under which the parties will cooperate to combine their complementary skills and expertise in the preparation of a proposal (the "Proposal") to be submitted to any enterprise prospect in Americas (North and South America; a list of countries are listed in Exhibit "A") (the "Customer") in pursuit Customer's award of one or more contracts (each a "Prime Contract") concerning Internet-of-Things ("IoT") project ("the Project").

## 1.  SCOPE OF AGREEMENT

    **a.**  HPE and ALLIANCE PARTNER shall cooperate in the preparation of the Proposal as well as the conduct of any pre-sales activities in connection therewith, as further described herein.  The Proposal may be in the form of either: (i) a joint response submitted by both parties (with each party proposing to contract directly with the Customer solely with respect to the products or services to be provided by that party), or (ii) a response submitted by one party as the prime contractor (the "Prime Contractor") and the other party as the subcontractor (the "Subcontractor"), as mutually agreed by the parties.

    **b.**  If the Proposal is a joint proposal, the parties shall agree upon any products or services required to be provided by third parties, and if any such third-party products or services are required, the parties shall jointly approach the third parties regarding participation in the submission of the Proposal. Otherwise, the Prime Contractor shall be solely responsible for approaching and negotiating with such third parties regarding participation in the submission of the Proposal.

    **c.**  The terms and conditions below that are labeled [*HPE or ALLIANCE PARTNER as Prime*] shall not apply unless and until such time as HPE and ALLIANCE PARTNER agree, in a writing signed by both parties, which party will be the Prime Contractor, and which party will be the Subcontractor. The terms and conditions below that are labeled [*HPE or ALLIANCE PARTNER as Prime*] shall apply from the date of the writing designating the Prime Contractor and Subcontractor. Effective from the date of the writing designating the Prime Contractor and Subcontractor, the terms and conditions below that are labeled [*Joint Proposal*] shall no longer apply.

## 2.  OBLIGATIONS OF THE PARTIES

    **a.  General**

        **1)** [*ALLIANCE PARTNER as Prime*] HPE and ALLIANCE PARTNER agree that Alliance Partner will be the Prime Contractor and HPE will be the Subcontractor.

        [*HPE as Prime*] HPE and ALLIANCE PARTNER agree that HPE will be the Prime Contractor and ALLIANCE PARTNER will be the Subcontractor

**Hewlett Packard**
Enterprise

[*Joint Proposal*]   Unless HPE and Alliance Partner agree otherwise, the parties shall submit a joint Proposal to Customer.

2) The products and services to be provided by each party are described in general terms in Exhibit A. Each party agrees to undertake their respective activities as set forth in this Agreement and in Exhibit A.  In the course of developing the Proposal, if the parties agree upon a more detailed statement of work for the work hereunder, then such statement of work will be attached hereto as Schedule 1.

3) Each party shall appoint a representative from its local sales team to supervise and coordinate its performance of its obligations under this Agreement. Each party shall also make available to the other party and to the Customer upon such party's request employees empowered to make commitments with respect of the Proposal.

4) [*HPE or ALLIANCE PARTNER as Prime*] Unless otherwise agreed by the parties, all communications with Customer relating to the Proposal or the Project shall be made through the Prime Contractor. The parties agree that the Prime Contractor has full responsibility for conducting all negotiations with the Customer relating to the Proposal and the Project. The Prime Contractor shall consult with the Subcontractor prior to any discussions or negotiations with the Customer regarding the portion of the Proposal that the Subcontractor would be required to perform. Subcontractor agrees to notify promptly the Prime Contractor if Subcontractor is contacted by Customer concerning any matter related to either the Proposal or the Project.

[*Joint Proposal*] All contacts with the Customer relating to the Proposal or the Project will be conducted jointly by representatives from each of HPE and ALLIANCE PARTNER.  Each party agrees to promptly notify the other party if the party is directly contacted by Customer concerning the Proposal or the Project, other than contacts regarding contracts to be negotiated separately with Customer.

5) Each party agrees to bear its own costs and expenses arising out of or related to the preparation, submission and negotiations regarding the Proposal.

b. **Preparation And Submission Of The Proposal**

1) [*HPE or ALLIANCE PARTNER as Prime*] The Prime Contractor will have overall responsibility for the preparation of the Proposal, and will retain control of all Proposal and Project activities including, but not limited to, pursuit strategy, program management, technical direction, systems engineering and integration, and the selection of and contact with all other proposed subcontractors. Prime Contractor shall provide Subcontractor with an opportunity to review the sections of the Proposal relating to Subcontractor's products and services, and agrees to review and incorporate the Subcontractor's comments to such sections into the Proposal where applicable. The Prime Contractor agrees to obtain the Subcontractor's agreement to any changes to the sections of the Proposal relating to the Subcontractor's products and services.

[*Joint Proposal*] HPE and ALLIANCE PARTNER will agree on the format of the Proposal and the time frame for the completion of each party's portion of the Proposal.  The parties shall appoint sufficient personnel from each party to form a

**Hewlett Packard**
Enterprise

team to coordinate the planning, preparation, integration and submission of the Proposal to Customer (the "Proposal Team").

2) [*HPE or ALLIANCE PARTNER as Prime*] Subcontractor shall assist Prime Contractor in developing and preparing sections of the Proposal (and any modifications thereto) relating to Subcontractor's products and services. Subcontractor shall prepare and submit to Prime Contractor, within the time frames and in the format and medium specified by Prime Contractor, a technical proposal for the Subcontractor's work for inclusion as part of the Proposal, together with a written quotation of the price to Prime Contractor for the provision of the Subcontractor work, with such details as may be reasonably requested by the Prime Contractor (the "Subcontractor Proposal"). In addition to the Subcontractor Proposal, Subcontractor shall also submit to Prime Contractor all schedules, data, information, resumes qualifications and experience and other materials as Prime Contractor may reasonably request in order that a fully responsive Proposal be submitted to Customer.

[*Joint Proposals*] Each party shall be responsible for the preparation, content, and evaluation of such party's portion of the Proposal. During preparation of their respective portions of the Proposal, the parties will meet regularly to review and discuss progress and resolve any issues. Notwithstanding the foregoing, each party shall be solely and exclusively responsible for the accuracy and adequacy of its portion of the Proposal. After each party approves the joint Proposal, the parties shall jointly submit the Proposal to the Customer.

3) [*HPE or ALLIANCE PARTNER as Prime*] In addition, the Subcontractor shall provide the Prime Contractor with any exceptions Subcontractor may have to any Customer requirements or proposed terms and conditions for the Project. Prime Contractor shall include all reasonable exceptions of Subcontractor in Prime Contractor's questions to Customer, whether through the question and answer phase or, if satisfactory results have not been obtained during that phase, with submission of the Proposal. Although the parties recognize and agree that the outcome of those exceptions which are subject to the approval of Customer cannot be predicted, they agree, in any event, to use commercially reasonable efforts to resolve Subcontractor's concerns underlying the exceptions so that the Parties can submit a fully responsive Proposal to Customer. Prime Contractor and Subcontractor shall, prior to the initial (or, if applicable, any subsequent) Proposal submission, negotiate in good faith those exceptions that are not subject to the approval of Customer.

[*Joint Proposal*] In addition, each party will provide the Proposal Team with any exceptions such party may have to the terms and conditions required by the Customer to be incorporated into the Prime Contracts.

4) [*HPE or ALLIANCE PARTNER as Prime*] Prime Contractor agrees to keep Subcontractor advised of all changes in Customer's requirements and of any feedback Prime Contractor receives from Customer with respect to the probability of Prime Contractor's receipt of the Prime Contract. In the event that Customer's requirements are modified, amended, or changed or negotiations between Customer and Prime Contractor result in increases or decreases to Subcontractor's work, but the nature of such Subcontractor work remains the same, Subcontractor agrees to make appropriate modifications to the Subcontractor Proposal, including the price for

**Hewlett Packard**
Enterprise

Subcontractor's products and services, as applicable. However, if Customer's requirements are materially modified, amended or changed, or if Prime Contractor reasonably deems the Subcontractor's products or services to be unresponsive to Customer's requirements, or not competitively priced, Prime Contractor reserves the right to solicit bids from other vendors and to team with other vendors in lieu of Subcontractor. Notwithstanding the foregoing, to the extent Subcontractor is able to meet Customer's technical requirements and to meet the bid price of such other vendors, Subcontractor shall have a right of first refusal on any such modified, amended or changed requirements within such time period as Prime Contractor may reasonably specify. In addition, if Prime Contractor is directed by Customer to place with another vendor the work that was contemplated as Subcontractor's responsibility or to put such work out for bid on a competitive basis, or if Customer modifies its requirements resulting in deletion of all or a substantial portion of such work, Prime Contractor may request Subcontractor to enter into joint discussions with Prime Contractor and Customer in an attempt to reverse Customer's position and have the parties' teaming arrangement remain intact. In any case, Prime Contractor will comply with Customer's direction and decision, and, under such circumstances, Prime Contractor shall have the right to terminate this Agreement with no further obligations hereunder, except as specified in Section 6.d below.

[*Joint Proposal*] If, during the Term, Customer's requirements are materially modified, amended or changed, then the parties shall promptly and jointly assess the impact of the changed requirements on the Proposal to determine: (A) the required changes, if any, to the Proposal, and (B) whether to submit to the Customer either the changed Proposal or a revised Proposal, as applicable. After such joint assessment, either party may, in its sole option, elect not to participate in the Proposal and may terminate this Agreement upon two weeks written notice to the other party.

5) In the event that the Project requires that the parties' respective products and services be compatible, the parties will consult with one another to help ensure that their respective portions of the Proposal meet such requirements in all material respects.

6) [*NOTE: THIS SECTION SHALL REQUIRE REVIEW BY THE PARTIES ON A PROJECT-BY-PROJECT BASIS TO DETERMINE THE APPROPRIATENESS OF HAVING AN IRREVOCABLE OFFER*]. [*HPE or ALLIANCE PARTNER as Prime*] Subject to each party's right to terminate this Agreement as specified in Section 2.b.4 above, Subcontractor's terms in the Subcontractor Proposal, including prices, shall be deemed an irrevocable offer which is valid until the latest date for acceptance of the Proposal by Customer, or any extension thereto agreed by the parties and Customer, unless a change in the Project is dictated by the Customer.

7) Each party shall clearly identify in the Proposal the party's pre-existing proprietary rights, and any reservations or restrictions pertaining thereto.

8) Each party shall use reasonable commercially efforts to contribute to a competitive Proposal and further will engage in any other commercially reasonable activity required for Customer to accept the Proposal and the award of the Prime Contract to the Prime Contractor or of separate Contracts to each party.

4

**Hewlett Packard
Enterprise**

9) **[*HPE or ALLIANCE PARTNER as Prime*]** Prime Contractor shall supply a copy of the Proposal, excluding pricing data and any material covered by third party confidentiality obligations, to Subcontractor no later than five (5) business days after submission of the Proposal to Customer.

10) If, after submission of the Proposal, Customer requires changes to the Proposal, HPE and ALLIANCE PARTNER will coordinate with each other to submit a revised Proposal.

11) If, at any time, Customer requires demonstrations or prototypes, each party will endeavor to provide, at no charge, the resources reasonably necessary to meet Customer's request with respect to the portion of the Proposal for which the party is responsible.

12) **[*HPE or ALLIANCE PARTNER as Prime*]** Prime Contractor will notify Subcontractor as soon as possible of Prime Contractor's receipt of the Customer's written acceptance or rejection of the Proposal.

   **[*Joint Proposal*]** Each party shall notify the other party as soon as possible of the receipt of the Customer's written acceptance or rejection of the Proposal.

c. Subcontract. **[*HPE or ALLIANCE PARTNER as Prime*]** If the Customer accepts the Proposal and awards the Prime Contract to Prime Contractor, the Prime Contractor shall enter into negotiations with Subcontractor for a subcontract that is consistent with the Customer's award of the Prime Contract, including all work-related and other applicable flow-down provisions, and in accordance with the schedule, technical specifications, pricing and other material terms identified in the Subcontractor Proposal (the "Subcontract"). If prior Customer approval of the Subcontractor is required, the Prime Contractor shall use commercially reasonable effort to secure such approval. Prime Contractor and Subcontractor shall use commercially reasonable efforts to enter into the Subcontract within a reasonable period of time following award of the Prime Contract. If, however, the parties have not executed the Subcontract within a reasonable period of time, and in any event no longer than thirty (30) calendar days after notice of award of the Prime Contract, then either party shall have the right to terminate this Agreement upon written notice to the other party with no further obligations hereunder, except as specified in Section 6.d below.

   **[*Joint Proposal*]** If Customer accepts the joint Proposal and awards a Prime Contract to each of the parties, then HPE and ALLIANCE PARTNER shall each separately negotiate with Customer to enter into separate Prime Contracts with Customer.

3. **INTELLECTUAL PROPERTY**

a. All intellectual property rights existing prior to the Effective Date of this Agreement, or acquired after the Effective Date without reference to or use of the intellectual property of the other party, shall belong to the party that either owned such rights immediately prior to the Effective Date or acquired such rights after the Effective Date. Nothing in this Agreement will be deemed to grant to one party, by implication, estoppel, or otherwise any license rights, ownership rights or any other intellectual property rights in the other party's patents, copyrights, trademarks, trade secrets, or other intellectual property, except as otherwise expressly provided in this Agreement. If the parties decide to undertake any joint development pursuant to this Agreement, any such joint

**Hewlett Packard**
Enterprise

development will be governed by a separate joint development agreement to be negotiated in good faith by the parties and executed prior to the commencement of any joint development efforts.

## 4. CONFIDENTIALITY

In the course of performing the activities contemplated by this Agreement, each party may disclose Confidential Information to the other party. The party disclosing Confidential Information is the "Discloser," and the party receiving the Confidential Information is the "Recipient". "Confidential Information" is information which is: (a) marked as "confidential" and disclosed in writing or in a visual presentation which is marked as "confidential", or (b) disclosed orally and identified as confidential at the time of disclosure and then described in detail and designated to show its confidential nature in a written message sent to the Recipient within thirty days after disclosure, and (c) the terms and conditions of this Agreement. Confidential Information shall not include and nothing in the Agreement shall prohibit or limit either party's use or disclosure of information (including but not limited to ideas, concepts, know-how, techniques, and methodologies) that is: (i) known to or in the Recipient's possession prior to receipt of Discloser's Confidential Information, (ii) publicly (or become publicly) known or readily ascertainable through no breach of this Agreement by the Recipient; (iii) is rightfully received by the Recipient from a third party without a duty of confidentiality; (iv) disclosed by Discloser to a third party without a duty of confidentiality on the third party; (v) is independently developed or learned by Recipient, or (iv) disclosed by Recipient with Discloser's prior written approval.

a. Discloser is providing its Confidential Information to the Recipient solely to be used in the performance of obligations under this Agreement by the Recipient and those other parties with whom Recipient has written confidentiality agreements imposing confidentiality obligations no less restrictive than those contained in this Section 4.

b. From the time Recipient receives Discloser's Confidential Information until two (2) years after the termination of this Agreement, (the "Protection Period"), Recipient will protect the confidentiality of Discloser's Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as Recipient uses to protect its own confidential information of a like nature.  At the end of the Protection Period, Recipient's obligations end.

c. If Recipient is required to reveal Discloser's Confidential Information under a subpoena, court order or other operation of law, Recipient will provide reasonable prior notice to allow Discloser a reasonable opportunity to obtain a protective order.

d. Each Party warrants that it has the right to make the disclosures under this Agreement. **EXCEPT AS SPECIFIED IN THIS SECTION 4, THE DISCLOSER PROVIDES CONFIDENTIAL INFORMATION "AS IS" WITHOUT WARRANTY OF ANY KIND.**

## 5. LIMITATION OF LIABILITY

IN THE EVENT OF ANY BREACH BY EITHER PARTY OF ITS OBLIGATIONS UNDER THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION THAT IMPOSES LIABILITY, WHETHER IN CONTRACT, EQUITY, NEGLIGENCE, INTENDED CONDUCT, TORT OR OTHERWISE, SUCH PARTY WILL BE LIABLE ONLY FOR THE ACTUAL, DIRECT

**Hewlett Packard**
Enterprise

DAMAGES SUFFERED BY THE OTHER PARTY WHICH ARE CAUSED BY SUCH BREACH IN ACCORDANCE WITH APPLICABLE LAW.  IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY AMOUNTS FOR LOST INCOME, LOST PROFITS, LOST SAVINGS INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES OF ANY PARTY, INCLUDING THIRD PARTIES, EVEN IF THE BREACHING PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE, AND ALL SUCH DAMAGES ARE EXPRESSLY DISCLAIMED.

6.  **TERM AND TERMINATION**

   a.  The term of this Agreement will commence on the Effective Date and will continue until terminated as specified in this Section 6 (the "Term").

   b.  This Agreement will automatically terminate upon the happening of any one of the following events, whichever occurs first:

   1)  Written notice from Customer that it is canceling the Project or that a Proposal is no longer required;

   2)  **[HPE or ALLIANCE PARTNER as Prime]** Written notice from Customer of award of the Prime Contract to a firm other than the Prime Contractor;

   **[Joint Proposal]** Written notice from Customer of award of the Prime Contract(s) to a firm or firms other than HPE and ALLIANCE PARTNER;

   3)  Written notice from Customer of award stating its: (i) disapproval of the participation of ALLIANCE PARTNER or HPE (as applicable), or (ii) direction to select someone other than ALLIANCE PARTNER or HPE (as applicable), for the work identified as such party's responsibility in the Proposal;

   4)  **[HPE or ALLIANCE PARTNER as Prime]** Written notice from Prime Contractor to Subcontractor that Prime Contractor has decided  not to include in the Proposal any bid for the Subcontractor's work;

   5)  **[HPE or ALLIANCE PARTNER as Prime]** Written  notice from Prime Contractor of its withdrawal of the Proposal;

   6)  Written notice from one party to the other party that it is terminating the Agreement pursuant to Section 2.b.4. above;

   7)  **[HPE or ALLIANCE PARTNER as Prime]** Written notice from either party pursuant to Section 2.c above in the event that the Parties are unable to agree, after negotiating in good faith, on the terms and conditions of the Subcontract;

   8)  **[HPE or ALLIANCE PARTNER as Prime]** Execution of the Subcontract;

   **[Joint Proposal]** Execution of a Prime Contract by and between a party and Customer for performance of such party's portions of the Project;

   9)  The expiration of a 12-month period from the Effective Date; provided, however, this Agreement shall be automatically extended for an additional 6-month period if a Proposal has been submitted and Customer has not awarded a contract for the Project within the initial 12-month period;

**Hewlett Packard**
Enterprise

**10)** Subject to Title 11 of the United States Code, either Party becoming or being declared insolvent or bankrupt, being the subject of any proceedings relating to its liquidation, insolvency or for the appointment of a receiver or similar officer for it, making an assignment for the benefit of all or substantially all of its creditors or entering into an agreement for the composition, extension or readjustment of all or substantially all of its obligations; or

**11)** Mutual agreement of the parties to terminate this Agreement.

c. Either party may terminate this Agreement if the other party is in material breach of any of its obligations under this Agreement and fails to remedy the breach, if susceptible of cure, within a period of 30 days after a written notice from the other party specifying the material breach.

d. Sections 2.a.5 (Responsibility for Costs), 3 (Intellectual Property), 4 (Confidentiality), 5 (Limitation of Liability) and 7 (Miscellaneous) will survive the termination of this Agreement.

## 7. MISCELLANEOUS

a. **No Publicity**. Neither party will publicize or disclose to any third party without the consent of the other party, either the terms of this Agreement or the fact of its existence and execution. If the  Prime Contractor is awarded the Prime Contract or the parties are each awarded separate Prime Contracts, neither party may issue a news release, public announcement, advertisement or any other form of publicity concerning its role in the Project, without obtaining prior written consent to such publicity from the other party and from Customer, if required.  In the publicity, the party agrees to give appropriate credit and recognition to the participation of the other party to this Agreement in a form acceptable to the other party. Each party shall coordinate with the other regarding any media release, public announcement or similar disclosure relating to this Agreement or its subject matter and shall give the other party a reasonable opportunity to review, comment on and agree in writing with respect to the content of such release, announcement or similar disclosure prior to its release; provided, however, that this provision will not alter the restrictions on the disclosure of confidential information set forth in Section 4 "Confidentiality," and will not be construed so as to delay or restrict either party from disclosing any information required to be disclosed in order to comply with any applicable laws, rules or regulations.

b. **No Joint Venture**. In all matters relating to this Agreement, each party shall be acting as an independent contractor.  Nothing contained in this Agreement will be construed as creating a joint venture, partnership or fiduciary relationship between the parties hereto, or as creating any other form of legal association that would impose liability on one party for the act or failure to act of the other. Nothing in this Agreement will be construed as providing for the sharing of profits or losses arising out of the efforts of either or both of the parties hereunder. Neither party shall have the right, power or authority to create any obligation or duty, express or implied, on behalf of the other. Each party assumes all liabilities or obligations imposed by any laws with respect to its employees, including any federal or state income tax, unemployment insurance, or worker's compensation laws.

c. **Freedom of Action.** Subject to the provisions of Section 4 "Confidentiality," nothing in this Agreement will impair either party's right to reassign its employees, acquire, license,

8

**Hewlett Packard**
Enterprise

market, distribute, develop for itself or others or have others develop for it similar technology or services performing the same or similar functions as the technology and services contemplated by this Agreement.

d. **No Assignment**. This Agreement may not be assigned by either party without the prior written consent of the other, except that each party will have the right to perform its obligations hereunder itself and through its affiliates and to use third party contractors and consultants in connection with its obligations hereunder, so long as it remains responsible for the obligations performed by any of its affiliates, contractors or consultants to the same extent as if such obligations were performed by such party.

e. **Force Majeure**.   Neither party will be liable for performance delays or for non-performance due to causes beyond its reasonable control.

f. **Third Parties.**  Nothing in this Agreement may be relied upon or is intended to benefit any party other than HPE and ALLIANCE PARTNER.   Neither party will act in any manner which would give rise to any claims for broker's commission, finder's fee or other like payment to any third party with respect to the subject matter of this Agreement.

g. **Notices**.  All notices permitted or required to be given under this Agreement shall be in writing and delivered personally or by a nationally recognized courier service, faxed or mailed by registered or certified mail, return receipt requested, postage prepaid, to a party at their respective addresses set forth below, and will be deemed to have been duly given (i) upon delivery, if delivered personally or by a nationally recognized courier service; (ii) upon confirmation of the facsimile transmission, if delivered by facsimile, or (iii) on the date received by the recipient as reflected on the return receipt, if delivered by mail in the manner described above, will be deemed given:

      **If to HPE:**

      Hewlett Packard Enterprise Company

      _____

      _____

      Attn: _____

      Telephone: _____

      Facsimile: _____

      **If to [ALLIANCE PARTNER HERE]** :

      Identidad IOT

      7950 NW 53 Street,

      Suite 132, Doral, FL 33166

      Attn:    Andres Sanchez

      Telephone:    786 – 546 - 7727

**Hewlett Packard**
Enterprise

Either Party may change its address or designee for notification purposes by giving notice to the other of the new address or designee and the date upon which such change will become effective

h. **Waiver.** Either party's failure to exercise any of its rights under this Agreement will not constitute or be deemed to constitute a waiver or forfeiture of such rights.

i. **Severability.** If any term or provision of this Agreement is held to be illegal or unenforceable, the validity or enforceability of the remainder of this Agreement will not be affected.

j. **Precedence.** In the event of conflict between the provisions of this Agreement and any attached Exhibit, the provisions of this Agreement will to the extent of such conflict take precedence.

k. **Compliance with Law.** Each Party and its employees and agents ("Personnel") shall, and each shall cause its contractors, consultants and subcontractors to, comply at their own expense with all applicable local, national, regional and international laws, ordinances, regulations and codes, standards, directives and international conventions and agreements, to the extent that any of the foregoing have the force of law by being directly enforceable by a governmental authority, a court or other proper tribunal, (collectively "Laws"), including, but not limited to, all applicable export and import laws and regulations and  the US Foreign Corrupt Practices Act ("FCPA") or similar laws in other countries, the UN Universal Declaration of Human Rights, child labor laws, data protection and privacy laws, criminal reporting laws or any other similar laws, and including, but not limited to, identifying and purchasing any and all required permits, certificates, licenses, insurance, approvals and inspections required in performance of each party's and/or each party's Personnel's obligations under this  Agreement.

l. **Dispute Resolution.** Except as specified in this Section 7.l, prior to initiating any proceedings, each party agrees to attempt to resolve any dispute, controversy or claim arising under or related to this Agreement, or the breach, termination, validity or enforceability of any provision hereof (a "Dispute"), through good-faith negotiations with the other party for a period of thirty (30) days after notice of the Dispute is given from one party to the other. If required during such thirty (30) day negotiation period, the parties agree to escalate the Dispute to the appropriate members of their respective management organization who have the power and authority to achieve a successful resolution. Nothing in this Agreement shall limit either Party's right to seek immediate injunctive or other equitable relief whenever the facts or circumstances would permit a Party to seek such relief in a court of competent jurisdiction.  Nothing in this Section 7.l shall be construed to prevent a party from exercising the party's right to terminate this Agreement in accordance with the terms hereof.

m. **Applicable Law.** This Agreement is made under and will be construed in accordance with the law of the State of New York without giving effect to that jurisdiction's choice of law rules. Each Party shall act in good faith in its performance under this Agreement, and where agreement, approval, acceptance or consent of either party is required by this Agreement, such action will not be unreasonably withheld, delayed or conditioned.

**Hewlett Packard**
Enterprise

contemporaneous communications, representations or agreements between the parties, whether oral or written, regarding the subject matter of this Agreement. The terms and conditions of this Agreement may not be changed except by an amendment signed by authorized representatives of each party.

**IN WITNESS WHEREOF**, each of HPE and ALLIANCE PARTNER has caused this Agreement to be signed and delivered by its duly authorized representative.

IDENTIDAD IOT                                              HEWLETT PACKARD ENTERPRISE

By: _____                    By: _____
    (*Authorized Signature*)                              (*Authorized Signature*)
Name: ___Andres Sanchez___                   Name: _____

Title: _____C.E.O_____                        Title: _____

Date: ____July 27 /2016____                       Date: _____

11



**Hewlett Packard
Enterprise**

## EXHIBIT A TO ALLIANCES TEAMING AGREEMENT

### HPE and IDENTIDAD IOT Joint Go-To-Market (J-GTM) Partnership

| | Activity | Description |
|---|---|---|
| 1 | **Issue Joint Press Announcement** | a) Announce the HPE-Identidad IOT partnership – highlighting the GTM Solution and Services, being powered by HPE Universal IoT Platform:<br><br>   i.   Through direct media (e.g. Online, Website, etc.)<br><br>   ii.   Through a conference or at an event (e.g., IoT World USA, Andicom, Futurecom, IoT Americas) |
| 2 | **Determine Target Customer Profiles** | a) Partner with Identidad IOT and build target customer profiles in Communications Service Provider (CSP) and Small & Medium Enterprise (SME) segments. The end customer profile may include:<br><br>   i.   Number of IoT Devices<br>   ii.   Number of IoT Applications<br>   iii.   Number of IoT Use Cases<br>   iv.   Type of IoT Use Cases<br>   v.   Type of IoT Industry Verticals<br><br>b) Support Identidad IOT in validating target accounts in Americas (North and South America) and confirming the addressable market in the region:<br><br>   i.   North America: U.S. Canada, and Mexico<br>   ii.   South America and the Caribbean<br><br>c) Determine whether HPE and Identidad IOT have existing customers who may be sales prospects |

1



**Hewlett Packard
Enterprise**

| 3 | **Develop Joint Sales Engagement Model and Governance** | a) Confirm sales ownerships: <br><br>    i.    Identidad IOT to provide overall sales ownership. <br><br>    ii.    HPE to provide IoT Domain Sales Representatives (DSRs) to partner with and work under the guidance of the Identidad IOT Sales Leader(s) or Account Principal(s) <br><br> b) Determine prime and sub, opportunity by opportunity, amongst the selected list of customers, in CSP and SME segments |
|---|---|---|
| 4 | **Develop Joint Solution Positioning and Service Delivery Models** | a) HPE to work with Identidad IOT to position the HPE Universal IoT Platform for all new IoT business pursuits and opportunities: <br><br>    i.    HPE to partner with Identidad IOT and help to position HPE Universal IoT Platform, as appropriate, for specific IoT Use Case, Industry Vertical, and Application <br><br>    ii.    HPE to work with Identidad IOT and assess if additional 3rd Party Partners (3PPs) will be necessary to be brought into the joint solution ecosystem and customer proposals (e.g. may be applicable to IoT Sensors, IoT Devices, IoT Gateways, and IoT Applications) <br><br> b) HPE to work with Identidad IOT to: <br><br>    i.    Identify and target IoT Platform solution proposal opportunities for 5,000 to 50,000 IoT Devices <br><br>    ii.    Offer service deliveries using as-a-Service (aaS) and On-Premise Models <br><br> Note: A brief Product Overview and Platform |

**Hewlett Packard**
Enterprise

| | | Architecture of the HPE Universal IoT Platform are provided below |
|---|---|---|
| 6 | **Develop Joint Technical Presales and Business Development Engagement Model** | a) Provide technical presales and business development subject matter expertise, as a part of the presales engagement stages, for all new business pursuits and opportunities, for the first year, from the effective date |
| 7 | **Develop Joint GTM Positioning Messaging, Marketing Materials and Artifacts** | a) Develop joint first-strike customer presentations |
| 8 | **Develop Business Case and ROIs** | a) Develop a joint value proposition, leverageable across all new business pursuits and opportunities<br><br>b) In necessary, develop a quick Return-on-Investment (RoI) analysis (e.g., may be subject to the exact type of IoT Use Case, Industry Vertical, and Application)<br><br>    i. The Return on Investment (RoI) exercise will require extra costs from HPE industry consultants that will be delivered at-cost by HPE<br><br>c) Develop and execute customer workshops |

**Hewlett Packard**
Enterprise

## Product Overview

The HPE Universal IoT Platform enables connection and information exchange between heterogeneous IoT sensors, devices, and gateways — standards-based as well as proprietary communication — and IoT applications. In doing so, it reduces dependency on legacy silo solutions and dramatically simplifies the integration of diverse devices with support for key communication protocols such as MQTT, LWM2M, DLMS/COSEM, HTTP/HTTPS, REST, CoAP, and others.

The platform architecture is aligned with oneM2M industry standard and built-in data models that are designed to be industry-, vertical-, and vendor-agnostic. The platform supports access to different southbound networks and technologies and various applications and processes from diverse application providers across multiple verticals on the northbound side — making it possible to support various industry-specific use cases on the same horizontal IoT platform.

The platform is IoT device vendor-independent and IoT network connectivity-agnostic (e.g., supports Cellular (3G/4G), LPWAN (LoRa), Short-Range (Wi-Fi, BLE, ZigBee, Z-Wave)). It also has security built directly into the platform's foundation, enabling end-to-end data and device protection throughout the lifecycle.

### IoT platform architecture



Standardized architecture streamlines onboarding new applications and manages information in a **unified, reliable, and flexible** end-to-end system.



4

**Hewlett Packard**
Enterprise

## Platform Architecture

The HPE Universal IoT Platform is composed of the following key modules:

- **Device and Service Management (DSM)**

  o The DSM module is the nerve center of the HPE Universal IoT Platform, which manages the end-to-end lifecycle of the IoT services and the associated gateways or devices and sensors. It provides a Web-based GUI for all the stakeholders to manage and consume the IoT services from the platform.

  o DSM manages the application and service registration, allowing applications to explore and subscribe oneM2M resources corresponding to the underlying gateways and sensors. DSM allows the service administrators to verify that the platform is efficiently setup with support for a wide range of devices over different access technologies thereby allowing for a rich set of application to be registered on the platform.

  o Hierarchical customer account modelling, coupled with the Role-Based Access Control (RBAC) mechanism, enables various mutually beneficial service models such as B2B, B2C, and B2B2C models.

- **Network Interworking Proxy (NIP)**

  o The NIP component provides a connected devices framework for managing and communicating with disparate IoT gateways and devices, and communicating over different types of underlying networks. With NIP, you get interoperability and information exchange between the heterogeneous systems deployed in the field and the uniform oneM2M-compliant resource mode supported by the HPE Universal IoT Platform. It's based on a "Distributed Message Queue" architecture and designed to deal with the three Vs—volume, variety, and velocity—typically associated with handling IoT data.

  o NIP is supported by the "Protocol Factory" for rapid development of the device controllers and proxies for onboarding new IoT protocols onto the platform. It has built-in device controllers and proxies for IoT vendor devices and other key IoT connectivity protocols such as MQTT, LWM2M, DLMS/COSEM, HTTP REST, and others.

- **Data Acquisition and Verification (DAV)**

  o DAV supports reliable bi-directional data communication between IoT applications in the cloud and IoT gateways and devices deployed in the field.

  o The DAV component uses the underlying NIP to interact and acquire IoT data and maintain it in a resource-oriented uniform data model aligned with oneM2M. This data model is completely agnostic to the device or application, so it's completely flexible and extensible.

  o IoT applications in turn can discover, access, and consume these resources on the northbound side using oneM2M-compliant HTTP REST interface.

**Hewlett Packard
Enterprise**

- **Data Analytics (DA)**

  - The data analytics module leverages HPE Vertica technology for discovery of meaning patterns in data collected from devices in conjunction with other application-specific externally imported data.

  - Vertica supports the creation, execution, and visualization environment for most types of analytics, including batch and real-time—based on "Complex-Event Processing"—for creating data insights that can be used for business analysis and monetized by sharing insights with partners.

  - IoT data analytics covers various types of analytical modelling such as descriptive—key performance indicator, social media, and geo-fencing, predictive determination, and prescriptive recommendation.

- **Operations and Business Support Systems (OSS/BSS)**

  - The BSS/OSS module provides a consolidated end-to-end view of devices, gateways, and network information. This module helps IoT operators to automate and prioritize key operational tasks, reduce downtime through faster resolution of infrastructure issues, improve service quality, and enhance human and financial resources needed for daily operations. The module uses field proven applications from HPE's own OSS portfolio such as Telecommunication Management Information Platform, Unified Correlation Analyzer, and Order Management.

- **Data Service Cloud (DSC)**

  - The DSC module enables advanced monetization models, especially fine-tuned for IoT and cloud-based offerings. DSC exposes the API from the DAV module to partners, developers, and customers with scalability, security, and control.

  - DSC also supports mashup for new content creation providing additional insight by combining embedded IoT data with internal and external data from other systems. This additional insight can provide value to other stakeholders outside the immediate IoT ecosystem, enabling monetization of such information.

  - Designer in DSC enables rapid development of IoT micro services through reusable components and modules, reducing the cost and time-to-market for IoT processes and applications. The DSC, a partner-oriented layer, securely manages the stakeholder lifecycle in B2B/B2B2C models.

# Exhibit

## "4"

## MASTER LEASE AND FINANCING AGREEMENT

This Master Lease and Financing Agreement Number 5348857849 (together with Annex A and Exhibits A and B attached hereto and hereby made a part hereof, this "Master Agreement") is entered into by and between Hewlett-Packard Financial Services Company, a Delaware corporation ("Lessor"), and Identidad Advertising Development LLC, a Florida Limited Liability Company ("Lessee"). Capitalized terms used in this Master Agreement without definition have the meanings specified in Annex A to this Master Agreement.

**1. MASTER AGREEMENT; SCHEDULES.** This Master Agreement sets forth the general terms and conditions upon which (a) Lessor shall lease to Lessee and Lessee shall lease from Lessor items of Hardware, Software or both (such Hardware and Software being collectively referred to as "Equipment") and (b) Lessor shall provide financing to Lessee for software program license fees or acquisition costs, maintenance fees, fees for other services, certain equipment acquisition costs, and other costs and one-time charges ("Financed Items") Lessee desires to finance hereunder. If Lessor and Lessee agree to a lease of particular Equipment (a "Lease") and/or a financing of particular Financed Items (a "Financing"), each item of Equipment and/or Financed Item will be described on a schedule in the form of Exhibit A, which schedule will incorporate this Master Agreement by reference ("Schedule"). Each Schedule, when executed by Lessee and Lessor, will constitute a separate Lease and/or Financing. If specific terms of a Schedule conflict with the terms of this Master Agreement, the provisions of the Schedule will control.

**2. ACCEPTANCE; INITIAL TERM AND TERM.** (a) <u>Acceptance</u>. Lessee shall unconditionally and irrevocably accept all Equipment under a Lease and, if applicable, all Financed Items subject to a Financing as soon as such Equipment is delivered and inspected by Lessee and found to be satisfactory. In the case of a Financing of Financed Items unrelated to any Equipment subject to a Lease, Lessee shall unconditionally and irrevocably accept such Financed Items as soon as it shall have become liable to pay for such Financed Items. In either case, Lessee will evidence such acceptance by executing and delivering to Lessor a properly completed Acceptance Certificate as soon as reasonably practicable. (b) <u>Initial Term of Leases and Term of Financings</u>. The Initial Term of each Lease and, if applicable, the Term of any related Financing stated in and evidenced by a Schedule executed pursuant to this Section 2 will begin on the Acceptance Date of the Equipment subject to that Lease and will continue for the period described in the applicable Schedule; the Term of each Financing stated in and evidenced by a Schedule executed pursuant to this Section 2 that is unrelated to any Lease will begin on the Acceptance Date for the related Financed Items and will continue for the period described in the applicable Schedule.

**3. RENT; LATE CHARGES.** As rent for the Equipment under any Lease and the Financed Items under any Financing (in either case, referred to in this Master Agreement and any Schedule as "Rent"), Lessee agrees to pay the amounts specified in the applicable Schedule on the due dates specified in the applicable Schedule. If any part of any Rent payment or other amount due under this Master Agreement is not paid within 10 days of its due date, Lessee agrees to pay Lessor: (a) in the first month, a late charge to compensate Lessor for collecting and processing the late amount, which late charge is stipulated and liquidated at the greater of $.05 per dollar of each delayed amount or $50; plus (b) a charge for every month after the first month in which the amount is late to compensate Lessor for the inability to reinvest the amount, which charge is stipulated and liquidated at 1-½% of the delayed amount per month (or the lesser rate that is the maximum rate allowable under applicable law).

**4. LEASES AND FINANCINGS NON-CANCELABLE; NET LEASES; WAIVER OF DEFENSES TO PAYMENT. IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT EACH LEASE AND FINANCING HEREUNDER SHALL BE NON-CANCELABLE, AND THAT EACH LEASE HEREUNDER IS A NET LEASE. LESSEE AGREES THAT IT HAS AN ABSOLUTE AND UNCONDITIONAL OBLIGATION TO PAY ALL RENT AND OTHER AMOUNTS WHEN DUE. LESSEE IS NOT ENTITLED TO ABATE OR REDUCE RENT OR ANY OTHER AMOUNT DUE, OR TO SET OFF ANY CHARGE AGAINST ANY SUCH AMOUNT. LESSEE HEREBY WAIVES ANY RECOUPMENT, CROSS-CLAIM, COUNTERCLAIM OR ANY OTHER DEFENSE AT LAW OR IN EQUITY TO ANY RENT PAYMENT OR OTHER AMOUNT DUE WITH RESPECT TO ANY LEASE OR FINANCING, WHETHER ANY SUCH DEFENSE ARISES OUT OF THIS MASTER AGREEMENT, ANY SCHEDULE, ANY CLAIM BY LESSEE AGAINST LESSOR, LESSOR'S ASSIGNEES OR SUPPLIER, OR OTHERWISE.**

**5. ASSIGNMENT OF PURCHASE DOCUMENTS.** Lessee assigns to Lessor all of Lessee's right, title and interest in and to (a) the Equipment described in each Schedule, and (b) the Purchase Documents relating to such Equipment. Such assignment of the Purchase Documents is an assignment of rights only; nothing in this Master Agreement shall be deemed to have relieved Lessee of any obligation or liability under any of the Purchase Documents, except that, as between Lessee and Lessor, Lessor shall pay for the Equipment within 30 days after Lessee's delivery to Lessor of a properly completed and executed Acceptance Certificate and all other documentation necessary to establish Lessee's acceptance of such Equipment under the related Lease. Lessee represents and warrants that it has reviewed and approved the Purchase Documents. In addition, if Lessor shall so request, Lessee shall deliver to Lessor a document acceptable to Lessor whereby Seller acknowledges and provides any required consent to such assignment. For the avoidance of doubt, Lessee covenants and agrees that it shall at all times during the Total Term of each Lease comply in all respects with the terms of any License Agreement relating to any Equipment leased thereunder. **IT IS ALSO SPECIFICALLY UNDERSTOOD AND AGREED THAT NEITHER SUPPLIER NOR ANY SALESPERSON OF SUPPLIER IS AN AGENT OF LESSOR, NOR ARE THEY AUTHORIZED TO WAIVE OR ALTER ANY TERMS OF THIS MASTER AGREEMENT OR ANY SCHEDULE.**

**6. ASSIGNMENT OF SUPPLIER WARRANTIES.** To the extent permitted, Lessor hereby assigns to Lessee, for the Total Term of any Lease, all Equipment warranties, indemnities, and representations provided in the applicable Purchase Documents. Lessee shall have the right to take any action it deems appropriate to enforce such warranties, indemnities and representations provided such enforcement is pursued in Lessee's name and at its expense. Any recovery resulting from any such enforcement efforts will be divided between Lessor and Lessee as their interests may appear.

HPFS US MLFAII (Rev. 03.24.15)

**7.  EQUIPMENT RETURN REQUIREMENTS.**  Not later than 5 days after the last day of the Total Term of each Lease (and any other time Lessee is required to return Equipment to Lessor under the terms of this Master Agreement or any Schedule), for all Equipment to be returned to Lessor, Lessee shall (a) remove any Lessee labels, tags or other identifying marks on the Equipment and wipe clean or permanently delete all data contained on the Equipment, including without limitation, any data contained on internal or external drives, discs, or accompanying media, (b) pack the Equipment in accordance with the manufacturer's guidelines, and (c) deliver such Equipment to Lessor at any destination within the continental United States designated by Lessor.  In the case of any item of Software to be returned to Lessor, Lessee shall also deliver to Lessor the original certificate of authenticity issued by the licensor of such Software, if any.  All dismantling, packaging, transportation, in-transit insurance and shipping charges shall be borne by Lessee.  All Equipment shall be returned to Lessor in the same condition and working order as when delivered to Lessee, reasonable wear and tear excepted, and, except in the case of PC Equipment and Software, shall qualify for maintenance service by the Supplier at its then standard rates for Equipment of that age, if available.  Lessee shall be responsible for, and shall reimburse Lessor promptly on demand for, the cost of returning the Equipment to good working condition or, in the case of Equipment other than PC Equipment and Software, qualifying the Equipment for the Supplier's maintenance service, if available.  The return of the Equipment shall constitute a full release by Lessee of any leasehold rights or possessory interest in the Equipment.

**8.  EQUIPMENT USE; MAINTENANCE AND ADDITIONS.**  Lessee shall, at its own expense, at all times during the applicable Total Term (a) operate and maintain the Equipment and other Collateral in good working order, repair and condition, and in accordance with the manufacturer's specifications and recommendations, (b) except in the case of PC Equipment and Software, maintain and enforce a maintenance agreement to service and maintain the Equipment, upon terms and with a provider reasonably acceptable to Lessor, such that the Equipment shall qualify for Maintenance Service at the time the Equipment is returned to Lessor, and (c) make all alterations or additions to the Equipment required by any applicable law, regulation or order.  Lessee shall make no alterations or additions to the Equipment or other Collateral, except those that will not void any warranty made by the Supplier of the Equipment, result in the creation of any security interest, lien or encumbrance on the Equipment or other Collateral or impair the value or use of the Equipment or other Collateral either at the time made or at the end of the Total Term of the applicable Lease, and that are readily removable without damage to the Equipment or other Collateral ("Optional Additions").  All additions to the Equipment or repairs made to the Equipment, except Optional Additions, become a part thereof and Lessor's property at the time made.  Optional Additions that have not been removed prior to the return of the Equipment shall become Lessor's property upon such return.  On at least 24 hours prior notice to Lessee, Lessor and Lessor's agents shall have the right, during Lessee's normal business hours, to enter the premises where the Equipment is located for the purpose of inspecting the Equipment.

**9.  EQUIPMENT OWNERSHIP; LIENS; LOCATION.**  As between Lessor and Lessee, Lessor is the sole owner of the Equipment and has sole title thereto.  Lessee covenants that it will not pledge or encumber any Collateral or Lessor's interest in any Collateral in any manner whatsoever nor create or permit to exist any levy, lien or encumbrance thereof or thereon except those created by or through Lessor.  The Equipment shall remain Lessor's personal property whether or not affixed to realty and shall not become a fixture or be made to become a part of any real property on which it is placed without Lessor's prior written consent.  If Lessee has been provided tags or identifying labels, Lessee will at Lessee's expense affix and maintain the same in a prominent position on each item of Equipment to indicate Lessor's ownership.  Lessee may relocate any Equipment or other Collateral from the Equipment Location specified in the applicable Schedule to another of its business locations within the United States upon prior written notice to Lessor specifying the new Equipment Location, provided Lessee remains in possession and control of the Equipment or other Collateral.  Lessee shall not locate or relocate any Equipment or other Collateral such that any third party comes into possession or control thereof without Lessor's prior written consent; provided, however, that Lessor shall not unreasonably withhold its consent to the location or relocation of Equipment or other Collateral to a third party co-location or hosting facility if such third party shall have executed and delivered to Lessor a waiver agreement in form and substance acceptable to Lessor pursuant to which, among other things, such third party shall have waived any rights to the Equipment and agreed to surrender the Equipment to Lessor in the event of a Lessee Default under this Master Agreement.

**10.  RISK OF LOSS AND INSURANCE.**  Lessee assumes any and all risk of loss or damage to the Equipment until such Equipment is returned to and received by Lessor in accordance with the terms and conditions of this Master Agreement.  Lessee agrees to keep the Equipment and other Collateral insured at Lessee's expense against all risks of loss from any cause whatsoever, including without limitation, loss by fire (including extended coverage), theft and damage, and such insurance shall cover not less than the (i) Stipulated Loss Value of the Equipment or (ii) with respect to any other Collateral, the replacement value thereof.  Lessee also agrees that it shall carry commercial general liability insurance in an amount not less than $2,000,000 total liability per occurrence.  Lessee shall cause Lessor and its affiliates, and its and their successors and assigns, to be named loss payees and additional insureds, as applicable, under such insurance policies. Each policy shall provide that the insurance cannot be canceled without at least 30 days prior written notice to Lessor, and no policy shall contain a deductible in excess of $25,000.  Lessee shall provide to Lessor (a) on or prior to the Acceptance Date for each Lease, and from time to time thereafter, certificates of insurance evidencing such insurance coverage throughout the Total Term of each Lease, and (b) upon Lessor's request, copies of the insurance policies.  If Lessee fails to provide Lessor with such evidence, then Lessor will have the right, but not the obligation, to purchase such insurance protecting Lessor at Lessee's expense.  Lessee's expense shall include the full premium paid for such insurance and any customary charges, costs or fees of Lessor.  Lessee agrees to pay such amounts in substantially equal installments allocated to each Rent payment (plus interest on such amounts at the rate of 1-1/2% per month or such lesser rate as is the maximum rate allowable under applicable law).

**11.  CASUALTY LOSS.**  Lessee shall notify Lessor of any Casualty Loss or repairable damage to any Equipment not later than 30 days following the date of any such occurrence.  In the event any Casualty Loss shall occur, on the next Rent payment date Lessee shall pay Lessor the Stipulated Loss Value of the Equipment suffering the Casualty Loss.  Upon Lessor's receipt of such payment of Stipulated Loss Value in full: (a) Lessor shall transfer to Lessee all of Lessor's interest in the Equipment suffering the Casualty Loss "AS IS, WHERE IS,"

2

without any warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor, (b) the applicable Lease shall terminate as it relates to such Equipment, and (c) except as provided in Section 26(m), Lessee shall be relieved of all obligations under the applicable Lease as it relates to such Equipment.  In the event of any repairable damage to any Equipment, the Lease shall continue with respect to such Equipment without any abatement of Rent and Lessee shall at its expense cause such Equipment to be repaired to the condition it is required to be maintained in pursuant to Section 8 not later than 30 days from the date of the occurrence.

**12.  TAXES.**  Lessor shall report and pay all Taxes now or hereafter imposed or assessed by governmental body, agency or taxing authority upon the purchase, ownership, delivery, installation, leasing, rental, use or sale of the Equipment, the Rent or other charges payable hereunder, or otherwise upon or in connection with any Lease or Financing, whether assessed on Lessor or Lessee, other than any such Taxes required by law to be reported and paid by Lessee.  Lessee shall within 30 days of invoice reimburse Lessor for all such Taxes paid by Lessor, together with any penalties or interest in connection therewith attributable to Lessee's acts or failure to act, excluding (a) Taxes on or measured by the overall gross or net income or items of tax preference of Lessor, (b) as to any Lease or the related Equipment, Taxes attributable to the period after the return of such Equipment to Lessor, and (c) Taxes imposed as a result of a sale or other transfer by Lessor of any portion of its interest in any Lease or Financing or in any Equipment, except for a sale or other transfer to Lessee or a sale or other transfer occurring after and during the continuance of any Lessee Default.

**13.  GENERAL INDEMNITY.**  Lessee shall indemnify, defend and hold harmless Lessor, its employees, officers, directors, agents and assignees from and against any and all Claims arising out of or in connection with any matter involving this Master Agreement, the Equipment, the Financed Items or any Lease and/or Financing.

**14.  TAX BENEFIT INDEMNITY.**  Lessor and Lessee agree that Lessor is entitled to certain federal, state and local tax benefits available to an owner of Equipment (collectively, "Tax Benefits"), including without limitation, accelerated cost recovery system deductions for 5-year property and deductions for interest incurred by Lessor to finance the purchase of Equipment available under the Code.  Lessee represents, warrants and covenants to Lessor that (a) Lessee is not a tax-exempt entity (as defined in Section 168(h) of the Code); (b) all Equipment will be used solely within the United States; and (c) Lessee will take no position inconsistent with the assumption that Lessor is the owner of the Equipment for federal, state, and local tax purposes.  If, due to any act or omission of Lessee or any party acting through Lessee, or the breach or inaccuracy of any representation, warranty or covenant of Lessee contained in any Fundamental Agreement, Lessor reasonably determines that it cannot claim, is not allowed to claim, loses or must recapture any or all of the Tax Benefits otherwise available with respect to the Equipment subject to any Lease (a "Tax Loss"), then Lessee shall, promptly upon demand, pay to Lessor an amount sufficient to provide Lessor the same after-tax rate of return and aggregate after-tax cash flow through the end of the Then Applicable Term of such Lease that Lessor would have realized but for such Tax Loss.

**15.  COVENANT OF QUIET ENJOYMENT.**  So long as no Lessee Default exists, and no event shall have occurred and be continuing which, with the giving of notice or the passage of time or both, would constitute a Lessee Default neither Lessor nor any party acting or claiming through Lessor, by assignment or otherwise, will disturb Lessee's quiet enjoyment of the Equipment during the Total Term of the related Lease.

**16.  DISCLAIMERS AND LESSEE WAIVERS.  LESSEE LEASES THE EQUIPMENT FROM LESSOR "AS IS, WHERE IS".  IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT (A) EXCEPT AS EXPRESSLY SET FORTH IN SECTION 15, LESSOR MAKES ABSOLUTELY NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY, OPERATION, OR CONDITION OF ANY EQUIPMENT OR FINANCED ITEMS (OR ANY PART THEREOF), THE MERCHANTABILITY OR FITNESS OF EQUIPMENT OR FINANCED ITEMS FOR A PARTICULAR PURPOSE, OR ISSUES REGARDING PATENT INFRINGEMENT, TITLE AND THE LIKE; (B) LESSOR SHALL NOT BE DEEMED TO HAVE MADE, BE BOUND BY OR LIABLE FOR, ANY REPRESENTATION, WARRANTY OR PROMISE MADE BY THE SUPPLIER OF ANY EQUIPMENT OR FINANCED ITEMS (EVEN IF LESSOR IS AFFILIATED WITH SUCH SUPPLIER); (C) LESSOR SHALL NOT BE LIABLE FOR ANY FAILURE OF ANY EQUIPMENT OR FINANCED ITEMS OR ANY DELAY IN THE DELIVERY OR INSTALLATION THEREOF; (D) LESSEE HAS SELECTED ALL EQUIPMENT AND FINANCED ITEMS WITHOUT LESSOR'S ASSISTANCE; AND (E) LESSOR IS NOT A MANUFACTURER OF ANY EQUIPMENT.  IT IS FURTHER AGREED THAT LESSOR SHALL HAVE NO LIABILITY TO LESSEE OR ANY THIRD PARTIES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS MASTER AGREEMENT OR ANY SCHEDULE OR CONCERNING ANY EQUIPMENT OR FINANCED ITEMS, OR FOR ANY DAMAGES BASED ON STRICT OR ABSOLUTE TORT LIABILITY OR LESSOR'S NEGLIGENCE; PROVIDED, HOWEVER, THAT NOTHING IN THIS MASTER AGREEMENT SHALL DEPRIVE LESSEE OF ANY RIGHTS IT MAY HAVE AGAINST ANY PERSON OTHER THAN LESSOR.  LESSOR AND LESSEE AGREE THAT THE LEASES AND THE FINANCINGS SHALL BE GOVERNED BY THE EXPRESS PROVISIONS OF THIS MASTER AGREEMENT AND THE OTHER FUNDAMENTAL AGREEMENTS AND NOT BY THE CONFLICTING PROVISIONS OF ANY OTHERWISE APPLICABLE LAW.  ACCORDINGLY, TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE WAIVES THOSE RIGHTS AND REMEDIES AGAINST A LESSOR CONFERRED UPON A LESSEE BY ARTICLE 2A OF THE UCC AND THOSE RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE, IN EITHER CASE THAT ARE INCONSISTENT WITH OR THAT WOULD LIMIT OR MODIFY LESSOR'S RIGHTS SET FORTH IN THIS MASTER AGREEMENT.**

**17.  LESSEE WARRANTIES.**  Lessee represents, warrants and covenants to Lessor that as of the date of this Master Agreement and for so long as this Master Agreement shall remain in effect:  (a) ALL EQUIPMENT AND FINANCED ITEMS WILL BE USED FOR BUSINESS PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES; (b) Lessee is duly organized, validly existing and in good standing under applicable law; (c) Lessee has the power and authority to enter into each of the Fundamental Agreements; (d) all

3

Fundamental Agreements are enforceable against Lessee in accordance with their terms and do not violate or create a default under any instrument or agreement binding on Lessee; (e) as of the date of its execution of this Master Agreement and as of the Acceptance Date of any Equipment or Financed Items, there are no pending or threatened actions or proceedings before any court or administrative agency that could reasonably be expected to have a material adverse effect on Lessee or any Fundamental Agreement, unless such actions are disclosed to Lessor and consented to in writing by Lessor; (f) Lessee shall comply  with the requirements of all applicable laws and regulations the violation of which could have an  adverse effect upon any Collateral, Lessor's rights and remedies under any Fundamental Agreement or Lessee's performance of its obligations under any Fundamental Agreement; (g) each Fundamental Agreement shall be effective against all creditors of Lessee under applicable law, including fraudulent conveyance and bulk transfer laws, and shall raise no presumption of fraud; (h) all financial statements and other related information furnished by Lessee shall be prepared in accordance with generally accepted accounting principles and shall fairly present Lessee's financial position as of the dates given on such statements; (i) Lessee's name set forth in the signature block below is Lessee's full and accurate legal name; (j) Lessee is a Limited Liability Company organized under the laws of Florida; (k) Lessee's "location" (within the meaning of UCC Section 9-307) is 7950 NW 53rd Street, Suite 132, Doral, FL  33166; (l) Lessee's organizational number assigned to it by its jurisdiction of organization is L02000009688; (m) Lessee's federal tax identification number is 14-1842840; (n) Lessee is familiar with the provisions of all applicable Anti-Corruption Laws, and shall not in connection with any Fundamental Agreement: (I) make any  improper payment or transfer anything of value, offer, promise or give a financial or other advantage or request to, or agree to receive or accept a financial or other advantage from, either directly or indirectly, any government official or government employee (including employees of a government corporation or public international organization) or to any political party or candidate for public office or to any other person or entity with an intent to obtain or retain business or otherwise gain an improper business advantage; or (II) take any action which would cause Lessor to be in violation of any Anti-Corruption Laws; (o) Lessee and all Lessee Affiliates do not export, re-export, or transfer any Equipment, Software, System Software or source code or any direct product thereof to a prohibited destination, or to nationals of proscribed countries wherever located, without prior authorization from the United States and other applicable governments; (p) Lessee and all Lessee Affiliates do not use any Equipment, Software or System Software or technology, technical data, or technical assistance related thereto or the products thereof in the design, development, or production of nuclear, missile, chemical, or biological weapons or transfer the same to a prohibited destination, or to nationals of proscribed countries wherever located, without prior authorization from the United States and other applicable governments; and (r) Lessee and all Lessee Affiliates are not entities designated by the United States government or any other applicable government with which transacting business without the prior consent of such government is prohibited. Lessee agrees to provide Lessor advance written notice of any change in any of the representations and covenants set forth in clauses (i) through (m) of this Section 17 and will promptly notify Lessor if it becomes aware of any violation of the representations and covenants set forth in clause (n) of this Section 17.

**18.  DEFAULT.**  Any of the following shall constitute a default by Lessee (a "Lessee Default") under this Master Agreement and all Leases and Financings: (a) Lessee fails to pay any Rent payment or any other amount payable to Lessor under this Master Agreement or any Schedule within 10 days after its due date; or (b) Lessee defaults on or breaches any of the other terms and conditions of any Material Agreement, and fails to cure such breach within 10 days after written notice thereof from Lessor; or (c) any representation or warranty made by Lessee in any Material Agreement proves to be incorrect in any material respect when made or reaffirmed; or (d) any change occurs in relation to Lessee's or Guarantor's business, management, ownership or financial condition that would have a material adverse effect on Lessee's ability to perform its obligations under this Master Agreement or any Schedule or Guarantor's ability to perform its obligations under its guaranty; or (e) Lessee or Guarantor dissolves or otherwise terminates its existence, ceases to do business or becomes insolvent or fails generally to pay its debts as they become due; or (f) any Collateral is levied against, seized or attached; or (g) Lessee or Guarantor makes an assignment for the benefit of creditors; or (h) a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency or receivership law is filed by or against Lessee or Guarantor (and, if such proceeding is involuntary, it is not dismissed within 60 days after the filing thereof) or Lessee or Guarantor takes any action to authorize any of the foregoing matters; or (i) any letter of credit or guaranty issued in support of a Lease or Financing is revoked, breached, cancelled or terminated (unless consented to in advance in writing by Lessor); or (j) any Guarantor fails to fulfill its obligations in favor of Lessor pursuant to its guaranty.

**19.  REMEDIES.**  If a Lessee Default occurs, Lessor may, in its sole discretion, exercise one or more of the following remedies: (a) declare all amounts due and to become due under any or all Leases and Financings to be immediately due and payable; or (b) terminate this Master Agreement or any Lease or Financing; or (c) take possession of, or render unusable, any Collateral wherever such Collateral may be located, without demand or notice and without any court order or other process of law in accordance with Lessee's reasonable security procedures, and no such action shall constitute a termination of any Lease or Financing; or (d) require Lessee to deliver the Collateral to a location specified by Lessor; or (e) declare the Stipulated Loss Value for any or all Equipment to be due and payable as liquidated damages for loss of a bargain and not as a penalty and in lieu of any further Rent payments under the applicable Lease or Leases; or (f) proceed by court action to enforce performance by Lessee of any Lease or Financing and/or to recover all damages and expenses incurred by Lessor by reason of any Lessee Default; or (g) terminate any other agreement that Lessor may have with Lessee; or (h) exercise any other right or remedy available to Lessor at law or in equity.  Also, Lessee shall pay Lessor all costs and expenses that Lessor may incur to maintain, safeguard or preserve the Collateral, and other expenses incurred by Lessor in enforcing any of the terms, conditions or provisions of this Master Agreement (including reasonable legal fees and collection agency costs).  Upon repossession or surrender of any Equipment or Collateral, Lessor may lease, sell or otherwise dispose of the Equipment and/or Collateral in a commercially reasonable manner, with or without notice and at public or private sale, and apply the net proceeds thereof to the amounts owed to Lessor hereunder, but only after deducting (1) in the case of a sale, the estimated Fair Market Value of the Equipment sold as of the scheduled expiration of the Then Applicable Term of the related Lease, (2) in the case of a lease, the rent due for any period beyond the scheduled expiration of the Then Applicable Term of the related Lease, and (3) in either case, all expenses (including reasonable legal fees and costs) incurred by Lessor in connection therewith, or propose to retain any or all of the Equipment and/or Collateral in full or partial satisfaction, as the case may be, of amounts owed to Lessor hereunder; provided, however, that Lessee shall remain liable to Lessor for any deficiency that remains after any

4

sale, lease or retention by Lessor of such Equipment or other Collateral.  Any proceeds of any sale or lease of such Equipment in excess of the amounts owed to Lessor hereunder shall be retained by Lessor.  Lessee agrees that with respect to any notice of a sale required by law to be given, 10 days' notice shall constitute reasonable notice.  Upon payment of all past due Rent and the Stipulated Loss Value as provided in clause (e) above, together with interest at the rate of 1-1/2% per month (or such lesser rate as is the maximum rate allowable under applicable law) from the date declared due until paid, Lessor will transfer to Lessee all of Lessor's interest in the Equipment for which such Rent and Stipulated Loss Value has been paid, which transfer shall be on an "AS IS, WHERE IS" basis, without any warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor.  With respect to any exercise by Lessor of its right to recover and/or dispose of any Equipment or other Collateral securing Lessee's obligations under any Schedule, Lessee acknowledges and agrees as follows: (i) Lessor shall have no obligation, subject to the requirements of commercial reasonableness, to clean-up or otherwise prepare the Equipment or any other Collateral for disposition, (ii) Lessor may comply with any applicable state or Federal law requirements in connection with any disposition of the Equipment or other Collateral, and any actions taken in connection therewith shall not be deemed to have adversely affected the commercial reasonableness of any such disposition, and (iii) Lessor may convey the Equipment and any other Collateral on an "AS IS, WHERE IS" basis, and without limiting the generality of the foregoing, may specifically exclude or disclaim any and all warranties, including any warranty of title or the like with respect to the disposition of the Equipment or other Collateral, and no such conveyance or such exclusion or such disclaimer of any warranty shall be deemed to have adversely affected the commercial reasonableness of any such disposition.  These remedies are cumulative of every other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise, and may be enforced concurrently or separately from time to time.

**20.  PERFORMANCE OF LESSEE'S OBLIGATIONS.**  If Lessee fails to perform any of its obligations hereunder, Lessor may perform any act or make any payment that Lessor deems reasonably necessary for the preservation of Lessor's interests therein; provided, however, that the performance of any act or payment by Lessor shall not be deemed a waiver or release of Lessee from the obligation at issue. All sums so paid by Lessor, together with expenses (including legal fees and costs) incurred by Lessor in connection therewith, shall be paid to Lessor by Lessee immediately upon demand.

**21.  TRUE LEASE; SECURITY INTEREST; MAXIMUM RATE.**  Each Lease is intended to be a "Finance Lease" as defined in Article 2A of the UCC.  The parties' intent that each Lease be a "Finance Lease" within the meaning of Article 2A of the UCC shall have no effect on the characterization of any Lease for accounting purposes, which characterization shall be made by each party independently on the basis of generally accepted accounting principles.  Lessee, by its execution of each Schedule, acknowledges that Lessor has informed it that (a) the identity of Seller is set forth in the applicable Schedule, (b) Lessee is entitled under Article 2A of the UCC to the promises and warranties, including those of any third party, provided to Lessor in connection with, or as a part of, the applicable Purchase Documents, and (c) Lessee may communicate with Seller and receive an accurate and complete statement of the promises and warranties, including any disclaimers and limitations of them or of remedies.  If (1) notwithstanding the express intention of Lessor and Lessee to enter into a true lease, any Lease is ever deemed by a court of competent jurisdiction to be a lease intended for security, or (2) Lessor and Lessee enter into a Lease with the intention that it be treated as a lease intended as security by so providing in the applicable Schedule, or (3) Lessor and Lessee enter into a Financing, then to secure payment and performance of Lessee's obligations under this Master Agreement and all Leases and Financings, Lessee hereby grants Lessor a purchase money security interest in all of the Collateral.  Lessee hereby authorizes Lessor to file a financing statement to give public notice of a) Lessor's ownership of the Equipment and, b) in the case of any Financing or lease intended for security, its security interest in any Collateral.  Notwithstanding any provisions contained in this Master Agreement or in any Schedule, neither Lessor nor any Assignee shall be entitled to receive, collect or apply as interest any amount in excess of the maximum rate or amount permitted by applicable law.  In the event Lessor or any Assignee ever receives, collects or applies as interest any amount in excess of the maximum amount permitted by applicable law, such excess amount shall be applied to the unpaid principal balance and any remaining excess shall be refunded to Lessee.  In determining whether the interest paid or payable under any specific contingency exceeds the maximum rate or amount permitted by applicable law, Lessor and Lessee shall, to the maximum extent permitted under applicable law, characterize any non-principal payment as an expense or fee rather than as interest, exclude voluntary prepayments and the effect thereof, and spread the total amount of interest over the entire term of this Master Agreement and all Leases and Financings.

**22.  ASSIGNMENT.**  Lessor shall have the unqualified right to sell, assign, grant a security interest in or otherwise convey any part of its interest in this Master Agreement, any Lease or Financing or any Equipment or other Collateral, in whole or in part, without prior notice to or the consent of Lessee.  If any Lease or Financing is sold, assigned, or otherwise conveyed, Lessee agrees that (a) Assignee shall (1) have the same rights, powers and privileges that Lessor has under the applicable Lease or Financing, and (2) have the right to receive from Lessee all amounts due under the applicable Lease or Financing, in either case, to the extent assigned; and (b) it may not require Assignee to perform any obligations of Lessor, other than those that are expressly assumed in writing by Assignee.  Lessee agrees to execute such acknowledgements thereto as may be reasonably requested by Lessor or Assignee.  Lessee further agrees that in any action brought by such Assignee against Lessee to enforce Lessor's rights hereunder, Lessee will not assert against such Assignee any set-off, defense or counterclaim that Lessee may have against Lessor, Assignee, or any other person.  Unless otherwise specified by Lessor and Assignee, Lessee shall continue to pay all amounts due under the applicable Lease or Financing to Lessor; provided, however, that upon notification from Lessor and Assignee, Lessee covenants to pay all amounts due under the applicable Lease or Financing to Assignee when due and as directed in such notice.  Lessee further agrees that any Assignee may further sell, assign, grant a security interest in or otherwise convey its rights and interests under the applicable Lease or Financing with the same force and effect as the assignment described herein.  Lessee may not assign, transfer, sell, sublease, pledge or otherwise dispose of this Master Agreement, any Lease or Financing, any Equipment or any interest therein.

**23. TERM OF MASTER AGREEMENT.** THIS MASTER AGREEMENT SHALL COMMENCE AND BE EFFECTIVE UPON THE EXECUTION HEREOF BY BOTH PARTIES AND SHALL CONTINUE IN EFFECT UNTIL TERMINATED BY EITHER PARTY BY 30 DAYS' PRIOR WRITTEN NOTICE TO THE OTHER. HOWEVER, NO TERMINATION OF THIS MASTER AGREEMENT PURSUANT TO THE PRECEDING SENTENCE SHALL BE EFFECTIVE WITH RESPECT TO ANY LEASE OR FINANCING THAT COMMENCED PRIOR TO SUCH TERMINATION UNTIL THE EXPIRATION OR TERMINATION OF SUCH LEASE OR FINANCING AND THE SATISFACTION BY LESSEE OF ALL OF ITS OBLIGATIONS HEREUNDER WITH RESPECT THERETO.

**24. WAIVER OF JURY TRIAL.** LESSEE AND LESSOR HEREBY EXPRESSLY WAIVE ANY RIGHT TO DEMAND A JURY TRIAL WITH RESPECT TO ANY ACTION OR PROCEEDING INSTITUTED BY LESSOR OR LESSEE IN CONNECTION WITH THIS MASTER AGREEMENT OR ANY FUNDAMENTAL AGREEMENT.

**25. NOTICES.** All notices, requests, demands, waivers and other communications required or permitted to be given under this Master Agreement or any other Fundamental Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or mailed via certified mail or a nationally recognized overnight courier service, or sent by confirmed facsimile transmission, addressed as follows (or such other address or fax number as either party shall so notify the other):

| If to Lessor: | If to Lessee: |
|---|---|
| Hewlett-Packard Financial Services Company | Identidad Advertising Development LLC |
| 200 Connell Drive, Suite 5000 | 7950 NW 53rd Street, Suite 132 |
| Berkeley Heights, NJ 07922 | Doral, FL 33166 |
| Attn: Director of Operations, Americas | Attn: |
| Fax: (908) 898-4882 | Fax: |

**26. MISCELLANEOUS.**
**(a) Governing Law.** THIS MASTER AGREEMENT AND EACH LEASE AND FINANCING SHALL BE GOVERNED BY THE INTERNAL LAWS (AS OPPOSED TO CONFLICTS OF LAW PROVISIONS) OF THE STATE OF NEW JERSEY.
**(b) Consent to Jurisdiction.** Lessor and Lessee consent to the jurisdiction of any local, state or Federal court located within the State of New Jersey and waive any objection relating to improper venue or forum non-conveniens to the conduct of any proceeding in any such court.
**(c) Credit Review.** Lessee consents to a credit review by Lessor for each Lease and Financing.
**(d) Further Assurances.** Lessee agrees to promptly execute and deliver to Lessor such further documents and take such further action as Lessor may require in order to more effectively carry out the intent and purpose of this Master Agreement and any Schedule. Without limiting the generality of the foregoing, Lessee agrees (a) to furnish to Lessor from time to time, its certified financial statements, officer's certificates and appropriate resolutions, opinions of counsel and such other information and documents as Lessor may reasonably request, and (b) to execute and timely deliver to Lessor any documents that Lessor deems necessary under applicable law to perfect or protect Lessor's security interest in the Collateral or to evidence Lessor's ownership interest therein as the case may be; provided, however, that Lessee authorizes Lessor to file any such financing statement or other document without Lessee's authentication to the extent permitted by applicable law. It is also agreed that Lessor or Lessor's agent may, and is hereby authorized to, file as a financing statement, any lease document (or copy thereof, where permitted by law) that Lessor deems appropriate to perfect or protect Lessor's security interest in the Collateral or to evidence Lessor's ownership interest therein. Upon demand, Lessee will promptly reimburse Lessor for any filing or recordation fees or expenses (including legal fees and costs) incurred by Lessor in perfecting or protecting its interests in any Collateral or the Equipment.
**(e) Captions and References.** The captions contained in this Master Agreement and any Schedule are for convenience only and shall not affect the interpretation of this Master Agreement. All references in this Master Agreement to Sections, Annexes and Exhibits refer to Sections hereof, Annexes hereof and Exhibits hereto unless otherwise indicated.
**(f) Entire Agreement; Amendments.** This Master Agreement and all other Fundamental Agreements executed by both Lessor and Lessee constitute the entire agreement between Lessor and Lessee relating to the leasing of the Equipment and the financing of Financed Items, and supersede all prior agreements relating thereto, whether written or oral, and may not be amended or modified except in a writing signed by the parties hereto.
**(g) No Waiver.** Any failure of Lessor to require strict performance by Lessee, or any written waiver by Lessor of any provision hereof, shall not constitute consent or waiver of any other breach of the same or any other provision hereof.
**(h) Lessor Affiliates.** Lessee understands and agrees that Hewlett-Packard Financial Services Company or any affiliate or subsidiary thereof may, as lessor, execute Schedules under this Master Agreement, in which event the terms and conditions of the applicable Schedule and this Master Agreement, as it relates to the lessor under such Schedule, shall be binding upon and shall inure to the benefit of such entity executing such Schedule as lessor, as well as any successors or assigns of such entity. Lessee agrees that Lessor may disclose any information provided by Lessee to any parent or affiliate of Lessor. In the States of Alabama and New York Lessor is authorized to do business in the name of Hewlett-Packard Financial Services Company Inc. and any documents executed in connection with this Master Agreement which are determined to be doing business in such states when signed in the name of Hewlett-Packard Financial Services Company shall be deemed to be executed by Hewlett-Packard Financial Services Company Inc.
**(i) Lessee Affiliates.** A Lessee Affiliate may enter into a Lease or Financing under and subject to the terms and conditions of this Master Agreement by executing a Schedule incorporating this Master Agreement by reference, in which case such Lessee Affiliate shall be deemed, for purposes of such Lease or Financing, to be the "Lessee" under this Master Agreement. The undersigned Lessee hereby unconditionally guarantees to Lessor the full and prompt payment, observance and performance when due of all obligations of all Lessee Affiliates (collectively, "Guaranteed Obligations") under all such Leases and Financings. The foregoing guarantee is absolute, continuing, unlimited and independent and shall not be affected, diminished or released for any reason whatsoever. The undersigned Lessee waives diligence,

presentment, demand for payment, protest or notice of any Lessee Default or nonperformance by any Lessee Affiliate, all affirmative defenses, offsets and counterclaims against Lessor, any right to the benefit of any security or statute of limitations, and any requirement that Lessor proceed first against a Lessee Affiliate or any collateral security.  Until the Guaranteed Obligations shall have been paid in full, Lessee shall have no right of subrogation.

**(j) Invalidity.**  If any provision of this Master Agreement or any Schedule shall be prohibited by or invalid under law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Master Agreement or such Schedule.

**(k) Counterparts.**  This Master Agreement may be executed in counterparts, which collectively shall constitute one document.

**(l)  Lessor Reliance.**  In connection with its execution of this Master Agreement, Lessee shall deliver to Lessor an officer's certificate (or partner's or member's certificate as appropriate) in form and substance acceptable to Lessor, executed by a duly authorized officer (or partner or member) of Lessee and certifying as to, among other things, Lessee's authority to enter into this Master Agreement and Leases and Financings hereunder and the authority of Lessee's officers or representatives specified therein to execute this Master Agreement and all other Fundamental Agreements. Lessor may act in reliance upon any instruction, instrument or signature reasonably believed by Lessor in good faith to be genuine.  Lessor may assume that any employee of Lessee who executes any document or gives any written notice, request or instruction has the authority to do so.

**(m) Survival.**  All representations, warranties and covenants made by Lessee hereunder shall survive the termination of this Master Agreement and shall remain in full force and effect.  All of Lessor's rights, privileges and indemnities under this Master Agreement or any Lease or Financing, to the extent they are fairly attributable to events or conditions occurring or existing on or prior to the expiration or termination of such Lease or Financing, shall survive such expiration or termination and be enforceable by Lessor and Lessor's successors and assigns.

**27.  Lessee acknowledges that neither this Master Agreement nor any other Fundamental Agreement may be amended or modified except by a writing signed by Lessor and Lessee.  Lessee Initials:** _____.

**IN WITNESS WHEREOF, LESSEE AND LESSOR HAVE EXECUTED THIS MASTER AGREEMENT ON THE DATES SPECIFIED BELOW.**

LESSEE:
IDENTIDAD ADVERTISING
DEVELOPMENT LLC

By: _____

Name: Gabriel Sanchez

Title: C.E.O

Date: July 27 2016

LESSOR:
HEWLETT-PACKARD FINANCIAL SERVICES
COMPANY

By: _____

Name: _____

Title: _____

Date: _____

7

## MASTER LEASE AND FINANCING AGREEMENT ANNEX A

Capitalized terms used in the Master Lease and Financing Agreement Number 5348857849 by and between Hewlett-Packard Financial Services Company and Identidad Advertising Development LLC ("Master Agreement") without definition shall have the following respective meanings, and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to the Master Agreement.

"**Acceptance Certificate**" means an acceptance certificate in substantially the form of Exhibit B executed by Lessee and delivered to Lessor in accordance with Section 2 of the Master Agreement.

"**Acceptance Date**" means the effective date of Lessee's acceptance of the Equipment or Financed Item(s) as referenced on the Acceptance Certificate for such Equipment and/or Financed Item(s).

"**Anti-Corruption Laws**" means the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act and other analogous anti-corruption legislation in other jurisdictions in which Lessee conducts business or which otherwise apply to Lessee collectively, and with related regulations.

"**Assignee**" means any assignee of all or any portion of Lessor's interest in the Master Agreement, any Schedule or any Equipment, whether such assignee received the assignment of such interest from Lessor or a previous assignee of such interest.

"**Casualty Loss**" means, with respect to any Equipment, the condemnation, taking, loss, destruction, theft or damage beyond repair of such Equipment.

"**Casualty Value**" means, as to any Equipment, an amount determined as of the date of the Casualty Loss or Lessee Default in question pursuant to a "Table of Casualty Values" attached to the applicable Schedule or, if no "Table of Casualty Values" is attached to the applicable Schedule, an amount equal to the sum of (a) the present value as of the date of the Casualty Loss or Lessee Default in question (discounted at 3% per annum, compounded monthly) of all Rent payments payable after such date through the scheduled date of expiration of the Then Applicable Term, plus (b) the present value as of the date of the Casualty Loss or Lessee Default in question (discounted at 3% per annum, compounded monthly, from the scheduled date of expiration of the Then Applicable Term) of an amount determined by multiplying the applicable casualty percentage specified below by the Total Cost of such Equipment. The applicable casualty percentage shall be 50% for Equipment having an Initial Term of less than 24 months; 40% for Equipment having an Initial Term of 24 months or greater, but less than 36 months; 30% for Equipment having an Initial Term of 36 months or greater, but less than 48 months; and 25% for Equipment having an Initial Term of 48 months or greater.

"**Claims**" means all claims, actions, suits, proceedings, costs, expenses (including, without limitation, court costs, witness fees and attorneys' fees), damages, obligations, judgments, orders, penalties, fines, injuries, liabilities and losses, including, without limitation, actions based on Lessor's strict liability in tort.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means, with respect to any Lease or Financing, all Equipment and Financed Items and any and all attachments, accessories, additions, general intangibles, substitutions, products, replacements, rentals, and any right, title or interest in any software used to operate or otherwise installed in any of the foregoing, and proceeds (including, without limitation, insurance proceeds) thereof, as well as any and all other equipment financed pursuant to this Master Agreement or any other agreement between Lessor and Lessee and all other collateral furnished by Lessee to secure Lessee's obligations under any Schedule.

"**Daily Rent**" means, as to any Lease or Financing, an amount equal to the per diem Rent payable under the applicable Schedule.

"**End-of-Term Notice**" has the meaning specified in the applicable Schedule.

"**Equipment**" has the meaning specified in Section 1 of the Master Agreement.

"**Equipment Location**" means, as to any Equipment or other Collateral, the address at which such Equipment or other Collateral is located from time to time, as originally specified in the applicable Schedule and as subsequently specified in a notice delivered to Lessor pursuant to Section 9 of the Master Agreement, if applicable.

"**Fair Market Value**" means the total retail price that would be paid for any specified Equipment in an arm's length transaction between an informed and willing buyer under no compulsion to buy and an informed and willing seller under no compulsion to sell. Such total price shall not be reduced by the costs of removing such Equipment from its current location or moving it to a new location.

"**Fair Rental Value**" means the amount of periodic rent that would be payable for any specified Equipment in an arm's length transaction between an informed and willing lessee and an informed and willing lessor, neither under compulsion to lease. Such amount shall not be reduced by the costs of removing such Equipment from its current location or moving it to a new location.

"**Final Invoice Amount**" has the meaning set forth in the applicable Schedule.

"**Financed Item**" has the meaning specified in Section 1 of the Master Agreement.

"**Financing**" has the meaning specified in Section 1 of the Master Agreement.

"**First Payment Date**" means, as to any Lease or Financing, the date the first Rent payment with respect to the Initial Term of such Lease or the Term of such Financing (as applicable) is due, as determined pursuant to the terms of the applicable Schedule.

"**Fundamental Agreements**" means, collectively, the Master Agreement, each Schedule and Acceptance Certificate and all other related instruments and documents.

"**Funding Date**" means, with respect to any Financed Item, the date Lessor makes funds available to the Seller of such Financed Item to pay for the same or to Lessee to reimburse Lessee for its payment of the same.

"**Guaranteed Obligations**" has the meaning specified in Section 26(i) of the Master Agreement.

"**Guarantor**" means any guarantor of all or any portion of Lessee's obligations under the Master Agreement or any Lease or Financing.

8

**"Hardware"** means items of tangible equipment and other property, including but not limited to computer, telecommunications, printing, imaging, copying, scanning, projection and storage equipment, and any related peripherals, attachments, accessions, additions, substitutions, or replacements.

**"Initial Term"** means, as to any Lease, the initial term thereof as specified in the applicable Schedule.

**"Lease"** has the meaning specified in Section 1 of the Master Agreement.

**"Lessee"** has the meaning specified in the preamble of the Master Agreement.

**"Lessee Affiliate"** means any corporation which directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, Lessee.

**"Lessee Default"** has the meaning specified in Section 18 of the Master Agreement.

**"Lessor"** has the meaning specified in the preamble of the Master Agreement.

**"License Agreement"** means any license agreement or other document granting a right to use Software or any technical information, confidential business information or other documentation relating to Hardware or Software, as amended, modified or supplemented by any other agreement between the licensor and Lessor.

**"Maintenance Service"** means the applicable Supplier's maintenance service at its then standard rates for Equipment of that age, if available.

**"Master Agreement"** has the meaning specified in the preamble of the Master Agreement.

**"Material Agreements"** means, collectively, all Fundamental Agreements, all other material agreements by and between Lessor and Lessee, and any application for credit, financial statement, or financial data required to be provided by Lessee in connection with any Lease or Financing.

**"Optional Additions"** has the meaning specified in Section 8 of the Master Agreement.

**"PC Equipment"** means, collectively, personal computers (e.g., workstations, desktops and notebooks) and related items of peripheral equipment (e.g., monitors, printers and docking stations).

**"Purchase Documents"** means, as to any Equipment, any purchase order, contract, bill of sale, License Agreement, invoice and/or other documents that Lessee has, at any time, approved, agreed to be bound by or entered into with any Supplier of such Equipment relating to the purchase, ownership, use or warranty of such Equipment.

**"Renewal Agreement"** has the meaning specified in the applicable Schedule.

**"Renewal Term"** has the meaning specified in the applicable Schedule.

**"Rent"** has the meaning specified in Section 3 of the Master Agreement.

**"Schedule"** has the meaning specified in Section 1 of the Master Agreement.

**"Seller"** means, as to any Equipment, the seller of such Equipment, and as to any Financed Item, the provider thereof, in either case as specified in the applicable Schedule.

**"Software"** means copies of computer software programs owned or licensed by Lessor.

**"Stipulated Loss Value"** means, as to any Equipment, an amount equal to the sum of (a) all Rent and other amounts due and owing with respect to such Equipment as of the date of payment of such amount, plus (b) the Casualty Value of such Equipment.

**"Supplier"** means (a) as to any Equipment, the Seller and the manufacturer or licensor of such Equipment collectively, or where the context requires, any of them, and (b) as to any Financed Item, the Seller thereof.

**"System Software"** means an item of Software that is pre-loaded on an item of Hardware purchased by Lessor for lease hereunder for which the relevant Purchase Documents specify no purchase price separate from the aggregate purchase price specified for such items of Hardware and Software.

**"Tax Benefits"** has the meaning specified in Section 14 of the Master Agreement.

**"Tax Loss"** has the meaning specified in Section 14 of the Master Agreement.

**"Taxes"** means all license and registration fees and all taxes, fees, levies, imposts, duties, assessments, charges and withholdings of any nature whatsoever, however designated (including, without limitation, any value added, transfer, sales, use, gross receipts, business, occupation, excise, personal property, real property, stamp or other taxes).

**"Term"** means, as to any Financing, the term thereof as specified in the applicable Schedule.

**"Then Applicable Term"** means, as to any Lease, the term of the Lease in effect at the time of determination, whether it be the Initial Term, any Renewal Term or any optional or other automatic extension of the Initial Term or any Renewal Term pursuant to the applicable Schedule.

**"Total Cost"** means (a) as to any Lease, the total amount of Equipment, and related charges, if any, stated in and subject to such Schedule, and (b) as to any Financing, the total amount of the Financed Items subject to such Financing.

**"Total Term"** means, as to any Lease, the aggregate term of such Lease, including the Initial Term, any Renewal Term and any optional or other automatic extension of the Initial Term or any Renewal Term pursuant to the applicable Schedule.

**"UCC"** means the Uniform Commercial Code as enacted and in effect in any applicable jurisdiction.

**"Unit of Equipment"** means, as to the Equipment leased pursuant to any Schedule, (a) each individual item of PC Equipment leased pursuant to such Schedule, and (b) all Equipment taken as a whole leased pursuant to such Schedule other than PC Equipment.

# Exhibit

# "5"

COUNTERPART NO. _____ OF _____. TO THE EXTENT THAT THIS SCHEDULE CONSTITUTES CHATTEL PAPER (AS DEFINED IN THE UCC), NO SECURITY INTEREST IN THIS SCHEDULE MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.

Master Agreement Number 5348857849
Schedule Number 5348857849USA000001

### MASTER LEASE AND FINANCING AGREEMENT SCHEDULE

Hewlett-Packard Financial Services Company[1] ("Lessor") and Identidad IOT, LLC ("Lessee") are parties to the Master Lease and Financing Agreement identified by the Master Agreement Number specified above (the "Master Agreement"). This Schedule (which shall be identified by the Schedule Number specified above) and the Master Agreement together comprise a separate Lease, a separate Financing or a separate Lease and [a separate] Financing, as the case may be, between the parties. The terms and conditions of the Master Agreement are hereby incorporated by reference into this Schedule. All capitalized terms used in this Schedule without definition have the meanings ascribed to them in the Master Agreement.

1.    **LEASE.**
A.   **Description of Items of Leased Equipment**
      See Attached Exhibit A                                   **Total Cost**
                                                               **$0.00**

B.   **Initial Term**: 36 Months (plus the number of days from and including the Acceptance Date through and including the last day of the calendar month or quarter (depending on whether Rent is payable monthly or quarterly as specified in Section 3 below) in which the Acceptance Date occurs).

2.    **FINANCING.**
A.   **Description of Financed Items**
      See Attached Exhibit A                                   **Total Cost**
                                                               **$314,278.40**

B.   **Term**: 36 Months (plus the number of days from and including the Acceptance Date through and including the last day of the calendar month or quarter (depending on whether Rent is payable monthly or quarterly as specified in Section 3 below) in which the Acceptance Date occurs).

3.    **RENT**:
For Lease: $0.00
For Financing: $8,729.94
Total Rent: $8,729.94

**RENT is payable:**      __X__ in advance   ___in arrears (check one)
                         __X__ monthly      ___quarterly (check one)

**DAILY RENT**:
For Lease: N/A (i.e., the Rent payment specified above expressed on a per diem basis, assuming a 360 day year and 30 day months)
For Financing: N/A (based on the Financing Rate, and interest only)

**For Financings, the "Financing Rate" generally equals the rate of interest that would cause the present value of the Rent payable over the Term, calculated as of the First Payment Date and assuming monthly or quarterly (as applicable) compounding, to equal the Total Cost of the Financed Items.**

Lessee shall pay Lessor (a) on the first day of each calendar month or calendar quarter (depending on whether Rent is payable monthly or quarterly as specified above) if Rent is payable in advance, or (b) on the last day of each calendar month or calendar quarter (depending on whether Rent is payable monthly or quarterly as specified above) if Rent is payable in arrears, the Rent payment specified above for the length of the Initial Term in the case of a Lease and for the length of the Term in the case of a Financing. The First Payment Date shall be the first day (if Rent is payable in advance) or the last day (if Rent is payable in arrears) of the month or quarter (as applicable) immediately following the month or quarter (as applicable) in which the Acceptance Date occurs. In addition, on the First Payment Date Lessee shall also pay Lessor (a) in the case of Leases an amount equal to the Daily Rent multiplied by (i) 15 days if Rent is payable monthly or (ii) 45 days if Rent is payable quarterly; or (b) in the case of Financings an amount equal to the Daily Rent multiplied by the number of days from and including the Funding Date up to but excluding the first day of the month or quarter (as applicable) in which the First Payment Date occurs.

For Financings, all payments of Rent will be deemed to be blended payments of principal and interest (which interest will be calculated and payable at the Financing Rate), other than (a) Daily Rent, which is interest only, and (b) if Rent is payable in advance, the first periodic payment of Rent which is principal only. All payments of Rent with respect to Financings will be applied first to accrued and unpaid interest and next on account of principal, with interest on overdue amounts calculated and payable in accordance with the Master Agreement.

4.    **PRICING EXPIRATION DATE**: 7/31/2016. Lessor's obligation to purchase and lease the Equipment or fund and finance the Financed Items is subject to the Acceptance Date being on or before the Pricing Expiration Date.

5.    **EQUIPMENT LOCATION**: See Attached Exhibit A

6.    **SELLER**: See Attached Exhibit A

7.    **LESSEE'S END-OF-LEASE-TERM OPTIONS.** Lessee may choose to exercise one of the following options upon the natural expiration of the Initial Term, any Renewal Term (as defined below) and any automatic extension of the Initial Term or any Renewal Term provided, however, that Lessee must give Lessor written notice of Lessee's choice ("End-of-Term Notice") not less than ninety (90) days before the expiration of the relevant term.
      **(a) Purchase Option.** Lessee may elect to purchase any or all Units of Equipment then subject to this Lease (other than items of Software that may not be sold by Lessor under the terms of any applicable License Agreement) for an amount equal to the Fair Market Value of such Units of Equipment as of the end of the Then Applicable Term, provided no Lessee Default shall have occurred and be continuing. In the event of such an election, Lessee shall pay such amount to Lessor, in immediately available funds, on or before the last day of the Then Applicable Term. If Lessee shall have so elected to purchase any of the Units of Equipment, and shall have so paid the applicable purchase price and shall have fulfilled the terms and conditions of the Master Agreement, then on the last day of the Then Applicable Term (1) the Lease with respect to such Units of Equipment shall terminate and, except as provided in Section 26(m) of the Master Agreement, Lessee shall be relieved of all of its

---
[1] Authorized to do business in the name of Hewlett-Packard Financial Services Company in the States of Alabama and New York.

(Rev. 8.12)
1

obligations in favor of Lessor with respect to such Units of Equipment, and (2) Lessor shall transfer all of its interest in such Units of Equipment to Lessee "AS IS, WHERE IS," without any representation, warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor. In the event Lessor and Lessee are unable to agree on the Fair Market Value of any Units of Equipment, Lessor shall, at Lessee's expense, select an independent appraiser to conclusively determine such amount.

**(b) Renewal Option.** Lessee may elect to renew the Lease with respect to any or all Units of Equipment then subject to this Lease (other than items of Software that may not be re-leased by Lessor under the terms of any applicable License Agreement) for an amount equal to the Fair Rental Value of such Units of Equipment as of the end of the Then Applicable Term. In the event of such an election, Lessee shall enter into a mutually agreeable renewal agreement with Lessor ("Renewal Agreement") on or before the last day of the Then Applicable Term confirming the Units of Equipment as to which the Lease is to be renewed, the period for which the Lease is to be renewed (the "Renewal Term"), and the amount of Rent and the times at which such Rent is to be payable during the Renewal Term. In the event Lessor and Lessee are unable to agree on the Fair Rental Value of any Units of Equipment, Lessor shall, at Lessee's expense, select an independent appraiser to conclusively determine such amount.

**(c) Return.** Lessee may elect to return any or all of the Units of Equipment then subject to this Lease in accordance with Section 7 of the Master Agreement.

**(d) AUTOMATIC EXTENSION. IF LESSEE FAILS TO DELIVER TO LESSOR AN END-OF-TERM NOTICE BY THE DATE SET FORTH HEREIN, THE INITIAL TERM OR RENEWAL TERM SHALL, WITHOUT ANY ADDITIONAL NOTICE OR DOCUMENTATION, BE AUTOMATICALLY EXTENDED FOR SUCCESSIVE CALENDAR MONTHS WITH RESPECT TO ALL ITEMS OF EQUIPMENT THEN SUBJECT TO THIS LEASE THROUGH THE END OF THE CALENDAR MONTH FALLING AT LEAST 90 DAYS AFTER THE DATE LESSEE SHALL HAVE DELIVERED TO LESSOR AN END-OF-TERM NOTICE WITH RESPECT TO THIS LEASE. FOR EACH CALENDAR MONTH THAT THE THEN APPLICABLE TERM OF THIS LEASE IS SO EXTENDED, LESSEE SHALL PAY TO LESSOR RENT IN AN AMOUNT EQUAL TO THE MONTHLY RENT PAYMENT IN EFFECT IMMEDIATELY PRIOR TO SUCH EXTENSION (OR THE APPROPRIATE PRO RATA PORTION OF THE RENT PAYMENT THEN IN EFFECT IN THE CASE OF RENT PAYABLE OTHER THAN ON A MONTHLY BASIS), AND ALL OTHER PROVISIONS OF THE MASTER AGREEMENT AND THIS SCHEDULE SHALL CONTINUE TO APPLY.**

**IF LESSEE SHALL HAVE DELIVERED TO LESSOR AN END-OF-TERM NOTICE WITH RESPECT TO A LEASE, BUT SHALL HAVE SUBSEQUENTLY FAILED TO COMPLY WITH ITS OBLIGATIONS ARISING FROM ITS ELECTIONS SPECIFIED THEREIN, THEN THE THEN APPLICABLE TERM OF THIS LEASE SHALL, WITHOUT ANY ADDITIONAL NOTICE OR DOCUMENTATION, BE AUTOMATICALLY EXTENDED FOR SUCCESSIVE CALENDAR MONTHS WITH RESPECT TO ALL ITEMS OF EQUIPMENT AS TO WHICH LESSEE SHALL HAVE SO FAILED TO COMPLY WITH ITS OBLIGATIONS THROUGH THE END OF THE CALENDAR MONTH IN WHICH LESSEE SHALL HAVE COMPLIED WITH SUCH OBLIGATIONS. FOR EACH CALENDAR MONTH THAT THE THEN APPLICABLE TERM OF THIS LEASE IS SO EXTENDED, LESSEE SHALL PAY TO LESSOR RENT IN AN AMOUNT EQUAL TO THE MONTHLY RENT PAYMENT IN EFFECT IMMEDIATELY PRIOR TO SUCH EXTENSION (OR THE APPROPRIATE PRO RATA PORTION OF THE RENT PAYMENT THEN IN EFFECT IN THE CASE OF RENT PAYABLE OTHER THAN ON A MONTHLY BASIS), AND ALL OTHER PROVISIONS OF THE MASTER AGREEMENT AND THIS SCHEDULE SHALL CONTINUE TO APPLY.**

Notwithstanding any of the provisions of this Section 7 to the contrary, if any Lessee Default shall have occurred and be continuing at any time during the last 90 days of the Then Applicable Term of this Lease, Lessor may cancel any Renewal Term or optional or other automatic extension of the Then Applicable Term immediately upon written notice to Lessee.

**8.    ADJUSTMENTS TO SCHEDULE.** Lessee acknowledges that the Total Cost of Equipment and Financed Items and the related Rent payments set forth in this Schedule may be estimates, and if the final invoice from the Seller specifies a Total Cost that is more or less than the Total Cost set forth in this Schedule, Lessee hereby authorizes Lessor to adjust the applicable Total Cost and Rent payment on this Schedule to reflect the final invoice amount (the "Final Invoice Amount"). However, if the Final Invoice Amount exceeds the estimated Total Cost by more than 5%, Lessor will notify Lessee and obtain Lessee's prior written approval of the aforementioned adjustments. If Lessee fails to so approve any such adjustments within 15 days of Lessor's request, then this Schedule shall terminate without penalty to either Lessor or Lessee and Lessee shall be solely responsible to the Supplier for all obligations arising under the applicable Purchase Documents, including, without limitation, the obligation to purchase Equipment and pay Financed Items. All references in this Schedule to Total Cost and Rent shall mean the amounts thereof specified herein, as adjusted pursuant to this Section. Lessee also acknowledges that the Equipment and Financed Items described herein may differ from the description of the Equipment and Financed Items set forth in the related Acceptance Certificate executed by Lessee. Lessee hereby authorizes Lessor to conform the description of the Equipment and Financed Items set forth herein to the description thereof in the related Acceptance Certificate executed by Lessee. All references in this Schedule to the Equipment subject to a Lease and the Financed Items subject to a Financing shall mean the Equipment and Financed Items described herein, as conformed to the related Acceptance Certificate pursuant to this Section.

**9.    ADDITIONAL PROVISIONS: Dollar Purchase Option.** As to this Schedule only, delete subsections (a), (b), and (d) of Section 7 of this Schedule and replace with the following: So long as no Lessee Default exists, and no event shall have occurred and be continuing which with the giving of notice or the passage of time or both would constitute a Lessee Default, Lessee shall, at the expiration of the Initial Term, elect to return the Equipment leased pursuant to this Schedule in accordance with Section 7 of the Master Agreement or to purchase any or all of the Equipment leased pursuant to this Schedule. If Lessee shall have so paid all amounts due and owing, and shall have otherwise fulfilled the terms and conditions of the Master Agreement and this Schedule, then on the last day of the Then Applicable Term (i) the Lease with respect to the Equipment shall terminate and, except as provided in Section 26(m), Lessee shall be relieved of all of Lessee's obligations to Lessor with respect to the Equipment, and (ii) Lessor shall transfer all of Lessor's interest in the Equipment to Lessee "AS IS, WHERE IS," without any warranty, express or implied, from Lessor, other than the absence of any liens or claims arising by or through Lessor. Lessee agrees that the tax indemnity provisions of Section 14 of the Master Agreement shall not apply to the Equipment leased pursuant to this Schedule. Lessee further agrees that this Schedule is to be treated as a lease intended for security, and pursuant to Section 21 of the Master Agreement, Lessee hereby reaffirms Lessee's grant to Lessor of a purchase money security interest in the Equipment identified in this Schedule.

LESSOR AGREES TO LEASE TO LESSEE AND LESSEE AGREES TO LEASE FROM LESSOR THE EQUIPMENT DESCRIBED IN SECTION 1.A ABOVE, IF ANY, AND LESSOR AND LESSEE AGREE TO ENTER INTO A FINANCING OF THE FINANCED ITEMS DESCRIBED IN SECTION 2.A ABOVE, IF ANY. SUCH LEASE AND/OR FINANCING WILL BE GOVERNED BY THE MASTER AGREEMENT AND THIS SCHEDULE, INCLUDING THE IMPORTANT ADDITIONAL TERMS AND CONDITIONS SET FORTH ABOVE. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS SCHEDULE AND THE MASTER AGREEMENT, THE TERMS OF THIS SCHEDULE SHALL GOVERN.

| **LESSEE:** | **LESSOR:** |
|---|---|
| **IDENTIDAD IOT, LLC** | **HEWLETT-PACKARD FINANCIAL SERVICES COMPANY[2]** |
| By: _Andres Sanchez (signature)_ | By: _____ |
| Name: _Andres Sanchez_ | Name: _____ |
| Title: _C.E.O_ | Title: _____ |
| Date: _July 27 2016_ | Date: _____ |

---

[2] Authorized to do business in the name of Hewlett-Packard Financial Services Company in the States of Alabama and New York.

Identidad IOT, LLC

Exhibit A

Sch 5348857849USA000001

| Vendor | Quote Number | Quote Date | Producer Name | Part Number | Equipment Description | Qty | Unit Price | Extended Price | Pmnt | Lease Rate Factor | Equipment Location | Term |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hewlett Packard Enterprise Company | USSW-60980-02 | 26 Jul 2016 | HP | JP664AAE | Universal Internet of Things Platform V1.2 E-Media | 1 | 19.20 | 19.20 | 0.53 | 0.02778 | 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| Hewlett Packard Enterprise Company | USSW-60980-02 | 26 Jul 2016 | HP | JP665AAE | Universal Internet of Things Platform Non-Commercial E-LTU | 1 | 3,200.00 | 3,200.00 | 88.89 | 0.02778 | 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| Hewlett Packard Enterprise Company | USSW-60981-02 | 26 Jul 2016 | HP | JP624AAE | Universal Internet of Things Platform fo Data Management E-LTU, Category B | 1 | 177,292.80 | 177,292.80 | 4,924.79 | 0.02778 | 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| Hewlett Packard Enterprise Company | USSW-60981-02 | 26 Jul 2016 | HP | JP639AAE | Universal Internet of Things Platform fo Data Transformation E-LTU, Category B | 1 | 87,091.20 | 87,091.20 | 2,419.19 | 0.02778 | 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| Hewlett Packard Enterprise Company | USSW-60981-02 | 26 Jul 2016 | HP | JP654AAE | Universal Internet of Things Platform fo Data Operation E-LTU, Category B | 1 | 46,656.00 | 46,656.00 | 1,296.00 | 0.02778 | 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| Hewlett Packard Enterprise Company | USSW-60981-02 | 26 Jul 2016 | HP | JP664AAE | Universal Internet of Things Platform V1.2 E-Media | 1 | 19.20 | 19.20 | 0.54 | 0.02778 | 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| | | | | | Grand Totals: | $ | 314,278.40 | $ 8,729.94 | | | | |

# Exhibit "6"

COUNTERPART NO. _____ OF _____. TO THE EXTENT THAT THIS SCHEDULE CONSTITUTES CHATTEL PAPER (AS DEFINED IN THE UCC), NO SECURITY INTEREST IN THIS SCHEDULE MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.

Master Agreement Number 5348857849
Schedule Number 5348857849USA000002

## MASTER LEASE AND FINANCING AGREEMENT SCHEDULE

Hewlett-Packard Financial Services Company[1] ("Lessor") and Identidad IOT, LLC ("Lessee") are parties to the Master Lease and Financing Agreement identified by the Master Agreement Number specified above (the "Master Agreement"). This Schedule (which shall be identified by the Schedule Number specified above) and the Master Agreement together comprise a separate Lease, a separate Financing or a separate Lease and [a separate] Financing, as the case may be, between the parties. The terms and conditions of the Master Agreement are hereby incorporated by reference into this Schedule. All capitalized terms used in this Schedule without definition have the meanings ascribed to them in the Master Agreement.

**1.    LEASE.**

**A.  Description of Items of Leased Equipment**
     See Attached Exhibit A

**Total Cost**
**$57,372.00**

**B.** Initial Term: 36 Months (plus the number of days from and including the Acceptance Date through and including the last day of the calendar month or quarter (depending on whether Rent is payable monthly or quarterly as specified in Section 3 below) in which the Acceptance Date occurs).

**2.    FINANCING.**

**A.  Description of Financed Items**
     See Attached Exhibit A

**Total Cost**
**$441,507.78**

**B.** Term: 36 Months (plus the number of days from and including the Acceptance Date through and including the last day of the calendar month or quarter (depending on whether Rent is payable monthly or quarterly as specified in Section 3 below) in which the Acceptance Date occurs).

**3.    RENT:**
Months 1 – 12 @ $36,113.91
Months 13 – 36 @ $2,728.87

**RENT is payable:**      __X__ in advance ____in arrears (check one)
                          __X__ monthly ____quarterly (check one)

**DAILY RENT:**
For Lease:  N/A  (i.e., the Rent payment specified above expressed on a per diem basis, assuming a 360 day year and 30 day months)
For Financing:  N/A (based on the Financing Rate, and interest only)

**For Financings, the "Financing Rate" generally equals the rate of interest that would cause the present value of the Rent payable over the Term, calculated as of the First Payment Date and assuming monthly or quarterly (as applicable) compounding, to equal the Total Cost of the Financed Items.**

Lessee shall pay Lessor (a) on the first day of each calendar month or calendar quarter (depending on whether Rent is payable monthly or quarterly as specified above) if Rent is payable in advance, or (b) on the last day of each calendar month or calendar quarter (depending on whether Rent is payable monthly or quarterly as specified above) if Rent is payable in arrears, the Rent payment specified above for the length of the Initial Term in the case of a Lease and for the length of the Term in the case of a Financing. The First Payment Date shall be the first day (if Rent is payable in advance) or the last day (if Rent is payable in arrears) of the month or quarter (as applicable) immediately following the month or quarter (as applicable) in which the Acceptance Date occurs. In addition, on the First Payment Date Lessee shall also pay Lessor (a) in the case of Leases an amount equal to the Daily Rent multiplied by (i) 15 days if Rent is payable monthly or (ii) 45 days if Rent is payable quarterly; or (b) in the case of Financings an amount equal to the Daily Rent multiplied by the number of days from and including the Funding Date up to but excluding the first day of the month or quarter (as applicable) in which the First Payment Date occurs.

For Financings, all payments of Rent will be deemed to be blended payments of principal and interest (which interest will be calculated and payable at the Financing Rate), other than (a) Daily Rent, which is interest only, and (b) if Rent is payable in advance, the first periodic payment of Rent which is principal only. All payments of Rent with respect to Financings will be applied first to accrued and unpaid interest and next on account of principal, with interest on overdue amounts calculated and payable in accordance with the Master Agreement.

**4.    PRICING EXPIRATION DATE:** 9/30/2016. Lessor's obligation to purchase and lease the Equipment or fund or finance the Financed Items is subject to the Acceptance Date being on or before the Pricing Expiration Date.

**5.    EQUIPMENT LOCATION:** See Attached Exhibit A

**6.    SELLER:** See Attached Exhibit A

**7.    LESSEE'S END-OF-LEASE-TERM OPTIONS.** Lessee may choose to exercise one of the following options upon the natural expiration of the Initial Term, any Renewal Term (as defined below) and any automatic extension of the Initial Term or any Renewal Term provided, however, that Lessee must give Lessor written notice of Lessee's choice ("End-of-Term Notice") not less than ninety (90) days before the expiration of the relevant term.
      **(a) Purchase Option.** Lessee may elect to purchase any or all Units of Equipment then subject to this Lease (other than items of Software that may not be sold by Lessor under the terms of any applicable License Agreement) for an amount equal to the Fair Market Value of such Units of Equipment as of the end of the Then Applicable Term, provided no Lessee Default shall have occurred and be continuing. In the event of such an election, Lessee shall pay such amount to Lessor, in immediately available funds, on or before the last day of the Then Applicable Term. If Lessee shall have so elected to purchase any of the Units of Equipment, shall have so paid the applicable purchase price and shall have fulfilled the terms and conditions of the Master Agreement, then on the last day of the Then Applicable Term (1) the Lease with respect to such Units of Equipment shall terminate and, except as provided in Section 26(m) of the Master Agreement, Lessee shall be relieved of all of its obligations in favor of Lessor with respect to such Units of Equipment, and (2) Lessor shall transfer all of its interest in such Units of Equipment to Lessee "AS IS, WHERE

---

[1] Authorized to do business in the name of Hewlett-Packard Financial Services Company in the States of Alabama and New York.

IS," without any representation, warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor. In the event Lessor and Lessee are unable to agree on the Fair Market Value of any Units of Equipment, Lessor shall, at Lessee's expense, select an independent appraiser to conclusively determine such amount.

**(b) Renewal Option.** Lessee may elect to renew the Lease with respect to any or all Units of Equipment then subject to this Lease (other than items of Software that may not be re-leased by Lessor under the terms of any applicable License Agreement) for an amount equal to the Fair Rental Value of such Units of Equipment as of the end of the Then Applicable Term. In the event of such an election, Lessee shall enter into a mutually agreeable renewal agreement with Lessor ("Renewal Agreement") on or before the last day of the Then Applicable Term confirming the Units of Equipment as to which the Lease is to be renewed (the "Renewal Term"), and the amount of Rent and the times at which such Rent is to be payable during the Renewal Term. In the event Lessor and Lessee are unable to agree on the Fair Rental Value of any Units of Equipment, Lessor shall, at Lessee's expense, select an independent appraiser to conclusively determine such amount.

**(c) Return.** Lessee may elect to return any or all of the Units of Equipment then subject to this Lease in accordance with Section 7 of the Master Agreement.

**(d) AUTOMATIC EXTENSION. IF LESSEE FAILS TO DELIVER TO LESSOR AN END-OF-TERM NOTICE BY THE DATE SET FORTH HEREIN, THE INITIAL TERM OR RENEWAL TERM SHALL, WITHOUT ANY ADDITIONAL NOTICE OR DOCUMENTATION, BE AUTOMATICALLY EXTENDED FOR SUCCESSIVE CALENDAR MONTHS WITH RESPECT TO ALL ITEMS OF EQUIPMENT THEN SUBJECT TO THIS LEASE THROUGH THE END OF THE CALENDAR MONTH FALLING AT LEAST 90 DAYS AFTER THE DATE LESSEE SHALL HAVE DELIVERED TO LESSOR AN END-OF-TERM NOTICE WITH RESPECT TO THIS LEASE. FOR EACH CALENDAR MONTH THAT THE THEN APPLICABLE TERM OF THIS LEASE IS SO EXTENDED, LESSEE SHALL PAY TO LESSOR RENT IN AN AMOUNT EQUAL TO THE MONTHLY RENT PAYMENT IN EFFECT IMMEDIATELY PRIOR TO SUCH EXTENSION (OR THE APPROPRIATE PRO RATA PORTION OF THE RENT PAYMENT THEN IN EFFECT IN THE CASE OF RENT PAYABLE OTHER THAN ON A MONTHLY BASIS), AND ALL OTHER PROVISIONS OF THE MASTER AGREEMENT AND THIS SCHEDULE SHALL CONTINUE TO APPLY.**

**IF LESSEE SHALL HAVE DELIVERED TO LESSOR AN END-OF-TERM NOTICE WITH RESPECT TO A LEASE, BUT SHALL HAVE SUBSEQUENTLY FAILED TO COMPLY WITH ITS OBLIGATIONS ARISING FROM ITS ELECTIONS SPECIFIED THEREIN, THEN THE THEN APPLICABLE TERM OF THIS LEASE SHALL, WITHOUT ANY ADDITIONAL NOTICE OR DOCUMENTATION, BE AUTOMATICALLY EXTENDED FOR SUCCESSIVE CALENDAR MONTHS WITH RESPECT TO ALL ITEMS OF EQUIPMENT AS TO WHICH LESSEE SHALL HAVE SO FAILED TO COMPLY WITH ITS OBLIGATIONS THROUGH THE END OF THE CALENDAR MONTH IN WHICH LESSEE SHALL HAVE COMPLIED WITH SUCH OBLIGATIONS. FOR EACH CALENDAR MONTH THAT THE THEN APPLICABLE TERM OF THIS LEASE IS SO EXTENDED, LESSEE SHALL PAY TO LESSOR RENT IN AN AMOUNT EQUAL TO THE MONTHLY RENT PAYMENT IN EFFECT IMMEDIATELY PRIOR TO SUCH EXTENSION (OR THE APPROPRIATE PRO RATA PORTION OF THE RENT PAYMENT THEN IN EFFECT IN THE CASE OF RENT PAYABLE OTHER THAN ON A MONTHLY BASIS), AND ALL OTHER PROVISIONS OF THE MASTER AGREEMENT AND THIS SCHEDULE SHALL CONTINUE TO APPLY.**

Notwithstanding any of the provisions of this Section 7 to the contrary, if any Lessee Default shall have occurred and be continuing at any time during the last 90 days of the Then Applicable Term of this Lease, Lessor may cancel any Renewal Term or optional or other automatic extension of the Then Applicable Term immediately upon written notice to Lessee.

**8.     ADJUSTMENTS TO SCHEDULE.** Lessee acknowledges that the Total Cost of Equipment and Financed Items and the related Rent payments set forth in this Schedule may be estimates, and if the final invoice from the Seller specifies a Total Cost that is more or less than the Total Cost set forth in this Schedule, Lessee hereby authorizes Lessor to adjust the applicable Total Cost and Rent payment on this Schedule to reflect the final invoice amount (the "Final Invoice Amount"). However, if the Final Invoice Amount exceeds the estimated Total Cost by more than 5%, Lessor will notify Lessee and obtain Lessee's prior written approval of the aforementioned adjustments. If Lessee fails to so approve any such adjustments within 15 days of Lessor's request, then this Schedule shall terminate without penalty to either Lessor or Lessee and Lessee shall be solely responsible to the Supplier for all obligations arising under the applicable Purchase Documents, including, without limitation, the obligation to purchase Equipment and pay Financed Items. All references in this Schedule to Total Cost and Rent shall mean the amounts thereof specified herein, as adjusted pursuant to this Section. Lessee also acknowledges that the Equipment and Financed Items described herein may differ from the description of the Equipment and Financed Items set forth in the related Acceptance Certificate executed by Lessee. Lessee hereby authorizes Lessor to conform the description of the Equipment and Financed Items set forth herein to the description thereof in the related Acceptance Certificate executed by Lessee. All references in this Schedule to the Equipment subject to a Lease and the Financed Items subject to a Financing shall mean the Equipment and Financed Items described herein, as conformed to the related Acceptance Certificate pursuant to this Section.

**9.     ADDITIONAL PROVISIONS: Dollar Purchase Option.** As to this Schedule only, delete subsections (a), (b), and (d) of Section 7 of this Schedule and replace with the following: So long as no Lessee Default exists, and no event shall have occurred and be continuing which with the giving of notice or the passage of time or both would constitute a Lessee Default, Lessee shall, at the expiration of the Initial Term, elect to return the Equipment leased pursuant to this Schedule in accordance with Section 7 of the Master Agreement or to purchase any or all of the Equipment leased pursuant to this Schedule. If Lessee shall have so paid all amounts due and owing, and shall have otherwise fulfilled the terms and conditions of the Master Agreement and this Schedule, then on the last day of the Then Applicable Term (i) the Lease with respect to the Equipment shall terminate and, except as provided in Section 26(m), Lessee shall be relieved of all of Lessee's obligations to Lessor with respect to the Equipment, and (ii) Lessor shall transfer all of Lessor's interest in the Equipment to Lessee "AS IS, WHERE IS," without any warranty, express or implied, from Lessor, other than the absence of any liens or claims arising by or through Lessor. Lessee agrees that the tax indemnity provisions of Section 14 of the Master Agreement shall not apply to the Equipment leased pursuant to this Schedule. Lessee further agrees that this Schedule is to be treated as a lease intended for security, and pursuant to Section 21 of the Master Agreement, Lessee hereby reaffirms Lessee's grant to Lessor of a purchase money security interest in the Equipment identified in this Schedule.

LESSOR AGREES TO LEASE TO LESSEE AND LESSEE AGREES TO LEASE FROM LESSOR THE EQUIPMENT DESCRIBED IN SECTION 1.A ABOVE, IF ANY, AND LESSOR AND LESSEE AGREE TO ENTER INTO A FINANCING OF THE FINANCED ITEMS DESCRIBED IN SECTION 2.A ABOVE, IF ANY. SUCH LEASE AND/OR FINANCING WILL BE GOVERNED BY THE MASTER AGREEMENT AND THIS SCHEDULE, INCLUDING THE IMPORTANT ADDITIONAL TERMS AND CONDITIONS SET FORTH ABOVE. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS SCHEDULE AND THE MASTER AGREEMENT, THE TERMS OF THIS SCHEDULE SHALL GOVERN.

| LESSEE: | LESSOR: |
|---|---|
| **IDENTIDAD IOT, LLC** | **HEWLETT-PACKARD FINANCIAL SERVICES COMPANY**[2] |
| By: _Andres Sanchez_ (signature) | By: _____ |
| Name: Andres Sanchez | Name: _____ |
| Title: C.E.O | Title: _____ |
| Date: July 27 2016 | Date: _____ |

[2] Authorized to do business in the name of Hewlett-Packard Financial Services Company in the States of Alabama and New York.

Identidad IOT, LLC

Exhibit A

Sch 5348857849USA000002

| Vendor | Quote Number | Quote Date | Producer Name | Part Number | Equipment Description | Qty | Unit Price | Extended Price | Equipment Location | Term |
|--------|--------------|------------|---------------|-------------|----------------------|-----|------------|----------------|--------------------|------|
| Hewlett-Packard Company | FL Tax | 26 Jul 2016 | NOBRAND | UPFTAX | Upfront Sales Tax | 1 | 29,225.78 | 29,225.78 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| Hewlett Packard Enterprise Company | Project ID No. 1064765 | 26 Jul 2016 | Generic | SUPPORT | Support Service | 1 | 370,000.00 | 370,000.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 339778-B21 | RAID 1 Drive 1 FIO Setting | 12 | 0.00 | 0.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 455883-B21 | 10Gbps Short Reach SFP+ Optical Transceiver Module | 10 | 283.00 | 2,830.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 456204-B21 | c7000 Onboard Administrator w/KVM Option | 1 | 354.00 | 354.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 517520-B21 | 6 x Active Cool 200 Fans | 1 | 349.00 | 349.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 652583-B21 | 600GB SAS Hard Disk Drive, 6Gbps, 10,000rpm, 2.5in Wide | 22 | 186.00 | 4,092.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 665243-B21 | 560FLR-SFP+ Dual Port 10Gbps Network Adapter | 1 | 180.00 | 180.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 677595-B21 | Intelligent Power Module | 1 | 132.00 | 132.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 681844-B21 | Blade System c7000 Blade Enclosure, 16 Blade Bays, No PS, No Fans | 1 | 1,997.00 | 1,997.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 691367-B21 | Virtual Connect FlexFabric 20/40 F8 Module | 2 | 7,601.00 | 15,202.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 700764-B21 | FlexFabric 20Gbps 650FLB FIO Adapter, 2-Ports | 11 | 97.00 | 1,067.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 720478-B21 | 500W Flex Slot Platinum Hot Plug Power Supply | 2 | 107.00 | 214.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 726719-B21 | 16GB DDR3 SDRAM DIMM, PC4-2133 | 40 | 98.00 | 3,920.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 726992-B21 | 2.6GHz Intel Xeon E5-2640v3 8-Core Processor, 16MB Smart Cache | 7 | 515.00 | 3,605.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 726992-L21 | 2.6GHz Intel Xeon E5-2640v3 8-Core Processor, 16MB Smart Cache | 11 | 698.00 | 7,678.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 727021-B21 | ProLiant BL460c Blade Base, No CPU, 0 RAM, 8Array P244br, No HD | 11 | 668.00 | 9,548.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 733460-B21 | 6 x 2650W Platinum Hot Plug Power Supplies Kit | 1 | 1,112.00 | 1,112.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 734807-B21 | 1U SFF Easy Install Rails Kit | 1 | 33.00 | 33.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 749974-B21 | Smart Array P440ar/2G FIO Controller | 1 | 199.00 | 199.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 755258-B21 | ProLiant DL360 G9 SFF CTO Server, CPU NA, RAM NA, HD NA | 1 | 660.00 | 660.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 755384-B21 | 2.4GHz Intel Xeon E5-2630V3 8-Core Processor, 20MB SmartCache | 1 | 424.00 | 424.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 755384-L21 | 2.4GHz Intel Xeon E5-2630v3 8-Core Processor, 20MB SmartCache | 1 | 429.00 | 429.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 761871-B21 | Smart Array P244br/2G SAS Controller | 11 | 241.00 | 2,651.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | Compaq | 781518-B21 | 1.2TB 12Gbps SAS Hard Disk Drive, 10,000rpm, 2.5in Wide, Hot Plug | 2 | 232.00 | 464.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | AJ716B | B-Series 8Gbps ShortWave Fibre Channel SFP+ Transceiver, 1 Pack | 4 | 58.00 | 232.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | BD505A | Integrated Lights Out Advanced Server License, 3yr Support | 1 | 157.00 | 157.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | E5Y41A | OneView 3yr 24x7 Enclosure FIO phys 16 service License | 1 | 4,630.00 | 4,630.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | G3J30A | RedHat Enterprise Linux Server LTU, 2 Sockets, 2 Guest, 3 Year, 24x7 | 11 | 1,605.00 | 17,655.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | H1K92A3 | 3y 24x7 Proactive Care Service | 2 | 0.00 | 0.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | H1K92A3 | 3y 4h 24x7 Proactive Care Service | 1 | 12.00 | 12.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | H1K92A3 | 3y 4h 24x7 Proactive Care Service | 1 | 46.00 | 46.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | H1K92A3 | 3y 4h 24x7 Proactive Care Service | 11 | 224.00 | 2,464.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | H1K92A3 | 3y 4h 24x7 Proactive Care Service | 2 | 416.00 | 832.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | H1K92A3 | 3y 4h 24x7 Proactive Care Service | 1 | 695.00 | 695.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | H1K92A3 | 3y 4h 24x7 Proactive Care Service | 11 | 900.00 | 9,900.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | H1K92A3 | 3y 4h 24x7 Proactive Care Service | 1 | 984.00 | 984.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | H1K92A3 | 3y 4h 24x7 Proactive Care Service | 1 | 1,113.00 | 1,113.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | HA114A1 | CP Installation & Startup | 1 | 594.00 | 594.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | HA114A1 | CP Installation & Startup | 1 | 1,651.00 | 1,651.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | HA124A1 | CP Tech Installation and Startup | 1 | 1,387.00 | 1,387.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |
| VeriStor Systems Inc. | AR3-80184-05 | 26 Jul 2016 | HP | P8B31A | OneView w/o iLO Physical LTU, 1 Server, 3yr, 24x7 | 1 | 182.00 | 182.00 7950 NW 53rd Street, Suite 132, Doral, FL 33166 | 36 |

Grand Totals:  $  498,679.78

# Exhibit

## "7"

## AMENDMENT NO. 1
## TO MASTER LEASE AND FINANCING AGREEMENT NO. 5348857849

| LESSEE:<br>Identidad Advertising Development LLC | LESSOR:<br>Hewlett-Packard Financial Services |
|---|---|
| Address:<br>7950 NW 53rd Street, Suite 132<br>Doral, FL  33166 | Address:<br>Company 200 Connell Drive, Suite 5000<br>Berkeley Heights, NJ  07922 |
| Master Lease and Financing Agreement<br>No.: 5348857849 | Date:  July 26, 2016 |

This Amendment (the "Amendment") to the Master Lease and Financing Agreement identified by the Master Lease and Financing Agreement No. specified above (the "Master Agreement") by and between (Lessor) and (Lessee), hereby amends the Master Agreement as specified below effective as of the date of the full execution of this Amendment. Capitalized terms used in this Amendment that are not otherwise defined herein shall have the meanings ascribed to them in the Master Agreement.

The following changes are hereby made to the Master Agreement:

The following is added to the beginning of Section 1: "In order to induce Lessor to enter into the Master Agreement and to provide Lessor with assurance of Lessee's performance of all obligations set forth therein, Identidad Advertising Development LLC hereby agrees to serve as joint and several co-lessee with Infomovil Television & Systems Corp. (aggregately referred to as "Co-Lessees") under the Master Agreement, Identidad Advertising Development LLC and Infomovil Television & Systems Corp. shall be jointly and severally responsible for fulfilling all obligations under the Master Agreement, and Co-Lessees hereby waive any and all claims of contribution or recoupment that may arise with respect to their status as Co-Lessees.  Moreover, it is specifically understood and agreed that Lessor shall discharge Lessor's obligations under the Master Agreement by rendering performance to either of the Co-Lessees, with commercially reasonable efforts to render Lessor's performance to the Co-Lessee which is the actual user of the Equipment if so identified to Lessor and requested by a Co-Lessee in writing. Any Schedules, Acceptance Certificates or any other Fundamental Agreement (as defined below) executed under the Master Agreement by one Co-Lessee, by referencing the above specified Master Agreement Number, shall be deemed to be executed by Identidad Advertising Development LLC and Infomovil Television & Systems Corp. regardless of which entity executed the Fundamental Agreement (as defined below) in question, and shall be enforceable by Lessor against either or both Co-Lessees."

Except as expressly amended hereby, all other terms and conditions of the Master Agreement shall remain in full force and effect as originally written.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED THIS AMENDMENT TO THE MASTER AGREEMENT.

| Lessee: Identidad Advertising Development LLC | Lessor: Hewlett-Packard Financial Services Company |
|---|---|
| By: _____ | By: _____ |
| Name: _____ Gabriel Sanchez _____ | Name: _____ |
| Print Title: _____ C.E.O _____ | Print Title: _____ |
| Date: _____ July 27 2016 _____ | Date: _____ |

| Co-Lessee: Infomovil Television & Systems Corp. |
|---|
| By: _____ |
| Name: _____ Gabriel Sanchez _____ |
| Print Title: _____ C.E.O _____ |
| Date: _____ July 27 2016 _____ |

# Exhibit

## "8"

**IoT Platform**                    **Statement of Work**

**Identidad IOT**            Project ID No.: 1064765                              **Hewlett Packard Enterprise**

# Statement of Work to Identidad IOT for Universal IoT Platform from Hewlett Packard Enterprise

  

June 30, 2016

HPE ID: 1064765

## Important Confidentiality Notice

This Statement of Work is proprietary to Hewlett Packard Enterprise Company ("HPE") and contains HPE Confidential Information. It may not be disclosed in whole or in part without the express written authorization of HPE. No portion of this Statement of Work may be duplicated or used for any purpose other than to receive Services or Deliverables from HPE described herein.

© *2016* Hewlett Packard Enterprise Development Company, L.P.

**IoT Platform**   **Statement of Work**

**Identidad IOT**            Project ID No.: 1064765                    **Hewlett Packard Enterprise**

## Customer Contact

Andres Sanchez
+1 786.899.2265
asanchez@identidadtelecom.net

## HPE Professional Services Contact

Melissa Ramirez
+1 915.600.1253
melissa.a.ramirez@hpe.com

## HPE Sales Contact

Mauricio Malpica Zamorano
+1 512.970.5658
mauricio.malpica-zamorano@hpe.com

## Document Version History

| Version | Date | Author | Comment |
|---------|------|--------|---------|
| 1.0 | 05/20/2016 | Melissa Ramirez and Aleksandar Prekajski | Initial version. |
| | | | |
| | | | |

HPE PM Methodology

| IoT Platform | Statement of Work | |
|---|---|---|
| Identidad IOT | Project ID No.: 1064765 |  Hewlett Packard Enterprise |

# Table of Contents

1.  **Statement of Work Information** ............................................................................. **5**
    - 1.1. Introduction ........................................................................................................ 5
    - 1.2. Services Overview ............................................................................................. 5
2.  **Project Description** ............................................................................................... **6**
    - 2.1. Scope Definition ................................................................................................ 6
    - 2.1.1. *Initial Deployment* ......................................................................................... 6
        - 2.1.1.1. *Milestone 1: Planning Activities and Documentation* 6
        - 2.1.1.2. *Milestone 2: Lab Deployment* 7
        - 2.1.1.3. *Milestone 3: IoT Customizations for Identidad IOT* 7
        - 2.1.1.4. *Milestone 4: Production Deployment and Functional Testing* 8
        - 2.1.1.5. *Milestone 5: Production Testing Support and Training* 9
        - 2.1.1.6. *Milestone 6: Acceptance and transition to Support* 9
    - 2.1.2. *Optional Solution Management Services* ..................................................... 10
        - 2.1.2.1. *Milestones 7-14: Solution Management Services* 10
    - 2.1.3. *Project Management* ..................................................................................... 10
        - 2.1.3.1. Project Management ................................................................................ 10
        - 2.1.3.2. Status Reports ........................................................................................ 10
        - 2.1.3.3. Status Meetings ...................................................................................... 11
        - 2.1.3.4. Project Schedule .................................................................................... 11
3.  **Project Responsibilities** ...................................................................................... **12**
    - 3.1. Customer Responsibilities .............................................................................. 12
    - 3.2. HPE Responsibilities ....................................................................................... 13
4.  **Assumptions, Dependencies, Limitations and Exclusions** ............................... **14**
5.  **Other Considerations** .......................................................................................... **15**
    - 5.1. Services Acceptance ....................................................................................... 15
    - 5.2. Document Acceptance Process ...................................................................... 15
    - 5.3. Acceptance of Deliverables Requiring Acceptance Testing .......................... 15
    - 5.3.1. *Acceptance Test Plan.* .................................................................................. 15
    - 5.3.2. *Deliverable Acceptance for Deliverables Requiring Acceptance Testing.* .......... 16
    - 5.4. Change Process .............................................................................................. 16
    - 5.4.1. *Definition* ...................................................................................................... 16
    - 5.4.2. *Procedures* ................................................................................................... 16
6.  **Order and Payment Information** .......................................................................... **18**
    - 6.1. Price ................................................................................................................ 18

HPE PM Methodology ........................... HPE

**IoT Platform**                    **Statement of Work**

Identidad IOT                    Project ID No.: 1064765                    **Hewlett Packard**
                                                                          Enterprise

6.2.    Order Information and Project Schedule ........................................................................ 18

*Table A: Optional Solution Management Services (two year term)* ............................................ 19

7.    Authorization ............................................................................................................... 21

8.    Attachment List .......................................................................................................... 22

Attachment A – HPE Customer Terms – Professional Services ................................................ 23

Attachment B – Deliverable Work Product and Phase Acceptance Form ................................... 25

Attachment C – HPE Communications and Media Solutions – Product Support Data Sheet... 25

HPE PM Methodology

IoT Platform · Statement of Work

Identidad IOT · Project ID No.: 1064765 · **Hewlett Packard Enterprise**

# 1. Statement of Work Information

## 1.1. Introduction

This Statement of Work ("**SOW**") is made by and between the Hewlett Packard Enterprise Company ("**HPE**") and Identidad IOT ("**Customer**") and identifies the professional services ("**Services**") HPE will perform for Customer. Handwritten or typewritten text (other than information specifically called for in the spaces provided) that purports to modify or supplement the printed text of this SOW shall have no effect and shall not add to or vary the terms of this SOW.

If not executed, HPE reserves the right to expire this SOW according to the expiration date of the accompanying quote, or if unspecified, thirty (30) days from the date this SOW was delivered.

This SOW is governed by the HPE Single Engagement Terms ("**Terms and Conditions**") for Professional Services, attached hereto as Attachment A.

## 1.2. Services Overview

This project is intended to provide Services as they relate to the Customer's Universal IoT (aka UIoT) Platform project. The objective of this project is to install, configure, and test HPE's UIoT Platform 1.2 solution on Identidad IOT's lab and production systems.

For more details on HPE UIoT Platform please see Solution Brief document attached here.



HPE_UIoT_1_2
Solution_Brief.pdf

As further described in this SOW, HPE's Services and Deliverables will include MOPs for deployment, documentation on network and server configurations for Identidad IOT production site.

HPE PM Mathodology

**IoT Platform**          **Statement of Work**

Identidad IOT                    Project ID No.: 1064765                              **Hewlett Packard**
                                                                                      **Enterprise**

## 2.   Project Description

## 2.1.   Scope Definition

This section defines all the Deliverables to be provided by HPE during the project.

**2.1.1.**     **Initial Deployment**

**2.1.1.1.**        **Milestone 1: Planning Activities and Documentation**

| Service Description | **Planning Services include the following:**<br><br>1. Kickoff meeting, to review/confirm architecture and use of HPE UIoT Platform solution<br>   a. Introduction and key players<br>   b. HPE IoT CMS Software Overview<br>2. Define business and Technical requirements:<br>   a. Interfaces and integration points |
|---|---|
| Deliverables | **Documents:**<br><br>1. HPE UIoT Platform Solution Definition Document summarizing results include:<br>  • HPE IoT Scope – IoT features<br>  • HPE IoT Interface Definition<br>  • HPE IoT High Availability Diagram<br>  • HPE IoT Network Diagram<br>  • HPE IoT Database description<br><br>2. Site Readiness Checklist documents prepared and reviewed with Identidad IOT to confirm that all required inputs received and validated. This will identify IP addresses, network elements and other Identidad IOT specific information that will be used to configure UIoT Platform to Identidad IOT's lab and production environment. Also identifies any specific configurations expected to be setup by Identidad IOT for their network elements.<br><br>3. Acceptance Test Plan ("ATP") – ATP identifies the activities to be tested and roles & responsibilities to validate the Deliverables being deployed. Identidad IOT and HPE will review and mutually agree to the ATP.<br><br>4. Method of Procedure ("MOP") – HPE will provide standard Method of Procedure ("MOP") documents detailing the following activities:<br>  • Software installation and configuration procedures for the Deliverables. HPE will execute the MOPs in the lab.<br>  • Production cutover MOPs required, if any, to introduce the new software releases and features into Production.<br><br>The MOPs will be authored for the Lab site and will subsequently be updated for each subsequent site following the completion of testing. |
| Acceptance Criteria | Documents contain the contents specified above. |

**IoT Platform**                 **Statement of Work**

Identidad IOT                    Project ID No.: 1064765                 **Hewlett Packard**
                                                                         **Enterprise**

| Assumptions | 1. Identidad IOT will have the key project staff members available to support the preparation discussions which may require follow-up meetings via phone/web. |
| | 2. Kick-off may identify changes to planned scope that will be addressed via the CR process as defined below. |
| Exclusions | None identified. |

### 2.1.1.2.    Milestone 2: Lab Deployment

| Service Description | HPE will deploy the UIoT Platform out-of-the-box solution in the Lab site. |
| --- | --- |
| | Key Services include: |
| | • Installation of appropriate HPE UIoT Platform installation binaries. |
| | • Configuring all internal HPE UIoT Platform parameters in accordance with the Identidad IOT network requirements to ensure reliable connections to the network elements as defined in the Site Readiness Checklist/Questionnaire document. |
| | • Establishing the identified communication paths between the Identidad IOT network and the HPE UIoT Platform. |
| | • Functional testing of UIoT Platform |
| Deliverables | 1. UIoT Platform release notes. |
| | 2. UIoT Platform installation files. |
| Acceptance Criteria | Documents contain the contents specified above. HPE IoT Customization release notes and patch files completed according to specifications as defined in the updated HPE UIoT Platform Solution Definition Document. |
| Assumptions | Some installation, configuration, and testing is planned to be remotely executed. |
| Exclusions | None identified. |

### 2.1.1.3.    Milestone 3: IoT Customizations for Identidad IOT

| Description | HPE will provide the HPE IoT Customizations and configurations for Identidad IOT, per the agreed to requirements and design as specified in the HPE UIoT Platform Solution Definition Document. |
| --- | --- |
| | The following customizations will be configured: |
| | • Interfaces toward Identidad IOT communication network partners Network Elements |
| | Key services: |

| | |
|---|---|
| | • Integration with out-of-the-box UIoT Platform<br>• Functional testing of customizations |
| Deliverables | 1. Release notes for IoT Customizations and configuration, which describe what is new in UIoT Platform CMS Software and the IoT Specific Customizations and configurations.<br>2. UIoT Platform patch installation files, if needed. |
| Acceptance Criteria | HPE IoT Customization release notes and patch files completed according to specifications as defined in the updated HPE UIoT Platform Solution Definition Document. |
| Assumptions | Interface must be received from Identidad IOT prior to customization design. |
| Exclusions | None identified. |

### 2.1.1.4.      Milestone 4: Production Deployment and Functional Testing

| | |
|---|---|
| Description | HPE will deploy the UIoT Platform 1.2 release on the Production site.<br><br>Key Services include:<br><br>• Installation of appropriate HPE UIoT Platform installation binaries, and IoT configurations and Software.<br>• Configuring all internal HPE UIoT Platform parameters in accordance with the Identidad IOT network requirements to ensure reliable connections to the network elements as defined in the Site Readiness Checklist/Questionnaire document. Includes the IoT Customization components.<br>• Establishing the identified communication paths between the Identidad IOT network and the HPE UIoT Platform solution.<br>• Functional testing of UIoT Platform with customizations. |
| Deliverables | **Documents:**<br>1. Modified Production MOP (if necessary) will be mutually agreed to and approved by Identidad IOT. The initial Lab MOP will be updated to reflect the Production Site requirements or any changes discovered while executing the MOP in the lab.<br>2. Production Site Readiness Checklist/Questionnaire updated to reflect results of the Production Site installation/configuration. The final version will reflect the final configuration for the Production site. |
| Acceptance Criteria | Successfully completed with no critical problems preventing ATP execution in accordance with Section 5.3.1. |
| Assumptions | 1. Some installation, configuration, and testing is planned to be remotely executed. |

**IoT Platform**                    **Statement of Work**

Identidad IOT                    Project ID No.: 1064765                    **Hewlett Packard Enterprise**

| Exclusions | None identified. |
|---|---|

### 2.1.1.5.   Milestone 5: Production Testing Support and Training

| Description | HPE Consultant will provide SME support to Identidad IOT production testing of UIoT Platform per the agreed to ATP and will deliver one-week onsite Training on the solution. |
|---|---|
| Deliverables | **Documents:** <br><br> ATP result document, defining the Test Cases executed and the results achieved. <br><br> Training slides, detailing the IoT Platform 1.2 |
| Acceptance Criteria | The Test Cases in the ATP successfully complete with no critical problems preventing Acceptance of UIoT Platform in accordance with Section 5.3.1. |
| Assumptions | 1. Identidad IOT will have the key project staff members available during all on-site activities to support the Identidad IOT network elements. <br><br> 2. The anticipated duration for support of Acceptance testing is up to 2 weeks in duration. Extending the duration will require a CR. <br><br> 3. Training is available for up to 12 students. |
| Exclusions | None identified. |

### 2.1.1.6.   Milestone 6: Acceptance and transition to Support

| Description | HPE will provide Services to transition the UIoT Platform solution to Identidad IOT Operations and the HPE Support Organization. <br><br> This will include presenting the customer support operations document/model to Identidad IOT and turning over operations to Identidad IOT Personnel. |
|---|---|
| Deliverables | **Documents:** <br><br> The support operations document describing the HPE standard support process and procedures for contacting HPE Support including the Service Agreement ID (SAID) contact numbers for reporting problems. |
| Acceptance Criteria | The support operations document defines the support processes and contains the SAID numbers. |
| Assumptions | None identified. |
| Exclusions | None. |

| IoT Platform | Statement of Work | Hewlett Packard Enterprise |
|---|---|---|
| Identidad IOT | Project ID No.: 1064765 | |

## 2.1.2. Optional Solution Management Services

### 2.1.2.1. Milestones 7-14: Solution Management Services

| Description | HPE will provide a Named Response Center Engineer (NRCE) familiar with the UIoT Platform and with in-depth knowledge of customer environment to provide 9x5 support. |
|---|---|
| | Provides a reactive engineer who will acquire a deep knowledge of the customer environment and work directly on support incidents and problems. |
| | SMS term will begin on July 1, 2017 and will end on June 30, 2019. |
| Deliverables | - SE startup |
| | - Named primary contact for all cases |
| | - Enhanced technical escalation management |
| | - Remote reviews |
| Acceptance Criteria | Remote reviews performed once per quarter. |
| Assumptions | 9x5 support only, excluding HPE holidays. |
| Exclusions | None. |

## 2.1.3. Project Management

### 2.1.3.1. Project Management

HPE will designate a project manager ("Project Manager") to oversee the project, manage HPE resources, and be the Customer's primary contact with HPE regarding the following:

- Management of scope (formal or informal requests for changes)
- Conducting Status Meetings
- Preparing Status Reports
- Other activities as specified in this Statement of Work

### 2.1.3.2. Status Reports

Project Status Reports will be prepared by the HPE Project Manager for review and discussion at the Status Meeting. Status Reports will contain the following:

- Project Status Summary
- Schedule status against the Project Plan
- Significant issues and actions to be taken by HPE and/or Customer
- Significant decisions at prior status meeting
- Significant risks and actions to be taken by HPE and/or Customer

Status reports are deemed accepted upon delivery by HPE to Customer.

**IoT Platform**                    **Statement of Work**

Identidad IOT                    Project ID No.: 1064765                    **Hewlett Packard**
                                                                            **Enterprise**

---

**2.1.3.3.          Status Meetings**

Project status meetings will be held, at a minimum, twice per month.  Customer's project manager and HPE Project Manager will represent their organizations at these meetings.  Status meetings will include, at a minimum:

- Review of progress against schedule
- Review open Change Orders
- Review significant issues
- Review of significant risks
- Review achievement against milestones

**2.1.3.4.          Project Schedule**

The HPE Project Manager will develop a Project Plan based upon a Work Breakdown Structure (WBS) that identifies and describes the activities and tasks required to produce the Deliverables specified in Section 2.2.1. Customer will be responsible for reviewing and approving the contents of the initial version of the Project Schedule. Once accepted, the Project Schedule will become the Project baseline against which Deliverables and performance of Services will be measured.

| IoT Platform | Statement of Work | Hewlett Packard |
|---|---|---|
| Identidad IOT | Project ID No.: 1064765 | Enterprise |

## 3.  Project Responsibilities

This section describes general Customer and HPE responsibilities relative to this Statement of Work. HPE's ability to fulfill its responsibilities relative to this Statement of Work is dependent upon Customer fulfilling the Customer Responsibilities described below and elsewhere herein.

### 3.1.  Customer Responsibilities

A) Assign a Project Sponsor who:

- Is available to HPE personnel for the life of the project

- Acts as an escalation point when conflicts cannot be resolved by the Project Manager.

B) Assign a Project Manager who is:

- Responsible for all Customer aspects of this project.

  - Authorized to make all decisions relative to the project, including identification and assignment of Customer resources

  - Available to HPE consulting personnel throughout the project's life

  - Is authorized to sign status reports, approve consultant hours, and approve project changes.

  - Will coordinate all interviews or meeting schedules

  - Responsible for acceptance of Deliverables and for verifying compliance of each Deliverable with the Deliverable  acceptance criteria documented herein

  - Authorized to approve Project changes.

C) Assign managers and other personnel, as appropriate, to work with HPE throughout the Project. Delays in providing this staffing may lead to a Change Order, and result in additional cost and/or delay in completion of the Services

D) Provide reasonable access to Customer personnel who are necessary for progress of this SOW.

E) In the event this SOW contains a Project Schedule, Customer is responsible for schedule management and execution.

F) Purchase or provide all hardware, software licenses, staff, current maintenance contracts, and environments necessary for HPE to provide these services.  HPE will provide laptops with standard client software for its consultants.

G) Provide HPE personnel access to Customer's building facilities, computer room facilities, systems, passwords, etc., as needed, during normal business hours as well as after hours, if needed. If systems credentials or systems access is delayed or incomplete, any services necessary to correct problems created thereby shall be treated as a Customer requested Change Order and subject to the Change Order process in Section 5.4.

H) Provide a suitable work area commensurate with the number of on-site HPE consultants. The work area will include desks, chairs, and telephones, and internet/HPE network access through a VPN.

I) Perform any backups needed before changes are made and backup the target systems and work implemented by HPE.

J) Customer will be responsible for scheduling production Change Management Control (CMC) windows according to the agreed upon project schedule

**K)** Provide accurate, complete and timely information, business and technical data or documentation as requested by HPE to perform the Services.

**L)** During the provision of the services contemplated in this SOW, HPE may be required to install copies of third party or HPE branded software and will be required to accept license terms accompanying such software on behalf of Customer. It is Customer's responsibility to review such license terms at the time of installation, and Customer hereby authorizes HPE to accept such license terms on its behalf.

**M)** If HPE's performance under this SOW depends upon services, hardware or software being supplied by third parties. Customer is responsible for obtaining all such third-party hardware, software, and consulting services, which are a prerequisite or dependency to HPE's performance under this SOW. Customer is also responsible for any such third-party product and/or service charges and fees.

**N)** Customer acknowledges that HPE's ability to deliver the Services is dependent upon Customer's reasonable and timely cooperation with HPE, as well as the accuracy and completeness of any information and data Customer provides to HPE. Therefore, Customer will provide HPE with reasonable access to, and use of, any necessary information, data, and documentation, and will use best efforts to provide HPE reasonable access to facilities, working space and office services mutually deemed necessary by the parties in order for HPE to fulfill its obligations under this SOW.

## 3.2.     HPE Responsibilities

**A)** Provide a single point of contact to Customer for the duration of the project for coordination and scheduling of project tasks, documentation and any changes to scope requiring a Change Order.

**B)** Perform the Services and provide the Deliverables set forth herein.

**IoT Platform**　　　　　**Statement of Work**

Identidad IOT　　　　　Project ID No.: 1064765　　　　　**Hewlett Packard Enterprise**

## 4.　Assumptions, Dependencies, Limitations and Exclusions

**A)**　Work on this services engagement will be performed at Customer's facilities listed below and/or at HPE consultant local office locations between the hours of 8am and 5pm local time Monday through Friday excluding HPE holidays, or other standard local business hours as mutually agreed. ("Working days".)

- Site 1:  Miami, FL

**B)**　Billing will be to the address specified on the Purchase Order.

**C)**　HPE uses a forty (40) hour billable work week as its standard. On-site services are generally delivered over a four (4) day, ten (10) hours/day work week, Monday through Thursday, unless otherwise mutually agreed. Weekend and holiday hours may be available at an additional charge.

**D)**　The on-site/off-site schedule of the HPE team will be mutually agreed prior to the commencement of the Services. HPE and Customer agree to plan an on-site/off-site schedule that leverages off-site work as much as possible.

**E)**　HPE may choose to utilize qualified subcontractors.

**F)**　The following software versions will be used:

- UIoT Platform version 1.2 baseline bundle only

**G)**　Any Services or Deliverables not documented in Sections 1 or 2 are considered outside of scope for this SOW.

**H)**　This SOW does not contemplate the sale of products or support services, which shall require the necessary terms and conditions for such purchase pursuant to separate agreement between the parties.

**I)**　The services described in this SOW do not include delivery of services provided by HPE Software Support, including fixing of software bugs. Customer is responsible for maintaining a valid support contract with HPE and contacting HPE Software Support for support-related issues.

**J)**　All Documentation created for this engagement will be available in electronic format using Microsoft Office. If applicable, the engagement planning software used for this engagement will be Microsoft Project.

**K)**　HPE and Customer acknowledge successful completion of this project will require full and mutual good faith cooperation. Where agreement, approval, acceptance, consent or similar action by either party is required by any provision of this SOW, such action will not be unreasonably delayed or withheld. Customer agrees that to the extent its failure to meet its responsibilities results in a failure or delay by HPE in performing its obligations under this SOW, HPE will not be liable for such failure or delay.

**L)**　HPE's responsibilities in this SOW specifically exclude the following:

- Any electrical wiring or re-wiring required for the Production and Lab Systems.

- Physical installation, hardware installation, heavy lifting, or moving, of equipment, unless specifically included in this SOW; removal of shipping crates, shipping boxes, and shipping packing materials from the Customer site.

- Installation of Customer applications or software unless specifically included in this SOW.

- Compilation, configuration, optimization of Customer applications or software.

## 5.    Other Considerations

### 5.1.    Services Acceptance

Services rendered pursuant to this Statement of Work are accepted upon HPE's performance of the services.

HPE will provide notice to Customer when the Deliverables are ready for acceptance.

To the extent the acceptance procedures or warranty for Services and/or Deliverable is set for in this SOW such procedures, warranty and associated remedies apply to the Services and Deliverables provided herein only and not to any HPE hardware or software Products, even if said Products can be used in connection with the Services and/or Deliverables.

### 5.2.    Document Acceptance Process

If HPE provides a document Deliverable as part of the project, each document outcome will initially be developed in draft form. The HPE Project Manager/Lead Consultant and Customer Project Manager may schedule working sessions, inclusive of HPE and/or Customer personnel, to refine the draft document as it is written.

When the draft document is complete, the HPE Project Manager/Lead Consultant will submit the initial release document to Customer's Project Manager for review. Customer's Project Manager will be responsible for distributing copies of the initial release document for internal review. Customer's Project Manager is responsible for consolidating Customer comments and for providing a clearly marked version of the draft document to HPE's Project Manager/Lead Consultant. Customer's Project Manager will have three (3) working days to review and return the consolidated comments to the HPE Project Manager/Lead Consultant, unless otherwise agreed to by the parties. If no revisions are received within three (3) working days, the document will be considered accepted. HPE will review and evaluate Customer comments and respond in writing within three (3) working days. Customer comments and HPE's recommendations will be discussed and integrated within three (3) working days into a final version and delivered to Customer's Project Manager Delivery of the final version of a document will constitute Customer's acceptance of the document.

Notwithstanding the foregoing, Deliverables provided to Customer under this Section 5.2 shall be deemed to be accepted if Customer starts using the Deliverables in a production environment.

### 5.3.    Acceptance of Deliverables Requiring Acceptance Testing

#### 5.3.1.    Acceptance Test Plan.

For Deliverables requiring acceptance testing, the parties will develop and mutually agree upon an Acceptance Test Plan ("ATP"). In the event that the parties are unable to reach agreement on the ATP within thirty (30) days of the effective date of the applicable Statement of Work, each party will have the right to terminate that Statement of Work immediately for convenience by giving written notice to such effect to the other party.

HPE will notify Customer when a Deliverable is ready for acceptance testing and such testing will commence within five (5) business days of such notice. Within five (5) business days after completion of the testing process, Customer will either: i) sign the acceptance report provided by HPE or ii) notify HPE in writing detailing any failure of the Deliverable to conform to the acceptance criteria in the ATP. Within a reasonable time, HPE will correct any such non-conformance and redeliver the Deliverable for a repeat of the steps in the ATP process necessary to verify conformance with the ATP.

IoT Platform          **Statement of Work**

Identidad IOT          Project ID No.: 1064765          **Hewlett Packard Enterprise**

**5.3.2.     Deliverable Acceptance for Deliverables Requiring Acceptance Testing.**

Deliverables requiring acceptance testing will be deemed accepted upon the earlier of: (a) when Customer so advises HPE, (b) five (5) business days after completion of testing unless HPE receives notice of non-conformance within such period, or (c) or when Customer uses the Deliverables for any purpose other than testing and review. Customer will not unreasonably withhold acceptance of Deliverables or corrected Deliverables.

## 5.4.     Change Process

**5.4.1.     Definition**

"**Change Order**" means an agreed upon change or modification to the Deliverables Services or other material aspect of this SOW. Requests by Customer and recommendations by HPE for Change Orders are subject to the procedures set forth below, and will be made in writing in the Change Order Form attached hereto.

**5.4.2.     Procedures**

A) Either party may request a change to the Services described in this SOW. All changes must be requested in writing and prepared by HPE and will be signed by the appointed representative for each party. HPE may charge a reasonable fee for investigating, preparing or initiating a Change Order at Customer's request.

B) Change Order requests will be processed as soon as is commercially reasonable. The change will be evaluated and any project impact will be identified. The cost, scope, and schedule impact, if any, of the change will be analyzed and documented by HPE utilizing the Change Order Form. The change impact will then be processed for Customer authorization or closure. If the evaluation of a change request initiated by Customer takes in excess of four (4) hours to complete, the cost of evaluation will be charged to Customer and any schedule slippage as a result of performing the evaluation will be documented as a formal change. Following is a diagram of the Change Process:



C) Change Orders will include the following:

- A description of any additional Services to be performed and/or any changes to the performance required of either party.

- A statement of the impact of additional Services or changes to Services, Deliverables or other requirements of the SOW.

- The estimated timetable for completion of the Services specified in the Change Order and the impact, if any, on pricing and payments.

- Specific roles and responsibilities affected by the Change Order will be identified when applicable.

- The documentation to be modified or supplied as part of the additional or changed Services.

**D)** All Change Orders must be mutually agreed by the parties. Pending such agreement, HPE will continue to perform and be paid as if such Change Order had not been requested or recommended, provided that if either party proposes a Change Order which, in HPE's judgment, represents a material change in the Services or Deliverables and such Change Order remains outstanding for thirty (30) days or is rejected by Customer, HPE will have the right to terminate the affected SOW.

| IoT Platform | **Statement of Work** | |
|---|---|---|
| **Identidad IOT** | Project ID No.: 1064765 | **Hewlett Packard Enterprise** |

## 6.    Order and Payment Information

### 6.1.    Price

The initial engagement is proposed to Customer for a fixed labor price of $370,000.00.  Additionally, HPE is offering optional solution management services as described in Tables B below. Travel Expenses are included in these prices. The pricing in this SOW is valid for thirty (30) days after issuance.

Customer will pay all invoices within thirty (30) days from the date of invoice. HPE will issue invoices in accordance with the payment schedule specified in HPE Financial Services Leasing Agreement. HPE may change credit terms upon reasonable notice at any time when, in HPE's opinion, Customer's financial condition, previous payment record, or the nature of Customer's relationship with HPE so warrants.

### 6.2.    Order Information and Project Schedule

Prices are exclusive of, and Customer shall pay HPE or reimburse HPE, any and all Taxes, duties, levies or fees, or other similar charges imposed on HPE or on the Customer by any taxing authority (other than taxes imposed on HPE's income) however designated or levied, based upon or arising from the provision of such Services or the charges for such Services, unless Customer has provided HPE with an appropriate resale or exemption certificate before the associated Professional Services are performed and charges made. If Customer requests that specific HPE personnel perform Services outside the city, state, province, or country in which such personnel are based, Customer shall reimburse HPE for increased Taxes and related out of pocket costs incurred by HPE and/or its personnel as a result of providing such Services.

Services for the Initial Deployment and Integration Services (Milestones 1-6) will be invoiced according to HPE Financial Services Leasing Agreement.

Dates shown on the schedule may change depending on the start date of the project.

The dates may be modified by the parties from time to time and should not be construed as a firm contractual commitment, unless otherwise specifically agreed to herein by the parties for payment or other purposes.

Upon signing of this SOW, HPE will coordinate with the Customer to schedule a mutually agreeable engagement start date based on the availability of the delivered HPE Products, Customer's System and of HPE resources. HPE is not responsible for changes in the schedule and scope of this project caused by delays in the Customer's resource availability

Below is a tentative schedule for the project.



| Milestone No. | Services and/or Deliverable | Dependency | Timeline Estimate | Project Phase | Percentage of Project |
|---|---|---|---|---|---|

**IoT Platform**                    **Statement of Work**

Identidad IOT                    Project ID No.: 1064765                    **Hewlett Packard Enterprise**

| | Description | | | | Completion |
|---|---|---|---|---|---|
| 1 | Planning Activities as described in section 2.1.1 | Signed SOW and PO and kickoff held. | PO + 2 weeks | Design and Planning | 30% |
| 2 | IoT out-of-the-box solution deployed on Lab as defined in section 2.1.2 | Site Checklist completed. | PO + 5 weeks | Solution Deployment | 40% |
| 3 | IoT customizations as defined in section 2.1.3 | IoT Solution Definition document completed. | PO + 8 weeks | | |
| 4 | IoT Installation on Production system as defined in section 2.1.4 | IoT customization complete and site ready for installation | PO + 8 weeks | Testing | 20% |
| 5 | Production Testing support and Training complete as described in section 2.1.5 | Lab Exit complete, Updated Production MOP | PO + 10 weeks | | |
| 6 | Project Acceptance | Soak Period Expired | PO + 12 weeks | Final Acceptance | 10% |

**Table A: Optional Solution Management Services (two year term)**

| Milestone | Services and Deliverable Payment | | Comment/Activity (see section 2.2 for details on individual deliverables) |
|---|---|---|---|
| 1 | 25% | $50,675.00 | Upon receipt of PO for SMS renewal, approximately July 1, 2017 |
| 2 | 25% | $50,675.00 | Second quarterly invoice: approximately October 1, 2017 |
| 3 | 25% | $50,675.00 | Third quarterly invoice: approximately January 1, 2018 |
| 4 | 25% | $50,675.00 | Fourth quarterly invoice: approximately April 1, 2018 |
| 5 | 25% | $50,675.00 | Fifth quarterly invoice: approximately July 1, 2018 |
| 6 | 25% | $50,675.00 | Sixth quarterly invoice: approximately October 1, 2018 |
| 7 | 25% | $50,675.00 | Seventh quarterly invoice: approximately January 1, 2019 |

IoT Platform                    **Statement of Work**

Identidad IOT              Project ID No.: 1064765                    **Hewlett Packard Enterprise**

| 8 | 25% | $50,675.00 | Final quarterly invoice: approximately April 1, 2019 |
|---|-----|------------|------------------------------------------------------|
| **Total services fixed price, including travel** | | **$405,400.00** | |

**IoT Platform**          **Statement of Work**

Identidad IOT          Project ID No.: 1064765          **Hewlett Packard Enterprise**

## 7. Authorization

In addition to Customer's execution of this SOW, HPE shall require a valid acceptable purchase order referencing this SOW in order to begin to provide the Services hereunder and the Customer represents that their execution of this SOW is a binding commitment to purchase the Services described herein. However, in the event that Customer does not issue purchase orders as a matter of business practice, Customer hereby warrants and represents that: i) its signature on this SOW authorizes HPE to provide the Services hereunder, and ii) that Customer shall pay for the Services provided to Customer without the necessity of a purchase order, and iii) Customer will not contest payment for the provision of Services hereunder due to the fact that no purchase order was issued.

Delivery of the Services described in this SOW are subject to satisfactory proof of Customer's ability to pay.

Effective Date: July 28, 2016

**Hewlett Packard Enterprise Company**          **Identidad IOT LLC**

_____          _____

Authorized Signature          Authorized Signature

_____          Andres Sanchez

Printed Name          Printed Name

_____          C.E.O

Title          Title

_____          July 28 2016

Date          Date

**Please email your documents to Mauricio Malpica Zamorano (mauricio.malpica-zamorano@hpe.com) and cc: Melissa Ramirez (melissa.a.ramirez@hpe.com)**

| IoT Platform | **Statement of Work** | |
|---|---|---|
| Identidad IOT | Project ID No.: 1064765 | **Hewlett Packard** Enterprise |

## 8.   Attachment List

Attachment A – HPE Customer Terms – Professional Services

Attachment B – Deliverable Work Product and Phase Acceptance Form

Attachment C – HPE Communications and Media Solutions – Product Support Data Sheet

**IoT Platform**          **Statement of Work**

**Identidad IOT**          Project ID No.: 1064765          **Hewlett Packard Enterprise**

# Attachment A – HPE Customer Terms – Professional Services

1. **Parties.** These terms represent the agreement ("**Agreement**") that governs the purchase of professional services from the Hewlett Packard Enterprise entity identified in the signature section below ("**HPE**") by the Customer entity identified below ("**Customer**").

2. **Orders.** "**Order**" means the accepted order including any supporting material which the parties identify as incorporated either by attachment or reference ("**Supporting Material**"). Supporting Material may include (as examples) specifications, standard or negotiated service descriptions, data sheets and their supplements, and statements of work (SOWs), published warranties and service level agreements, and may be available to Customer in hard copy or by accessing a designated HPE website.

3. **Scope and Order Placement.**  These terms may be used by Customer either for a single Order or as a framework for multiple Orders. In addition, these terms may be used on a global basis by the parties' "**Affiliates**", meaning any entity controlled by, controlling, or under common control with a party. The parties can confirm their agreement to these terms either by signature where indicated at the end or by referencing these terms on Orders. Affiliates participate under these terms by placing orders which specify service delivery in the same country as the HPE Affiliate accepting the Order, referencing these terms, and specifying any additional terms or amendments to reflect local law or business practices.

4. **Order Arrangements.** Customer may place orders with HPE through our website, customer-specific portal, or by letter, fax or e-mail. Where appropriate, orders must specify a service delivery date. If Customer extends the service delivery date of an existing Order beyond ninety (90) days, then it will be considered a new order.

5. **Prices and Taxes.** Prices will be as quoted in writing by HPE or, in the absence of a written quote, as set out on our website, customer-specific portal, or HPE published list price at the time an order is submitted to HPE. Prices are exclusive of taxes, duties, and fees (including installation, shipping, and handling) unless otherwise quoted. If a withholding tax is required by law, please contact the HPE order representative to discuss appropriate procedures. HPE will charge separately for reasonable out-of-pocket expenses, such as travel expenses incurred in providing professional services.

6. **Invoices and Payment.** Customer agrees to pay all invoiced amounts within thirty (30) days of HPE's invoice date. HPE may suspend or cancel performance of open Orders or services if Customer fails to make payments when due.

7. **Professional Services.** HPE will deliver any ordered IT consulting, training or other services as described in the applicable Supporting Material.

8. **Professional Services Acceptance.** The acceptance process (if any) will be described in the applicable Supporting Material, will apply only to the deliverables specified, and shall not apply to other products or services to be provided by HPE.

9. **Dependencies.** HPE's ability to deliver services will depend on Customer's reasonable and timely cooperation and the accuracy and completeness of any information from Customer needed to deliver the services.

10. **Change Orders.** We each agree to appoint a project representative to serve as the principal point of contact in managing the delivery of services and in dealing with issues that may arise. Requests to change the scope of services or deliverables will require a change order signed by both parties.

11. **Services Performance.** Services are performed using generally recognized commercial practices and standards. Customer agrees to provide prompt notice of any such service concerns and HPE will re-perform any service that fails to meet that standard.

12. **Services with Deliverables.** If Supporting Material for services define specific deliverables, HPE warrants those deliverables will conform materially to their written specifications for 30 days following delivery. If Customer notifies HPE of such a non-conformity during the 30 day period HPE will promptly remedy the impacted deliverables or refund to Customer the fees paid for those deliverables and Customer will return those deliverables to HPE.

13. **Eligibility.** HPE's service, support and warranty commitments do not cover claims resulting from:

    1. improper use, site preparation, or site or environmental conditions or other non-compliance with applicable Supporting Material;

    2. Modifications or improper system maintenance or calibration not performed by HPE or authorized by HPE;

    3. failure or functional limitations of any non-HPE software or product impacting systems receiving HPE support or service;

    4. malware (e.g. virus, worm, etc.) not introduced by HPE; or

    5. abuse, negligence, accident, fire or water damage, electrical disturbances, transportation by Customer, or other causes beyond HPE's control.

14. **Remedies.**  This Agreement states all remedies for warranty claims. To the extent permitted by law, HPE disclaims all other warranties.

15. **Intellectual Property Rights.** No transfer of ownership of any intellectual property will occur under this Agreement. Customer grants HPE a non-exclusive, worldwide, royalty-free right and license to any intellectual property that is necessary for HPE and its designees to perform the ordered services. If deliverables are created by HPE specifically for Customer and identified as such in Supporting Material, HPE hereby grants Customer a worldwide, non-exclusive, fully paid, royalty-free license to reproduce and use copies of the deliverables internally.

16. **Intellectual Property Rights Infringement.** HPE will defend and/or settle any claims against Customer that allege that an HPE-branded product or service as supplied under this Agreement infringes the intellectual property rights of a third party. HPE will rely on Customer's prompt notification of the claim and cooperation with our defense. HPE may modify the product or service so as to be non-infringing and materially equivalent, or we may procure a license. If these options are not available, we will refund to Customer the amount paid for the affected product in the first year or the depreciated value thereafter or, for support services, the balance of

**HPE PM Methodology**          **HPE Internal Use O...**

**IoT Platform**          **Statement of Work**

**Identidad IOT**          Project ID No.: 1064765          **Hewlett Packard Enterprise**

any pre-paid amount or, for professional services, the amount paid. HPE is not responsible for claims resulting from any unauthorized use of the products or services. This section shall also apply to deliverables identified as such in the relevant Support Material except that HPE is not responsible for claims resulting from deliverables content or design provided by Customer.

17. **License Term and Termination.** Unless otherwise specified, any license granted is perpetual, provided however that if Customer fails to comply with the terms of this Agreement, HPE may terminate the license upon written notice. Immediately upon termination, or in the case of a limited-term license, upon expiration, Customer will either destroy all copies of the software or return them to HPE, except that Customer may retain one copy for archival purposes only.

18. **Confidentiality.** Information exchanged under this Agreement will be treated as confidential if identified as such at disclosure or if the circumstances of disclosure would reasonably indicate such treatment. Confidential information may only be used for the purpose of fulfilling obligations or exercising rights under this Agreement, and shared with employees, agents or contractors with a need to know such information to support that purpose. Confidential information will be protected using a reasonable degree of care to prevent unauthorized use or disclosure for 3 years from the date of receipt or (if longer) for such period as the information remains confidential. These obligations do not cover information that: i) was known or becomes known to the receiving party without obligation of confidentiality; ii) is independently developed by the receiving party; or iii) where disclosure is required by law or a governmental agency.

19. **Personal Information.** Each party shall comply with their respective obligations under applicable data protection legislation. HPE does not intend to have access to personally identifiable information ("PII") of Customer in providing services. To the extent HPE has access to Customer PII stored on a system or device of Customer, such access will likely be incidental and Customer will remain the data controller of Customer PII at all times. HPE will use any PII to which it has access strictly for purposes of delivering the services ordered.

20. **Global Trade compliance.** Services and products/deliverables provided under these terms are for Customer's internal use and not for further commercialization. If Customer exports, imports or otherwise transfers products and/or deliverables provided under these terms, Customer will be responsible for complying with applicable laws and regulations and for obtaining any required export or import authorizations. HPE may suspend its performance under this Agreement to the extent required by laws applicable to either party.

21. **Limitation of Liability.** HPE's liability to Customer under this Agreement is limited to the greater of $1,000,000 or the amount payable by Customer to HPE for the relevant Order. Neither Customer nor HPE will be liable for lost revenues or profits, downtime costs, loss or damage to data or indirect, special or consequential costs or damages. This provision does not limit either party's liability for: unauthorized use of intellectual property, death or bodily injury caused by their negligence; acts of fraud; willful repudiation of the Agreement; nor any liability which may not be excluded or limited by applicable law.

22. **Disputes.** If Customer is dissatisfied with any services purchased under these terms and disagrees with HPE's proposed resolution, we both agree to promptly escalate the issue to a Vice President (or equivalent executive) in our respective organizations for an amicable resolution without prejudice to the right to later seek a legal remedy.

23. **Force Majeure.** Neither party will be liable for performance delays nor for non-performance due to causes beyond its reasonable control, except for payment obligations.

24. **Termination.** Either party may terminate this Agreement on written notice if the other fails to meet any material obligation and fails to remedy the breach within a reasonable period after being notified in writing of the details. f either party becomes insolvent, unable to pay debts when due, files for or is subject to bankruptcy or receivership or asset assignment, the other party may terminate this Agreement and cancel any unfulfilled obligations. Any terms in the Agreement which by their nature extend beyond termination or expiration of the Agreement will remain in effect until fulfilled and will apply to both parties' respective successors and permitted assigns.

25. **General.** This Agreement represents our entire understanding with respect to its subject matter and supersedes any previous communication or agreements that may exist. Modifications to the Agreement will be made only through a written amendment signed by both parties. The Agreement will be governed by the laws of the country of HPE or the HPE Affiliate accepting the Order and the courts of that locale will have jurisdiction, however, HPE or its Affiliate may, bring suit for payment in the country where the Customer Affiliate that placed the Order is located. Customer and HPE agree that the United Nations Convention on Contracts for the International Sale of Goods will not apply. Claims arising or raised in the United States will be governed by the laws of the state of California, excluding rules as to choice and conflict of law.

**IoT Platform**          **Statement of Work**

Identidad IOT                    Project ID No.: 1064765                                          **Hewlett Packard**
                                                                                                  **Enterprise**

## Attachment B – Deliverable Work Product and Phase Acceptance Form

Statement of Work:    **UIoT Platform**

Deliverable Work Product or Phase Name:    _____

Date Delivered to Customer:    _____

Signature below signifies that HPE completed and provided the Deliverable Work Product or Phase named above and Identidad IOT accepts said Deliverable Work Product or Phase.

Check One

Accepted: _____          Rejected: _____

If rejected, provide the reason for rejection below:

Services under this agreement shall be accepted according to the Statement of Work for this project.

**Hewlett Packard Enterprise Company**          **Identidad IOT LLC**

_____          _____
Signature (Project Manager)                      Signature (Project Manager)

_____          Andres Sanchez
Name                                             Name

_____          C.EO
Title                                            Title

_____          July 28 2016
Date                                             Effective Date

## Attachment C – HPE Communications and Media Solutions – Product Support Data Sheet

HPE PM Methodology          HPE Internal Use Only

**IoT Platform**   **Statement of Work**

Identidad IOT              Project ID No.: 1064765              **Hewlett Packard**
Enterprise



HPE CMS
Foundation Suppor



**IDENTIDAD IOT**

7950 NW 53 Street; Suite 132
Doral FL 33166
786-242-2224

# PURCHASE ORDER

| DATE | 7/28/16 |
|---|---|
| PO # | 12016 |

**VENDOR**

HEWLETT PACKARD ENTERPRISE COMPANY
Mauricio Malpica
3000 HANOVER ST
PALO ALTO CA 94304-1112 US
Phone:+1(512)970-5658

**SHIP TO**

Andres Sanchez
Identidad IOT
7950 NW 53 Street; Suite 132
Doral FL 33166
786-242-2224

| REQUISITIONER | SHIP VIA | F.O.B. | SHIPPING TERMS |
|---|---|---|---|
|  |  |  |  |

| ITEM # | DESCRIPTION | QTY | UNIT PRICE | TOTAL | COMM |
|---|---|---|---|---|---|
| HM610A3 | HPE SW Enterprise Standard 3yr Support | 1 |  |  | Commercial platform support |
| Opt. XG6 | Software XG6 Supp | 5 | 142,112.50 | 142,112.50 |  |
| Opt. TKP | Software TKP Supp | 5 | 70,230.05 | 70,230.05 |  |
| Opt. T1Q | Software T1Q Supp | 5 | 37,892.00 | 37,892.00 |  |
| Opt. SZ9 | Software SZ9 Supp | 1 |  |  |  |
| HM611A3 | HPE SW Enterprise Basic 3yr Support | 1 |  |  | Lab support |
| Opt. 9VP | Software 9VP Supp | 1 |  |  |  |
| Opt. 4V4 | Software 4V4 Supp | 1 | 8,670.00 | 8,670.00 |  |

**Comments or Special Instructions**

Payment term : NET30

Email for license delivery:

asanchez@identidadtelecom.net

| | |
|---|---|
| SUBTOTAL | 258,904.55 |
| TAX | - |
| SHIPPING | - |
| OTHER | - |
| **TOTAL** | **$  258,904.55** |



**Hewlett Packard
Enterprise**

**Legal Quotation**

To: **Identidad Advertising Development,
LLC
1400 NW 107th Ave
Suite 430
Doral, FL 33172**


**Attn: Andres Sanchez
Phone: (786) 899-2265
Fax:
Email: asanchez@identidadtelecomm.net**

**In reply to your request:**
Telecom UIOT Platform Support Only

| **HPE Quote #** | **Created** | **Expires** |
|---|---|---|
| USSW-60981-04 | 7/26/2016 | 7/31/2016 |

**Your HPE Sales Contact:**

Mauricio Malpica Zamorano,
Phone:    (512) 970-5658
Fax:
Email:    mauricio.malpica-zamorano@hpe.com
**Payment Terms:**
Net 30 days from the invoice date, subject to
credit approval.
**Submit Purchase Order To:**
Ali Behrens,
Phone:    1-916-785-4864
Fax:
Email:    HPSW_US_Orders8@hpe.com
8000 Foothills Blvd
Roseville, CA 95747

| Solution | Net Price |
|---|---|
| Hardware: | US$           0.00 |
| Software: | US$           0.00 |
| Support: | US$    250,234.55 |
| Installation: | US$           0.00 |
| Other: | US$           0.00 |
| Sub-Total: | US$    250,234.55 |
| Shipping and Handling: | US$           0.00 |
| **Grand Total:** | **US$    250,234.55** |

**Estimated delivery upon PO receipt (in business days):**

**Delivery Method:**
Standard
Delivery Duty Paid

Print Date:        7/26/2016  12:23:21PM



**Hewlett Packard**
Enterprise
Legal Quotation

| | Quote Number | Page |
|---|---|---|
| | USSW-60981-04 | 2 |

| No. | Qty | Product | Description | Extended Item Net Price | Estimated Delivery Upon Order Entry |
|---|---|---|---|---|---|
| 0100 | 1 | HM610A3 | HPE SW Enterprise Standard 3yr Support | | |
| | 5 | Opt. XG6 | Software XG6 Supp | 142,112.50 | |
| | 5 | Opt. TKP | Software TKP Supp | 70,230.05 | |
| | 5 | Opt. T1Q | Software T1Q Supp | 37,892.00 | |
| | 1 | Opt. SZ9 | Software SZ9 Supp | | |
| | | | **Grand Total:** | US$ 250,234.55 | |

**HPE Proprietary for Customer Use Only - Do Not Share**



**Hewlett Packard**
Enterprise

**Legal Quotation**

| Quote Number | Page |
|---|---|
| USSW-60981-04 | 3 |

Upon issuing a Purchase Order to Hewlett Packard Enterprise please include the following:
• Hewlett Packard Enterprise. listed as the Vendor
• Bill to & ship to addresses
• PO# and valid HPE quote number
• Contact name, phone number & e-Mail address
• For electronic software include the end user e-Mail Address
• Requested delivery date (per SLA requirements) and any special delivery requirements
• Tax status & payment terms
• If support is ordered provide the end user's name and phone number. For upgrades include the
   serial number or the support identifier for contract entitlement.
In addition:
• Prices are exclusive of use, sales value added and other taxes. Should the item(s) being quoted herein be exempt
   from sales tax please include the appropriate valid tax exemption certificate referencing Hewlett Packard Enterprise.
   as the vendor.
• Changes on product mix and/or quantities may affect the discount percentage.
• Products purchased under this quote must be placed on one purchase order and no products may be added at a
   later date.
• The sale of products under this quotation will be predicated upon ordering the products and quantities as specified
   on the quotation.
• Software products must be delivered to one location with a requested delivery date. Products shall be electronically
   delivered on or about the day the order is placed.
• Additional license authorizations and restrictions applicable to your software product are found at
   www.hpe.com/software/SWLicensing

Governing terms for this quotation will be either: (i) the valid master agreement with Hewlett Packard Enterprise identified at the bottom of
this page; or (ii) one of the individual Hewlett Packard Enterprise Customer Terms Agreements identified immediately below.
Individual HPE Customer Terms Agreements are available as follows:
• For Software purchases: http://h20195.www2.hp.com/V2/GetPDF.aspx/4AA6-0414ENUS.
• For Software-as-a-Service purchases: http://h20195.www2.hp.com/V2/GetPDF.aspx/4AA6-0650ENW.
In addition:
• For HPE Support Services, the Data Sheet applicable to your purchase can be found here:
https://softwaresupport.hp.com/web/softwaresupport/software-support-offerings.
• For HPE Service Manager by Subscription (SMS) purchases, the following Data Sheet also applies:
http://www8.hp.com/us/en/software-solutions/software.html?compURI=1173779#tab=TAB1. SM-S is available for a one (1), two (2) or three
(3) year subscription period. Customer is required to submit a purchase order reflecting the elected subscription period. This offering will be
billed in advance for the first year of the elected subscription period. Customer shall receive an annual invoice for the fees for each additional
elected year of the subscription period that will reference the purchase order submitted with the original order.
• For Software Term Licenses: Upon delivery of your Term License Key, you will receive up to 7 calendar days to activate. If key is activated
more than 7 days after delivery, the license term duration will reflect the remaining available days on the Term license.
• For Training Units for HPE Software Education and subsequent delivery of HPE Software Education Services: HPE Software Education
Delivery Policies also apply and are posted to: https://h20546.www2.hp.com/main/orderprocessing/policy.cfm?sitepick=US
• If you purchased Vertica: Hewlett Packard Enterprise may transfer all its rights and obligations under the agreement[s] covered by this
quotation to Vertica Systems, Inc. or another subsidiary or affiliate of HPE. By entering into the agreement(s) you hereby provide your
consent[s] to such transfer in advance. Hewlett Packard Enterprise may nevertheless continue to invoice you, acting as the invoicing and
payment agent.
The value of educational services offered in this quote corresponds to the purchase of the HPE Vertica training units applied herein. All Hewlett
Packard Enterprise Customer Terms are located here: http://www8.hp.com/us/en/hpe/hp-information/end-user-agreement/terms.html

**HPE Proprietary for Customer Use Only - Do Not Share**

# Exhibit "9"



**Hewlett Packard**
Enterprise

# Identidad UIoT Project List of Deliverables and Gantt Chart Review

**September 5th, 2016**

# Gantt Chart Overview

| ID | (i) | Task Mode | Task Name | Start | Finish |
|---|---|---|---|---|---|
| 1 | (i) | ➡ | **Identidad IoT Solution Deployment** | **Mon 8/15/16** | **Fri 10/28/16** |
| 2 | | | **Design and Documentation** | **Mon 8/15/16** | **Fri 9/9/16** |
| 3 | | ➡ | **HPE UIoT Platform Solution Definition Documents** | **Mon 8/15/16** | **Thu 9/8/16** |
| 12 | 📅 | | Customer Workshop with WW to agree and sign Design Documents | Tue 9/6/16 | Fri 9/9/16 |
| 13 | | | **Solution Design and ATP Documents Signed** | Fri 9/9/16 | Fri 9/9/16 |
| 14 | | | **HW installation and Configuration** | **Mon 9/12/16** | **Thu 9/15/16** |
| 15 | 📅 | | HW - OS and Remote Access Installation | Mon 9/12/16 | Wed 9/14/16 |
| 16 | 📅 | | Switch Installation | Mon 9/12/16 | Tue 9/13/16 |
| 17 | | | HW Configurations | Thu 9/15/16 | Thu 9/15/16 |
| 18 | | | HW Acceptance | Thu 9/15/16 | Thu 9/15/16 |
| 19 | | | **Use Case Configuration** | **Mon 9/12/16** | **Fri 10/14/16** |
| 20 | 📅 | | Configuration and Integration Development | Fri 9/16/16 | Fri 10/14/16 |
| 21 | | | **UIOT Platform Installation, Configuration, and Integration** | **Fri 9/16/16** | **Thu 10/20/16** |
| 22 | ⚠ | | UIoT Platform v1.2 Lab (Baseline) Non-HA | Fri 10/7/16 | Thu 10/20/16 |
| 23 | ⚠ | | UIoT Platform v1.2 Production (Baseline) HA | Fri 9/16/16 | Thu 10/6/16 |
| 24 | 🔴 | | LB and NW Tunning and Configurations | Fri 9/16/16 | Tue 9/20/16 |
| 25 | | | **Production Testing** | **Mon 10/17/16** | **Wed 10/26/16** |
| 26 | | | **UIoT Testing** | **Mon 10/17/16** | **Fri 10/21/16** |
| 27 | 🔴 | | Unit Functional and Volume Testing | Mon 10/17/16 | Tue 10/18/16 |
| 28 | 🔴 | | Bug Fixes | Wed 10/19/16 | Wed 10/19/16 |
| 29 | 🔴 | | E2E Integration Testing | Thu 10/20/16 | Fri 10/21/16 |
| 30 | 🔴 | | UAT Execution and Defect fixes | Mon 10/24/16 | Tue 10/25/16 |
| 31 | 🔴 | | ATP result document | Wed 10/26/16 | Wed 10/26/16 |
| 32 | | | **Production Environment Accepted** | Wed 10/26/16 | Wed 10/26/16 |
| 33 | | | **LAB Testing** | **Wed 10/26/16** | **Fri 10/28/16** |
| 34 | | | **UIoT Testing** | **Wed 10/26/16** | **Fri 10/28/16** |
| 35 | 🔴 | | Unit Functional and Volume Testing | Wed 10/26/16 | Wed 10/26/16 |
| 36 | | | Bug Fixes | Thu 10/27/16 | Thu 10/27/16 |
| 37 | 🔴 | | E2E Integration and Use Case Testing | Fri 10/28/16 | Fri 10/28/16 |
| 38 | | | ATP result document | Fri 10/28/16 | Fri 10/28/16 |
| 39 | | | **Acceptance and Handover** | **Fri 10/7/16** | **Fri 10/28/16** |
| 40 | 📅 | | Training | Mon 10/24/16 | Fri 10/28/16 |
| 41 | 🔴 | | Support operations document | Fri 10/7/16 | Fri 10/7/16 |

# Deliverables List – SOW vs Actual Project Deliverables

**Milestone 1 Deliverables – Planning Activities and Documentation**
- Solution Definition Documents
  - HPE IoT Scope – IoT features
  - HPE IoT Interface Definition
  - HPE IoT Use Cases
  - HPE IoT High Availability Diagram
  - HPE IoT Network Diagram
  - HPE IoT Database description
- Site Readiness Checklist
- Acceptance Test Plan
- Method of Procedures for:
  - Software installation and configuration
  - Production cutover (if required)

**Milestone 2 Deliverables – Lab Deployment**
- UIoT Platform release notes
- UIoT Platform installation files

**Milestone 3 Deliverables – IoT Customizations for Identidad Telecom**
- Release notes for IoT Customization and Configuration
- UIoT Platform patch installation files (if needed)

**Milestone 4 Deliverables – Production Deployment and Functional Testing**
- Modified Production MOP (if necessary)
- Updated Production Site Readiness Checklist

**Milestone 5 Deliverables – Production Testing Support and Training**
- ATP Results Document
- Training Slides

**Milestone 6 Deliverables – Acceptance and Transition to Support**
- Support Operations Document

**Milestone 1 – Documentation**
- **Product UIoT Documentation**
  - HPE UIoT Features description
  - HPE UIoT External Interfaces guide
  - HPE UIoT Users guide
  - HPE UIoT Installation and configuration guide
  - HPE UIoT Troubleshooting guide
  - HPE UIoT Onboarding guides (devices, protocols, applications)
  - UIoT Platform Release Notes

- **Identidad Solution Definition Documents**
  - Identidad UIoT solution design
  - HPE UIoT Use Cases for Identidad
  - HPE UIoT Architecture diagram
  - Site Readiness Checklist
  - Acceptance Test Plan

**Milestone 2 – Production Testing Support and Training**
- ATP completed with no critical issues
  - ATP Results Document
- 5 days onsite training completed
  - Training slides
- Transition to support (1 hour review)
  - HPE CMS Support Operations Document
  - Identidad Operational Maintenance Guide (MOP)

**Hewlett Packard**
Enterprise

Private

3

# Deliverables List – SOW vs Actual Project Deliverables

## SOW Milestone and Deliverables

- Solution Definition Documents
  - HPE IoT Scope – IoT features
  - HPE IoT Interface Definition
  - HPE IoT Use Cases
  - HPE IoT High Availability Diagram
  - HPE IoT Network Diagram
  - HPE IoT Database description
- Site Readiness Checklist
- Acceptance Test Plan
- Method of Procedures for:
  - Software installation and configuration
  - Production cutover (if required)

- UIoT Platform release notes
- UIoT Platform installation files

- Release notes for IoT Customization and Configuration
- UIoT Platform patch installation files (if needed)

- Modified Production MOP (if necessary)
- Updated Production Site Readiness Checklist

- ATP Results Document
- Training Slides

- Support Operations Document

## Delivered or To be Delivered

- **Identidad Solution Definition Documents**
  - Identidad UIoT solution design
  - HPE UIoT Use Cases for Identidad
  - HPE UIoT Architecture diagram
  - Site Readiness Checklist
  - Acceptance Test Plan

- **Product UIoT Documentation**
  - HPE UIoT Features description
  - HPE UIoT External Interfaces guide
  - HPE UIoT Users guide
  - HPE UIoT Installation and configuration guide
  - HPE UIoT Troubleshooting guide
  - HPE UIoT Onboarding guides (devices, protocols, applications)
  - UIoT Platform Release Notes

**Milestone 2 – Production Testing Support and Training**
- ATP completed with no critical issues
  - ATP Results Document
- 5 days onsite training completed
  - Training slides
- Transition to support (1 hour review)
  - HPE CMS Support Operations Document
  - Identidad Operational Maintenance Guide (MOP)

Private

4

**Hewlett Packard**
Enterprise



# Exhibit

# "10"



| | |
|---|---|
| Quote Date: | 9/2/16 |
| Exp Date: | 10/2/16 |
| Quote No: | AR3-98482-06 |

VeriStor Systems, Inc
4850 River Green Parkway
Duluth, GA  30096
Phone:  678-990-1593
Fax:  678-990-1597

*Quote Prepared For:*
Identidad Advertising Development LLC
Andres Sanchez
7950 NW 53rd Street, #132
Doral, FL 33166
(786) 899-2265
asanchez@identidadtelecomm.net

| Item No. | | Description | Qty | Price | Extended |
|---|---|---|---|---|---|

### HP 5700 40XG 2QSFP Switch

| | | Hardware | | | |
|---|---|---|---|---|---|
| JG896A | | HPE 5700 40XG 2QSFP+ Switch | 2 | $4,343.00 | $8,686.00 |
| JG900A | | HPE A58x0AF 300W AC Power Supply | 4 | $261.00 | $1,044.00 |
| JD118B | | HPE X120 1G SFP LC SX Transceiver | 8 | $159.00 | $1,272.00 |
| JD089B | | HPE X120 1G SFP RJ45 T Transceiver | 8 | $137.00 | $1,096.00 |
| JD092B | | HPE X130 10G SFP+ LC SR Transceiver | 10 | $520.00 | $5,200.00 |
| JG326A | | HPE X240 40G QSFP+ QSFP+ 1m DAC Cable | 2 | $150.00 | $300.00 |
| JC682A | | HPE 58x0AF Bck(pwr) Frt(prt) Fan Tray | 4 | $95.00 | $380.00 |
| | | **Software** | | | |
| JH061A | | HPE 57xx CTO Switch Solution | 2 | $1.00 | $2.00 |
| | | **Maintenance** | | | |
| H1K92A3 | | HPE 3Y Proactive Care 24x7 Service | 1 | $0.00 | $0.00 |
| H1K92A3 | TF4 | HPE FF 5700 Switch Support | 2 | $1,001.00 | $2,002.00 |
| | | **Installation** | | | |
| HA114A1 | 5RN | HPE Top of Rack Startup SVC | 2 | $1,952.00 | $3,904.00 |

Total:   $23,886.00

Account Executive: Mark Barnard
Phone: 727-934-6009
Email:mbarnard@veristor.com

*All prices are in U.S. Dollars and are exclusive of sales, use or like taxes.*
*Pricing is valid for 30 days unless otherwise extended in writing by VeriStor.*
*FOB Origin - Customer will be responsible for Shipping cost once unit has been shipped.*
*Payment Terms: Net-30 Days*



| | | | | |
|---|---|---|---|---|
| **Quote Date:** | | | | 9/22/16 |
| **Exp Date:** | | | | 10/22/16 |
| **Quote No:** | | | | AR4-02649-01 |

VeriStor Systems, Inc
4850 River Green Parkway
Duluth, GA  30096
Phone:  678-990-1593
Fax:  678-990-1597

Quote Prepared For:
Identidad Advertising Development LLC
Andres Sanchez
7950 NW 53rd Street, #132
Doral, FL 33166
(786) 899-2265
asanchez@identidadtelecomm.net

| Item No. | Description | Qty | Price | Extended |
|---|---|---|---|---|
| | **HPE 5130 Switches** | | | |
| | **Hardware** | | | |
| JH323A | HPE 5130 24G 4SFP+ 1-slot HI Switch | 2 | $1,438.00 | $2,876.00 |
| JH157A | HPE 5130/5510 10GbE SFP+ 2p Module | 2 | $647.00 | $1,294.00 |
| JD362A | HP 5500 150WAC Power Supply | 4 | $255.00 | $1,020.00 |
| JD092B | HPE X130 10G SFP+ LC SR Transceiver | 8 | $517.00 | $4,136.00 |
| JD095C | HPE X240 10G SFP+ SFP+ 0.65m DAC Cable | 2 | $70.00 | $140.00 |
| | **Maintenance** | | | |
| U7DT1E | HPE 3Y PC 24x7 HPE 5130 24G 4SFP+ 1- SVC | 2 | $1,194.00 | $2,388.00 |
| | **Installation** | | | |
| UX119E | HPE Networks 55xx Startup SVC | 2 | $827.00 | $1,654.00 |
| | | | Total: | $13,508.00 |

Account Executive: Mark Barnard
Phone: 727-934-6009
Email:mbarnard@veristor.com

All prices are in U.S. Dollars and are exclusive of sales, use or like taxes.
Pricing is valid for 30 days unless otherwise extended in writing by VeriStor.
FOB Origin - Customer will be responsible for Shipping cost once unit has been shipped.
Payment Terms: Net-30 Days

# Exhibit "11"



| Deliverables and Milestones: *SIS Installation* | Prepared by: | *Henry Medina* |
|---|---|---|

- **Production System Assumptions/Prerequisites:**

  1. *Existing Barracuda load balancer will be reused for SIS High availability*
  2. *Existing UIoT platform EDB will be re-used for HPE SIS module*
  3. *Current SIS deployment can support up to 3 applications for transactions per second(TPS) up to 230 with individual services having average response time less than 100 ms.*
  4. *Max concurrent requests across application is 100.*

- **HPE SIS Test system** *will be installed on virtual Machine on top HPE DL 360 windows hyper v.  The VM shall be installed with SIS FE, SIS BE, SIS Designer and DSS components.*

- **Test system assumptions:**

  1. *HPE SIS Test system is single instance non high available (HA) deployment.*
  2. *To be used only for functional test and is not presently sized for performance testing.*
  3. *Existing UIoT Test EDB will be used by the HPE SIS Test platform.*
  4. *I.P. allocation and installation will be agreed with Identidad IOT during VM installation.*

- **Deliverables:**

  1. *SIS V1.1 Documentation*
  2. *User Acceptance Test Cases*
  3. *Training slides*

- **High Level plan:**

  1. *Installation and configuration will be remote for a period of 3 weeks*
  2. *Standalone demo application will be deployed for Identidad IOT acceptance.*
  3. *User Acceptance for SIS will be remote using the stand alone demo application deployed – 1 day.*
  4. *Training for SIS will be remote – 1 day*

| Price Amount - *$5,042.70 annual support* | Prepared by: | *Henry Medina* |
|---|---|---|

1. HPE investment – total cost: $55,000. **No cost to the customer.**
2. Identidad IOT cost for support – total price: $5,042.70. HPE quotes for support to be provided to Identidad IOT separately from this Delivery Agreement Document (shown below for reference).
   a. USSW-62612-01 – (Production Systems) SIS CAT A 100k Devices 1yr24x7
   b. USSW-62629-01 – (Lab Systems) ACE SIS IoT 1yr 9x5

| **HPE: Mark the appropriate action for your signature on this Delivery Agreement document.**<br>__ Approve __ Reject __Acknowledge __Cancel | **Customer: Mark the appropriate action for your signature on this Delivery Agreement document.**<br>__ Approve __ Reject __Acknowledge __Cancel |
|---|---|
| **Hewlett Packard Enterprise** | **Identidad IOT** |

| **Name:** | | **Name:** | |
|---|---|---|---|
| **Signature:** | | **Signature:** | |
| **Date:** | | **Date:** | |

# Exhibit "12"

| ID | Task Name | Duration | % Complete | Start | Finish | W |
|---|---|---|---|---|---|---|
| 1 | Identidad IoT Solution Deployment | 112 days? | 60% | Mon 8/15/16 | Tue 1/17/17 | |
| 2 | Design and Documentation | 20 days | 100% | Mon 8/15/16 | Fri 9/9/16 | |
| 3 | HPE UIoT Platform Solution Definition Documents | 20 days | 100% | Mon 8/15/16 | Fri 9/9/16 | |
| 4 | HPE Identidad IoT Solution Design and Description | 10 days | 100% | Mon 8/22/16 | Fri 9/2/16 | |
| 5 | HPE IoT High Availability Document | 5 days | 100% | Mon 8/22/16 | Fri 8/26/16 | |
| 6 | HPE IoT External Interface Definition | 10 days | 100% | Mon 8/22/16 | Fri 9/2/16 | |
| 7 | HPE IoT Conceptual Use Case Definition | 5 days | 100% | Mon 8/22/16 | Fri 8/26/16 | |
| 8 | OSS - SNMP Trap Integration Scope | 10 days | 100% | Mon 8/22/16 | Fri 9/2/16 | |
| 9 | CDRs Creation and Reporting Scope | 10 days | 100% | Mon 8/22/16 | Fri 9/2/16 | |
| 10 | HPE IoT Network Diagram - Architecture | 5 days | 100% | Mon 8/22/16 | Fri 8/26/16 | |
| 11 | Acceptance Test Plan (Solution and Use case) Document | 20 days | 100% | Mon 8/15/16 | Fri 9/9/16 | |
| 12 | Customer Workshop with WW to agree and sign Design Documents | 4 days | 100% | Tue 9/6/16 | Fri 9/9/16 | |
| 13 | Solution Design and ATP Documents Signed | 0 days | 100% | Fri 9/9/16 | Fri 9/9/16 | |
| 14 | HW installation and Configuration | 26 days | 75% | Fri 10/14/16 | Fri 11/18/16 | |
| 15 | HW - Stack and Rack and OS Installation | 3 days | 100% | Fri 10/14/16 | Tue 10/18/16 | |
| 16 | Switch Installation | 1 day | 100% | Fri 11/11/16 | Fri 11/11/16 | |
| 17 | HW - OS and Remote Access Installation | 2 days | 100% | Mon 11/14/16 | Tue 11/15/16 | |
| 18 | Switch Network Configurations | 2 days | 0% | Thu 11/17/16 | Fri 11/18/16 | |

| | | |
|---|---|---|
| Task | | Manual Summary Rollup |
| Split | | Manual Summary |
| Milestone | | Start-only |
| Summary | | Finish-only |
| Project Summary | | External Tasks |
| Inactive Task | | External Milestone |
| Inactive Milestone | | Deadline |
| Inactive Summary | | Progress |
| Manual Task | | Manual Progress |
| Duration-only | | |

Project: IoT Solution_Project Plan
Date: Wed 11/16/16

Page 1

| ID | Task Name | Duration | % Complete | Start | Finish | W |
|----|-----------|----------|------------|-------|--------|---|
| 19 | HW Acceptance | 0 days | 0% | Tue 11/15/16 | Tue 11/15/16 | |
| 20 | **Smart Parking Configuration** | **25 days** | **60%** | **Mon 9/12/16** | **Fri 10/14/16** | |
| 21 | Configuration and Integration Development | 25 days | 60% | Mon 9/12/16 | Fri 10/14/16 | |
| 22 | **UIOT Platform Installation, Configuration, and Integration** | **30 days** | **46%** | **Fri 10/28/16** | **Thu 12/8/16** | |
| 23 | UIoT Platform v1.2 Lab (Baseline) Non-HA | 19 days | 50% | Fri 10/28/16 | Wed 11/23/16 | |
| 24 | UIoT Platform v1.2 Production (Baseline) HA | 26 days | 50% | Fri 10/28/16 | Fri 12/2/16 | |
| 25 | Smart Parking Onboarding | 4 days | 0% | Mon 12/5/16 | Thu 12/8/16 | |
| 26 | **Production Testing** | **19 days** | **0%** | **Mon 11/28/16** | **Thu 12/22/16** | |
| 27 | **UIoT Testing** | **15 days** | **0%** | **Mon 11/28/16** | **Fri 12/16/16** | |
| 28 | System Integration Testing, E2E Integration Testing | 10 days | 0% | Mon 11/28/16 | Fri 12/9/16 | |
| 29 | UAT Validation | 5 days | 0% | Mon 12/12/16 | Fri 12/16/16 | |
| 30 | UAT Execution | 4 days | 0% | Mon 12/19/16 | Thu 12/22/16 | |
| 31 | ATP result document | 0 days | 0% | Thu 12/22/16 | Thu 12/22/16 | |
| 32 | Production Environment Accepted | 0 days | 0% | Thu 12/22/16 | Thu 12/22/16 | |
| 33 | **Training and Handover** | **5 days** | **0%** | **Mon 1/9/17** | **Fri 1/13/17** | |
| 34 | Training | 5 days | 0% | Mon 1/9/17 | Fri 1/13/17 | |
| 35 | Support operations document | 0 days | 0% | Fri 1/13/17 | Fri 1/13/17 | |
| 36 | **UIoT Platform Acceptance** | **1 day?** | **0%** | **Fri 1/13/17** | **Mon 1/16/17** | |
| 37 | | | 0% | | | |

| | | | |
|---|---|---|---|
| Task | | Manual Summary Rollup | |
| Split | | Manual Summary | |
| Milestone | ◆ | Start-only | |
| Summary | | Finish-only | |
| Project Summary | | External Tasks | |
| Inactive Task | | External Milestone | ◇ |
| Inactive Milestone | ◇ | Deadline | ➔ |
| Inactive Summary | | Progress | |
| Manual Task | | Manual Progress | |
| Duration-only | | | |

Project: IoT Solution_Project Plan
Date: Wed 11/16/16

Page 2

| ID | Task Name | Duration | % Complete | Start | Finish | W |
|----|-----------|----------|------------|-------|--------|---|
| 38 | **LAB Testing** | **8 days** | | **0% Mon 1/2/17** | **Wed 1/11/17** | |
| 39 | **UIoT Testing** | **8 days** | | **0% Mon 1/2/17** | **Wed 1/11/17** | |
| 40 | System Integration Testing, E2E Integration Testing, Use Case Testing using Device Similator | 8 days | | 0% Mon 1/2/17 | Wed 1/11/17 | |
| 41 | ATP result document | 0 days | | 0% Wed 1/11/17 | Wed 1/11/17 | |
| 42 | **Use Case #2 and #3 Onboarding on Production Systems** | **4 days** | | **0% Thu 1/12/17** | **Tue 1/17/17** | |
| 43 | Use Case #2 - Fleet Management | 2 days | | 0% Thu 1/12/17 | Fri 1/13/17 | |
| 44 | Use Case #3 - Personal Tracking | 2 days | | 0% Mon 1/16/17 | Tue 1/17/17 | |

Task
Split
Milestone
Summary
Project Summary
Inactive Task
Inactive Milestone
Inactive Summary
Manual Task
Duration-only

Manual Summary Rollup
Manual Summary
Start-only
Finish-only
External Tasks
External Milestone
Deadline
Progress
Manual Progress

Project: IoT Solution_Project Plan
Date: Wed 11/16/16

Page 3

9/9

| | | | | |
|---|---|---|---|---|
| Task | | Manual Summary Rollup | | |
| Split | | Manual Summary | | |
| Milestone | | Start-only | | |
| Summary | | Finish-only | | |
| Project Summary | | External Tasks | | |
| Inactive Task | | External Milestone | | |
| Inactive Milestone | | Deadline | | |
| Inactive Summary | | Progress | | |
| Manual Task | | Manual Progress | | |
| Duration-only | | | | |

Project: IoT Solution_Project Plan
Date: Wed 11/16/16

Page 4

**Legend**

| | | |
|---|---|---|
| Task | Manual Summary Rollup | |
| Split | Manual Summary | |
| Milestone | Start-only | |
| Summary | Finish-only | |
| Project Summary | External Tasks | |
| Inactive Task | External Milestone | |
| Inactive Milestone | Deadline | |
| Inactive Summary | Progress | |
| Manual Task | Manual Progress | |
| Duration-only | | |

Project: IoT Solution_Project Plan
Date: Wed 11/16/16

**1/11**

| | | |
|---|---|---|
| Task | | Manual Summary Rollup |
| Split | | Manual Summary |
| Milestone | | Start-only |
| Summary | | Finish-only |
| Project Summary | | External Tasks |
| Inactive Task | | External Milestone |
| Inactive Milestone | | Deadline |
| Inactive Summary | | Progress |
| Manual Task | | Manual Progress |
| Duration-only | | |

Project: IoT Solution_Project Plan
Date: Wed 11/16/16

Page 6

# Exhibit "13"

| ID | Task Mode | Task Name | Duration | % Complete | Start |
|----|-----------|-----------|----------|------------|-------|
| 1 | | **Identidad IoT Solution Deployment** | 128 days | 62% | Mon 8/15/16 |
| 2 | | **Design and Documentation** | 20 days | 100% | Mon 8/15/16 |
| 14 | | **HW installation and Configuration** | 34 days | 100% | Fri 10/14/16 |
| 20 | | **Smart Parking Development** | 25 days | 100% | Mon 9/12/16 |
| 22 | | **UIOT Platform Installation, Configuration, and Integration** | 50 days | 39% | Fri 10/28/16 |
| 23 | | UIoT Platform v1.2 Lab (Baseline) Non-HA | 31 days | 45% | Fri 10/28/16 |
| 24 | | UIoT Platform v1.2 Production (Baseline) HA | 36 days | 43% | Fri 10/28/16 |
| 25 | | Smart Parking Onboarding | 4 days | 0% | Mon 12/19/16 |
| 26 | | Fleet Management Onboarding | 4 days | 0% | Mon 1/2/17 |
| 27 | | **Production Testing** | 30 days | 0% | Mon 12/19/16 |
| 28 | | **UIoT Testing** | 20 days | 0% | Mon 12/19/16 |
| 29 | | System Integration Testing, E2E Integration Testing | 5 days | 0% | Mon 12/19/16 |
| 30 | | UAT Validation | 5 days | 0% | Mon 1/9/17 |
| 31 | | UAT Execution - UIoT Platform and Use Case #1 and #2 | 10 days | 0% | Mon 1/16/17 |
| 32 | | ATP result document | 0 days | 0% | Fri 1/27/17 |
| 33 | | UIoT Platform Acceptance | 0 days | 0% | Fri 1/27/17 |
| 34 | | **LAB Testing** | 8 days | 0% | Mon 12/19/16 |

| | | | | | |
|---|---|---|---|---|---|
| Task | | Manual Summary Rollup | | | |
| Split | | Manual Summary | | | |
| Milestone | | Start-only | | | |
| Summary | | Finish-only | | | |
| Project Summary | | External Tasks | | | |
| Inactive Task | | External Milestone | | | |
| Inactive Milestone | | Deadline | | | |
| Inactive Summary | | Progress | | | |
| Manual Task | | Manual Progress | | | |
| Duration-only | | | | | |

Project: IoT Solution_Project Plan
Date: Thu 12/8/16

Page 1

| ID | Task Mode | Task Name | Duration | % Complete | Start |
|---|---|---|---|---|---|
| 35 | | **UIoT Testing** | **8 days** | | **0% Mon 12/19/16** |
| 36 | | System Integration Testing, E2E Integration Testing, Use Case Testing using | 8 days | | 0% Mon 12/19/16 |
| 37 | | **Training and Handover** | **5 days** | | **0% Mon 1/30/17** |
| 38 | | Training | 5 days | | 0% Mon 1/30/17 |
| 39 | | Support operations document | 0 days | | 0% Fri 2/3/17 |
| 40 | | **Use Case #3 Onboarding on Production Systems** | **4 days** | | **0% Mon 1/30/17** |
| 41 | | Use Case #3 - Personal Tracking | 4 days | | 0% Mon 1/30/17 |
| 42 | | UAT Execution for Use Case #3 | 3 days | | 0% Mon 2/6/17 |

Task
Split
Milestone
Summary
Project Summary
Inactive Task
Inactive Milestone
Inactive Summary
Manual Task
Duration-only

Manual Summary Rollup
Manual Summary
Start-only
Finish-only
External Tasks
External Milestone
Deadline
Progress
Manual Progress

Project: IoT Solution_Project Plan
Date: Thu 12/8/16

Page 2



| Finish | Predecessors | Resource Names |
|---|---|---|
| **Wed 2/8/17** | | |
| | | |
| **Fri 9/9/16** | | |
| **Wed 11/30/16** | | |
| **Fri 10/14/16** | 7 | |
| **Thu 1/5/17** | | |
| Fri 12/9/16 | | HPE |
| Fri 12/16/16 | | HPE |
| Thu 12/22/16 | 24 | HPE |
| Thu 1/5/17 | 25FS+6 days | HPE |
| **Fri 1/27/17** | | |
| **Fri 1/13/17** | | |
| Fri 12/23/16 | 24 | HPE |
| | | |
| Fri 1/13/17 | 29FS+5 days | HPE |
| Fri 1/27/17 | 30 | HPE,Identidad |
| Fri 1/27/17 | 31 | HPE |
| Fri 1/27/17 | 32 | HPE,Identidad |
| **Wed 12/28/16** | | |

Project: IoT Solution_Project Plan
Date: Thu 12/8/16

| | | | | |
|---|---|---|---|---|
| Task | | Manual Summary Rollup | |
| Split | | Manual Summary | |
| Milestone | | Start-only | |
| Summary | | Finish-only | |
| Project Summary | | External Tasks | |
| Inactive Task | | External Milestone | |
| Inactive Milestone | | Deadline | |
| Inactive Summary | | Progress | |
| Manual Task | | Manual Progress | |
| Duration-only | | | |

Page 3

| Finish | Predecessors | Resource Names |
|---|---|---|
| **Wed 12/28/16** | **24** | **HPE** |
| Wed 12/28/16 | | HPE |
| **Fri 2/3/17** | | |
| Fri 2/3/17 | 33 | HPE |
| Fri 2/3/17 | 38 | HPE |
| **Thu 2/2/17** | | |
| Thu 2/2/17 | | HPE |
| Wed 2/8/17 | 41,37 | Identidad |

Timeline: Aug 7, '16 — Aug 28, '16 — Sep 18, '16 — Oct 9, '1

Legend:

| Task | | Manual Summary Rollup |
|---|---|---|
| Split | | Manual Summary |
| Milestone | | Start-only |
| Summary | | Finish-only |
| Project Summary | | External Tasks |
| Inactive Task | | External Milestone |
| Inactive Milestone | | Deadline |
| Inactive Summary | | Progress |
| Manual Task | | Manual Progress |
| Duration-only | | |

Project: IoT Solution_Project Plan
Date: Thu 12/8/16

Page 4

Project: IoT Solution_Project Plan
Date: Thu 12/8/16

| | | |
|---|---|---|
| Task | Manual Summary Rollup | |
| Split | Manual Summary | |
| Milestone | Start-only | |
| Summary | Finish-only | |
| Project Summary | External Tasks | |
| Inactive Task | External Milestone | |
| Inactive Milestone | Deadline | |
| Inactive Summary | Progress | |
| Manual Task | Manual Progress | |
| Duration-only | | |

Page 5

Project: IoT Solution_Project Plan
Date: Thu 12/8/16

| | | | |
|---|---|---|---|
| Task | | Manual Summary Rollup | |
| Split | | Manual Summary | |
| Milestone | | Start-only | |
| Summary | | Finish-only | |
| Project Summary | | External Tasks | |
| Inactive Task | | External Milestone | |
| Inactive Milestone | | Deadline | |
| Inactive Summary | | Progress | |
| Manual Task | | Manual Progress | |
| Duration-only | | | |

Page 6

# Exhibit

# "14"

| | |
|---|---|
| From: | McDonald, Luke |
| To: | Andres Sanchez; Vicente Pava - HPE |
| Cc: | Gabriel Sanchez; Santiago Sanchez; Rodriguez Padron, Onofre; Castro, German Eduardo (CMS MAP CACPR); Malpica Zamorano, Mauricio; Osorio, Patricia |
| Subject: | RE: Identidad IoT Project: Issues Pending |
| Date: | Wednesday, December 21, 2016 7:19:10 PM |

Hello Andres – thank you for reaching out. I've followed up with the team and would like to provide the following response to your questions. Would you like to have a quick call before the holidays to cover these topics? We could arrange it for tomorrow.

1. We still not have documented agreement of how many SIS licenses will be delivered based on the current agreement.
   100K licenses have been included for SIS. This represents 20% of the installed license base (500K). This ratio was derived based upon the fact that not all uses cases will require SIS.

2. We still have not received the confirmation of the sizing capacity of the platform and its respectively hardware… What was the assumed threshold for the implemented capacity?
   The platform sizing is dependent upon the use-cases deployed. It is sized at for 500K Cat B devices. It would support approximately 1M Cat A devices.

3. We have not received the confirmation that the current installed hardware will be enough to run the SIS licenses without compromising the performance of the UIoT platform.
   In order to ensure SIS has no impact to the current capacity model, the team is evaluating the sizing with our product team. We will determine early in January if additional hardware is required, and if so, would accommodate the costs of that hardware.

4. As you may remember in our conversation, we were offered in the initial discussions as part of the structure of this deal Sim Management, Device Management, and Analytics platform, Have you been able to conclude your investigation regarding about the Sim management and Analytics platform we were offered?
   As the use cases that require these components were not fully identified, they were not included in the proposal. I'd like to get the team together with you to discuss the future roadmap and where these components fit into your plans.

5. We need to have the certainty that there will be an internal launch of the teaming agreement between HPE and Identidad IoT, as a go to market tool for the developing countries.
   German is running point on this topic. I understand that the discussions are on-going, and we're presently awaiting any questions or concerns you may have with the documents which need to be completed in order to establish your partner/service provider status

Thanks,
Luke

**From:** Andres Sanchez [mailto:asanchez@identidadtelecom.net]
**Sent:** Tuesday, December 20, 2016 3:27 PM
**To:** McDonald, Luke <luke.ray.mcdonald@hpe.com>; Vicente Pava - HPE <vicente.pava@hpe.com>
**Cc:** Gabriel Sanchez <gabrielsanchez@identidadtelecom.net>; Santiago Sanchez
<ssanchez@identidadtelecom.net>; Rodriguez Padron, Onofre <onofre.rodriguez-
padron@hpe.com>; Castro, German Eduardo (CMS MAP CACPR) <gcastro@hpe.com>; Malpica
Zamorano, Mauricio <mauricio.malpica-zamorano@hpe.com>; Osorio, Patricia
<patricia.osorio@hpe.com>
**Subject:** Identidad IoT Project: Issues Pending

Hello Luke and Vicente,

A month have passed since our meeting, and most of the issues we discussed have not been
addressed. As of today we are still waiting for the resolution of the following items:

1. We still not have documented agreement of how many SIS licenses will be delivered
   based on the current agreement.
2. We still have not received the confirmation of the sizing capacity of the platform and its
   respectively hardware… What was the assumed threshold for the implemented
   capacity?
3. We have not received the confirmation that the current installed hardware will be
   enough to run the SIS licenses without compromising the performance of the UIoT
   platform.
4. As you may remember in our conversation, we were offered in the initial discussions as
   part of the structure of this deal Sim Management, Device Management, and Analytics
   platform, Have you been able to conclude your investigation regarding about the Sim
   management and Analytics platform we were offered?
5. We need to have the certainty that there will be an internal launch of the teaming
   agreement between HPE and Identidad IoT, as a go to market tool for the developing
   countries.

As you will understand, the lack of response regarding these issues we are loosing the
confidence on HPE ability to execute and deliver against commitments. For this reason, we
have made the decision that, if we don't get the response to all of these items before the end of
the year, We will stop the installation process until we have it all addressed.

Best Regards,

Andres Sanchez


IDENTIDAD IOT
Andrés Sánchez
CEO
pbx + 1.786.242.2224 Ext. 107 | direct | + 1 786 899 2265 | cell + 1 786 546 7727
mail: asanchez@identidadtelecom.net | skype: andsancheza
www.identidadtelecom.net | 7950 NW 53rd Street #132, Doral FL 33166

# Exhibit "15"

| From: | Bank, Anette (CMS) |
|---|---|
| To: | Andres Sanchez; Upton, Nigel; Hansen, Claus (IoT Director WW); De Pablo, Miguel; Smith, Beth A; Rodriguez Padron, Onofre; Santiago Sanchez |
| Cc: | Bank, Anette (CMS) |
| Subject: | RE: Identidad recovery plan |
| Date: | Wednesday, March 8, 2017 11:57:14 AM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |
| | image009.png |
| | image010.png |

Hi Andres and Santiago;

Great seeing you and the Identidad team last week @ MWC. I will be leading the efforts from the IoT team to bring Identidad back to long term stability after seeing new issues this week. I will also be the point of communication for the activities.

Re-cap of the status is that we have seen several  stability issues concentrated around EDB/PGPool as well as  ActiveMQ stopping due to overrun of logs. Detailed status and RCA on individual issues has already been provided by Beth. Current status is that these issue are fixed and platform is operational.

Going forward the team will focus on the end2end review of the platform configuration and recommend a plan of action to secure stability on the long term.

**Short term plan (this week):**
Verify configuration end2end against installation guidelines and Product team recommendations
Review possible configuration recommendations from EDB
Daily health check of the platform

**Next week:**
On-site team for the full week: Miguel; Andrei; SA from lab and Anette
We plan to cover during on-site:
- Completed the end2end platform assessment
- Present recommended plan of action and agree on the plan to implement
- Work with Identidad team on O&M including knowledge transfer, processes and monitoring tools
- I will detail the plan as we move forward with recommendations

Let us review this plan as well as collect your inputs in the call.

Look forward to talk to you soon.

Anette

**From:** Andres Sanchez [mailto:asanchez@identidadtelecom.net]

**Sent:** 8. marts 2017 17:30
**To:** Upton, Nigel <nigel.upton@hpe.com>; Hansen, Claus (IoT Director WW) <claus.hansen@hpe.com>; Bank, Anette (CMS) <anette.bank@hpe.com>; De Pablo, Miguel <miguel.depablo@hpe.com>; Smith, Beth A <beth.a.smith@hpe.com>; Rodriguez Padron, Onofre <onofre.rodriguez-padron@hpe.com>
**Cc:** Santiago Sanchez <ssanchez@identidadtelecom.net>
**Subject:** Re: Identidad recovery plan

Thank you!

— Andrés S







---

**From:** "Upton, Nigel" <nigel.upton@hpe.com>
**Date:** Wednesday, March 8, 2017 at 11:26 AM
**To:** Andres Sanchez <asanchez@identidadtelecom.net>, "Hansen, Claus (IoT Director WW)" <claus.hansen@hpe.com>, "Bank, Anette (CMS)" <anette.bank@hpe.com>, "De Pablo, Miguel" <miguel.depablo@hpe.com>, "Smith, Beth A" <beth.a.smith@hpe.com>, "Rodriguez Padron, Onofre" <onofre.rodriguez-padron@hpe.com>
**Cc:** Santiago Sanchez <ssanchez@identidadtelecom.net>
**Subject:** RE: Identidad recovery plan

Done, look forward to talking to you,
Thanks
Nigel

---

**From:** Andres Sanchez [mailto:asanchez@identidadtelecom.net]
**Sent:** Wednesday, March 08, 2017 9:19 AM
**To:** Upton, Nigel <nigel.upton@hpe.com>; Hansen, Claus (IoT Director WW) <claus.hansen@hpe.com>;

Bank, Anette (CMS) <anette.bank@hpe.com>; De Pablo, Miguel <miguel.depablo@hpe.com>; Smith, Beth A <beth.a.smith@hpe.com>; Rodriguez Padron, Onofre <onofre.rodriguez-padron@hpe.com>
**Cc:** Santiago Sanchez <ssanchez@identidadtelecom.net>
**Subject:** Re: Identidad recovery plan

Nigel,

Could you please include Santiago Sanchez in this call?

ssanchez@identidadiot.com

— Andrés S





  

**From:** "Upton, Nigel" <nigel.upton@hpe.com>
**Date:** Wednesday, March 8, 2017 at 10:51 AM
**To:** Andres Sanchez <asanchez@identidadtelecom.net>, "Hansen, Claus (IoT Director WW)" <claus.hansen@hpe.com>, "Bank, Anette (CMS)" <anette.bank@hpe.com>, "De Pablo, Miguel" <miguel.depablo@hpe.com>, "Smith, Beth A" <beth.a.smith@hpe.com>, "Rodriguez Padron, Onofre" <onofre.rodriguez-padron@hpe.com>
**Subject:** Identidad recovery plan

⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯

→ Join Skype Meeting

This is an online meeting for Skype for Business, the professional meetings and communications app formerly known as Lync.

Join by phone

+54-115-352-8229 (Argentina, Buenos Aires) (*Default) English (United States)

+54-351-526-9246 (Argentina, Cordoba) (*Default) English (United States)

+61-2-9273-4250 (Australia, Sydney) (*Default) English (United States)

+43-1-36027-74140 (Austria, Vienna) (*Default) English (United States)

+973-1619-8609 (Bahrain, Manama) (*Default) English (United States)

+32-26-200-555 (Belgium, Brussels) (*Default) English (United States)

+55-21-2730-6955 (Brazil, Rio De Janeiro) (*Default) English (United States)

+55-11-3351-7292 (Brazil, Sao Paulo) (*Default) English (United States)

+359-293-58-181 (Bulgaria, Sofia) (*Default) English (United States)

+1-416-216-4164 (Canada, Toronto) (*Default) English (United States)

+56-2-2618-8234 (Chile, Santiago) (*Default) English (United States)

+506-2539-7300 (Costa Rica, San Jose) (*Default) English (United States)

+385-1777-6511 (Croatia, Zagreb) (*Default) English (United States)

+357-2200-7364 (Cyprus, Nicosia) (*Default) English (United States)

+420-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 (Czech Republic, Prague) (*Default) English (United States)

+45-3515-8001 (Denmark, Copenhagen) (*Default) English (United States)

+1-829-956-9726 (Dominican Republic, Santo Domingo ) (*Default) English (United States)

+372-686-8844 (Estonia, Tallinn) (*Default) English (United States)

+358-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 (Finland, Helsinki) (*Default) English (United States)

+33-1-7048-9028 (France, Paris) (*Default) English (United States)

+49-610996-78000 (Germany, Frankfurt) (*Default) English (United States)

+30-2111-81-3888 (Greece, Athens) (*Default) English (United States)

+852-3060-2624 (Hong Kong, Hong Kong) (*Default) English (United States)

+36-1328-5356 (Hungary, Budapest) (*Default) English (United States)

+91-226-187-5060 (India, Mumbai) (*Default) English (United States)

+353-1525-1851 (Ireland, Dublin) (*Default) English (United States)

+972-3721-9012 (Israel, Tel Aviv) (*Default) English (United States)

+39-0238-59-1979 (Italy, Milan) (*Default) English (United States)

+82-2-2258-0933 (Korea, Seoul) (*Default) English (United States)

+254-202-214-780 (Kenya, Nairobi) (*Default) English (United States)

+371-6785-2141 (Latvia, Riga) (*Default) English (United States)

+370-5205-1144 (Lithuania, Vilnius) (*Default) English (United States)

+352-27300-010 (Luxembourg, Capellen) (*Default) English (United States)

+60-3-2053-5153 (Malaysia, Kuala Lumpur) (*Default) English (United States)

+52-334-777-2034 (Mexico, Guadalajara) (*Default) English (United States)

+52-55-5091-3003 (Mexico, Mexico City) (*Default) English (United States)

+212-520-48-00-48 (Morocco, Casablanca) (*Default) English (United States)

+31-20-721-9040 (Netherland, Amsterdam) (*Default) English (United States)

+64-9308-4024 (New Zealand, Auckland) (*Default) English (United States)

+234-1-277-8390 (Nigeria, Lagos) (*Default) English (United States)

+47-235-000-66 (Norway, Oslo) (*Default) English (United States)

+505-2268-3454 (Nicaragua, Managua) (*Default) English (United States)

+507-833-6650 (Panama, Panama City) (*Default) English (United States)

+511-707-5777 (Peru, Lima) (*Default) English (United States)

+63-23-95-2323 (Philippines, Manila) (*Default) English (United States)

+48-225-844-344 (Poland, Warsaw) (*Default) English (United States)

+351-2131-800-80 (Portugal, Lisbon) (*Default) English (United States)

+40-2120-44886 (Romania, Bucharest) (*Default) English (United States)

+7-495-411-7370 (Russian Federation, Moscow) (*Default) English (United States)

+65-6429-8383 (Singapore) (*Default) English (United States)

+421-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 (Slovakia, Bratislava) (*Default) English (United States)

+386-1600-1465 (Slovenia, Ljubljana) (*Default) English (United States)

+27-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 (South Africa, Cape Town) (*Default) English (United States)

+27-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 (South Africa, Johannesburg) (*Default) English (United States)

+34-913754145 (Spain, Madrid) (*Default) English (United States)

+46-8-51-99-33-99 (Sweden, Stockholm) (*Default) English (United States)

+41-22-567-5566 (Switzerland, Geneva) (*Default) English (United States)

+41-43-547-9047 (Switzerland, Zurich) (*Default) English (United States)

+886-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 (Taiwan, Taipei) (*Default) English (United States)

+216-31-300-303 (Tunisia, Tunis) (*Default) English (United States)

+90-212-375-5123 (Turkey, Istanbul) (*Default) English (United States)

+256-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 (Uganda, Kampala) (*Default) English (United States)

+44-207-660-1232 (United Kingdom, London) (*Default) English (United States)

+1-978-289-4114 (USA, Andover, MA) (*Default) English (United States)

+1-678-367-0003 (USA, Atlanta, GA) (*Default) English (United States)

+1-512-865-6123 (USA, Austin, TX) (*Default) English (United States)

+1-208-629-2920 (USA, Boise, ID) (*Default) English (United States)

+1-970-672-4888 (USA, Fort Collins, CO) (*Default) English (United States)

+1-281-377-1991 (USA, Houston, TX) (*Default) English (United States)

+1-650-300-4050 (USA, Palo Alto, CA) (*Default) English (United States)

+81-36-837-2291 (Japan, Tokyo) (*Default) English (United States)

+86-400-810-0915 (Customers/Partners in China) (*Default) English (United States)

Find a local number

Conference ID: 77526062

Forgot your dial-in PIN? | Help

.......................................................................................................................

# Exhibit

# "16"

| | |
|---|---|
| From: | Andres Sanchez |
| To: | Sliter_David; Upton_Nigel |
| Cc: | Castro_German Eduardo (CMS MAP CACPR); Rodriguez Padron_Onofre; Gabriel Sanchez; Santiago Sanchez; Hansen_Claus (IoT Director WW); McNinch_Scott; Raval_Kapil; Raza_Sarwar S. (VP Product Management_CSB); Kaser_Roy E. |
| Bcc: | Eduardo Rodriguez |
| Subject: | Re: HPE Universal IOT platform still not suitable for production. |
| Date: | Wednesday, April 19, 2017 7:02:52 PM |
| Attachments: | Service Request Dashboard_19042017.xls |
| | image001.png |
| | image002.png |
| | image003.png |

Dear David and Nigel,

I asked my team to give me a complete description of the problems we are facing so I can show you why we want to stop the entire operation, and of course the payments until the platform meet all the requirements that we were offered, and that we need to proceed to develop clients on it without facing costly problems. Please read this email with the premise that we are looking to solve the issue without delays, but without having to incur in more monthly costs.

Let's start with the base that we need this platform available and stable as soon as possible, therefore, for Identidad, to the halt of the project is not the solution we were looking for, but today we don't trust the platform we have is the platform that we purchased and we are paying for, that based on the cost, we expected to be a top of the line product. On top of that, we have costs over U$ 100,000.00 dollars per month, and even more complicated, we have three very important leads that we could lose if we are not able to fulfill it in a short period of time, therefore any day lost represent huge losses for Identidad IoT. Unfortunately, you will see in the report bellow, that we cannot work with this platform as it is, and that we need HPE to stop charging us for the monthly payments, and focus all the efforts in solving the issues, and having the platform ready to handle the 500k devices we paid for, and be ready for 1MM devices when we upgrade.

To be able to show the magnitude of the problem, and the frustration within the company, I want to give a brief history of the entire process with the platform.

- On July 31st, 2016, we signed the purchase order of the Universal IoT platform from HPE with the following features and expectations:
    o "Horizontal" Platform to enable a long list of "Vertical" Use Cases (As per presentation received on April 7, 2016)
    o Network-Agnostic – Cellular (3G/4G), LPWAN (LoRa), Short-Range (Wi-Fi, BLE, ZigBee, Z-Wave) (As per presentation received on April 7, 2016): *As you will see in the report bellow, we have found that there are some issues making impossible to work with some Lora devices.*
    o Device vendor-independent with support for Data acquisition over any IoT protocol (As per presentation received on April 7, 2016): **We have learned that there are no DC's for several vendors, and the configuration of a device takes a long time, making the platform extremely difficult to operate.**
    o Powerful and world-class IoT Analytics (As per presentation received on April 7, 2016): *When we received the platform, we noticed there was not included in the system, and then we were told that this was an additional software*.
    o Fully virtualized solution (As per presentation received on April 7, 2016)
    o Hardware enough for 1M Devices (As per presentation received on April 7, 2016 and June 4, 2016) *As you will see in the failures report, the hardware configuration is not holding more than 20 devices.*
    o License to manage 500k Devices, and expandable to 1MM. (As per presentation received on June 28, 2016 with the financial proposal). *As you will see in the failures report, the hardware configuration is not holding more than 20 devices.*
    o Different partners already connected to the platform with DC's already included (As per presentation received on July 14, 2016) as: Trackimo, Trinetra, Atrack, IEM, BH technologies (For waste management and For Smart Lighting),  Sagecom (lora), Libelium, ZigBee Networks, Finsecure,

Abeeway: *We have been working with several of these partners, and we have found that most of them doesn't have DC's included in the platform either.*

o   Installation in 8 weeks: Due on October 1st, 2016 (As per SOW received on July 26, 2016). *Having this in consideration, we hired the entire developing and engineering team to be ready to start at that date, incurring in costs from day 1.*

o   A teaming agreement between HPE and Identidad IOT to target customers in CSP and SME segments in North America, South America and Caribbean, *Including the DIRECT support of one HPE IOT Specialist, and all the CMS sales team in LatAm and NORA.* (Offered by HPE on our meeting on July 14th 2016)

-   On February 28th (5 months of delay) we signed the acceptance of the platform, trusting that it was functioning correctly, without a full backup and recovery, and a stress test, with the promise from HPE that it was tested before, and that we were going to be able to test it immediately after the training. Unfortunately, we found later that the backup and restore process didn't exist, and that the stress test was never performed on the platform.

-   Since the acceptance, we have had several problems with the platform, including total failures. I have attached the list of tickets we have opened. Some of them have been solved, some others are still open.

-   We also found that the hardware included in the solution is not enough to manage even the 500K devices in the platform, but HPE promised us, this issue was going to be addresses in the next version.

-   We were promised that the new version was going to available to us on April 15, and we received a notice that the version is not ready yet, delaying even further the solution to some, but not all the problems we have found.

The following is the report received from my development and engineering team regarding the failures, and security issues found in the platform:

"Hi Andres,

Based on the conversation we had earlier today, the following is a list of issues we found in the UIoT platform during the process of developing new use cases and understanding the use cases provided by HPE. We agree that technically we can deploy a use case with the current platform version; however, we have some concerns about the feasibility of a commercial deployment.

•   Once again, on Friday one of the components ran out of available free disk space, which completely freeze the UIoT platform. This is a big issue because the redundancy on the components us not working, therefore, the high availability of the platform is not working correctly, and don't have any redundancy in case of failure.

•   We are concerned with the reliability, on the scenario described before, once the issue was resolved we had to restart every single component on the platform, we believe we should not have to do this on a production environment, as it would affect all the customers installed in the platform.

•   In terms of time of resolution for this issue, we are not comfortable with the resolution times, as it takes too long and it will have a high impact on a production environment.

•   Currently we are making configuration changes that should be addressed during the design phase. (For example: Partitions sizing, scripts for startup process, the number of process per user that the UIoT needs, permissions for critical files). We believe the sizing and architecture of the platform is not accurate with the high availability, and sizing of the system.

•   We have found some differences between the behavior of the lab and production environments. As an example, uploading of devices fails in the Lab environment but not it production, debugging this issue consumed a lot of our development time, only to discover that it is a platform issue. This is a big concern because we don't feel confident developing in the lab environment and then having a smooth migration to production.

•   We are concerned with the work being done by HPE team, as an example in the problem described in the case **#5317900669** where a view on the database disappeared suddenly. We agreed with HPE's

engineers that this was a human error that could only being done by HPE as we don't have access to these tables.

- In the current version of the UIoT Platform there are very long and complex procedures to deploy new DCs, codecs, etc. This has created some issues. As a matter of fact, right now we have case open for an issue related to this, case **#5319006459** (*Auto provisioned failed*).

- We have found several breaches that raise big concerns regarding the impact to the **security**, that is a big topic in IOT:

  - It is not possible to use authentication for MQTT in current platform version, therefore, all the information sent using MQTT to another MQTT clients is exposed and free to be hacked.

  - Some web services are exposed without any kind of authentication. In general, all our solutions will be exposed over internet and we think that every single point of the platform that does not have at least a basic authentication method could represent a security flaw, particularly Device Controllers.

  - In our point of view, any component or functionality that prevent DDoS attacks at the level of the DCs should be cover in some way by the platform. It is the most basic and popular attack.

- We believe that in production environment we could have a significant performance impact because SIS component is sharing resources with PRM – SGF. We are already facing issues with the platform performance without using SIS, and will affect even more when the SIS is installed and working.

- Some Manufacturers of sensors such as PNI only use OTAA as a Valid authentication method for their devices. In consequence, in a scenario with hundreds of sensors it is strongly recommended to use a KNS for activation on devices in a Lora network server. In our point of view, it is recommended the deployment of a KMS (key management System) for Lora Use Cases inside of UIOT platform to perform a proper activation of several Lora devices using the protocol OTAA. It is not efficient handle the activation manually or through ABP method.

Santiago Sanchez – Director of IOT"

Please let me know if you are available for a call tomorrow morning to discuss the following steps.

— Andrés S





**From:** "Sliter, David" <david.sliter@hpe.com>
**Date:** Tuesday, April 18, 2017 at 5:55 PM
**To:** Andres Sanchez <asanchez@identidadtelecom.net>

**Cc:** "Upton, Nigel" <nigel.upton@hpe.com>, German Castro <gcastro@hpe.com>, "Rodriguez Padron, Onofre" <onofre.rodriguez-padron@hpe.com>, Gabriel Sanchez <gabrielsanchez@identidadtelecom.net>, Santiago Sanchez <ssanchez@identidadtelecom.net>, Claus Hansen <claus.hansen@hpe.com>, "McNinch, Scott" <scott.mcninch@hpe.com>, "Raval, Kapil" <kapil.raval@hpe.com>, "Raza, Sarwar S. (VP Product Management, CSB)" <sarwar.s.raza@hpe.com>, "Kaser, Roy E." <roy.e.kaser@hpe.com>
**Subject:** RE: HPE Universal IOT platform still not suitable for production.

Andres. Thank you for reaching out. Let me quickly sync with team and we will circle back to you.
Dave

---

**From:** Andres Sanchez [mailto:asanchez@identidadtelecom.net]
**Sent:** Tuesday, April 18, 2017 2:44 PM
**To:** Sliter, David <david.sliter@hpe.com>
**Cc:** Upton, Nigel <nigel.upton@hpe.com>; Castro, German Eduardo (CMS MAP CACPR) <gcastro@hpe.com>; Rodriguez Padron, Onofre <onofre.rodriguez-padron@hpe.com>; Gabriel Sanchez <gabrielsanchez@identidadtelecom.net>; Santiago Sanchez <ssanchez@identidadtelecom.net>; Hansen, Claus (IoT Director WW) <claus.hansen@hpe.com>
**Subject:** HPE Universal IOT platform still not suitable for production.

Hello David,

I'm sorry to escalate this to you, but right now we are in a very complicated situation.

Today I had a very stressful conversation with my developers and platform engineers that are saying the platform is still not suitable to have clients on it, and that every day we found more and more errors. Yesterday the platform was down most of the day, and today is not completely stable.  In top of that, we were supposed to have the new version installed on the 15th of April, that supposedly will solve most the problems, but today we received an email that the release is still been tested, and that we will be able to have it installed in about two weeks.

We have been patient, and have work with what we got so far, but at this point I cannot allow HPE to continue spending time trying to solve something that Identidad IOT is already paying for. We started this project on September, and signed the delivery of the platform on February without knowing all the issues it had, and as of today, the platform is still not usable.

As you know, we are now paying 50k per month for this platform, plus our regular expenses that add up more than 100k per month in costs, and so far, we have not been able to start generating any revenue, and not even have a light that we will be able to do it soon. Having this in mind, I need HPE to stop charging us for this platform, hardware and services until all the issues are resolved and we have a stable platform in which we can work, and it's been tested and pass all the required standards. At this point, we are not comfortable with just upgrading to the new version, we need to install it, and be able to test it thoroughly before continuing with the payments.

I have a meeting tomorrow in the morning with my developers, and will have an entire list of the issues we have found in the platform so far, and would like to have a call with you to discuss further. Please let me know if you have available time tomorrow in the afternoon EST.

Best Regards,

— Andrés S



pbx + 1.786.242.2224 Ext. 107 | direct + 1 786 899 2265 | cell + 1 786 546 7727
mail: asanchez@identidadtelecom.net | skype: andsancheza
www.identidadtelecom.net | 7950 NW 53rd Street #132, Doral FL 33166

# Exhibit

# "17"

| From: | Sliter, David |
|---|---|
| To: | Andres Sanchez; Upton, Nigel |
| Cc: | Castro_German Eduardo (CMS MAP CACPR); Rodriguez Padron_Onofre; Gabriel Sanchez; Santiago Sanchez; Hansen_Claus (IoT Director WW); McNinch_Scott; Raval_Kapil; Raza_Sarwar S. (VP Product Management_CSB); Kaser_Roy E. |
| Subject: | RE: HPE Universal IOT platform still not suitable for production. |
| Date: | Thursday, April 20, 2017 7:13:02 PM |
| Attachments: | image001.png |
|  | image002.png |
|  | image003.png |

Dear Andres,

Thank you for your message, I apologize for not being able to speak to you directly today.  Your message is very important to me and my organization and are deeply concerned with the issues.  Since we last spoke at MWC in Barcelona I was under the impression that we had made some progress, but clearly we are not where we need to be.

My teams are going through all the points of your message.  As we work through the details, I wanted to take this opportunity to stress the following.

1. We remain your committed partner in making you and your company a successful IoT provider to your customers
2. We completely understand the delays and cost impact on your business and are working a proposal to review with you early next week
3. My teams are working round the clock to get the platform to the level that is required to win your confidence and get into production
4. I am channeling more resources to accelerate our efforts, your success is a critical proof point for us and you are a strategic reference point in our own IoT journey

I am asking Nigel and Onofre to take day to day accountability, overseeing the proposal to address the concerns and to manage the timelines.  We have some suggestions which my team will go through the details of when they meet with you next week.  I know the journey from July 2016 to now has not been easy, you and your team under Santiago have been patient, professional and supportive.  Our mutual journey of driving significant change in our industry through the emergence of a global demand for IOT services is not easy. The vision you have of filling that need through our joint offering is critical to us as I hope we have demonstrated through our increase in support, awareness and public outreach over the last 4 months. Your success is our success.

Thank you again and please keep me informed on progress.

Sincerely
Dave

---

**From:** Andres Sanchez [mailto:asanchez@identidadtelecom.net]
**Sent:** Wednesday, April 19, 2017 4:03 PM
**To:** Sliter, David <david.sliter@hpe.com>; Upton, Nigel <nigel.upton@hpe.com>
**Cc:** Castro, German Eduardo (CMS MAP CACPR) <gcastro@hpe.com>; Rodriguez Padron, Onofre <onofre.rodriguez-padron@hpe.com>; Gabriel Sanchez <gabrielsanchez@identidadtelecom.net>; Santiago Sanchez <ssanchez@identidadtelecom.net>; Hansen, Claus (IoT Director WW) <claus.hansen@hpe.com>; McNinch, Scott <scott.mcninch@hpe.com>; Raval, Kapil <kapil.raval@hpe.com>; Raza, Sarwar S. (VP Product Management, CSB) <sarwar.s.raza@hpe.com>; Kaser, Roy E. <roy.e.kaser@hpe.com>
**Subject:** Re: HPE Universal IOT platform still not suitable for production.

Dear David and Nigel,

I asked my team to give me a complete description of the problems we are facing so I can show you why we want to

stop the entire operation, and of course the payments until the platform meet all the requirements that we were offered, and that we need to proceed to develop clients on it without facing costly problems. Please read this email with the premise that we are looking to solve the issue without delays, but without having to incur in more monthly costs.

Let's start with the base that we need this platform available and stable as soon as possible, therefore, for Identidad, to the halt of the project is not the solution we were looking for, but today we don't trust the platform we have is the platform that we purchased and we are paying for, that based on the cost, we expected to be a top of the line product. On top of that, we have costs over U$ 100,000.00 dollars per month, and even more complicated, we have three very important leads that we could lose if we are not able to fulfill it in a short period of time, therefore any day lost represent huge losses for Identidad IoT. Unfortunately, you will see in the report bellow, that we cannot work with this platform as it is, and that we need HPE to stop charging us for the monthly payments, and focus all the efforts in solving the issues, and having the platform ready to handle the 500k devices we paid for, and be ready for 1MM devices when we upgrade.

To be able to show the magnitude of the problem, and the frustration within the company, I want to give a brief history of the entire process with the platform.

- On July 31st, 2016, we signed the purchase order of the Universal IoT platform from HPE with the following features and expectations:
    - "Horizontal" Platform to enable a long list of "Vertical" Use Cases (As per presentation received on April 7, 2016)
    - Network-Agnostic – Cellular (3G/4G), LPWAN (LoRa), Short-Range (Wi-Fi, BLE, ZigBee, Z-Wave) (As per presentation received on April 7, 2016): ***As you will see in the report bellow, we have found that there are some issues making impossible to work with some Lora devices.***
    - Device vendor-independent with support for Data acquisition over any IoT protocol (As per presentation received on April 7, 2016): **We have learned that there are no DC's for several vendors, and the configuration of a device takes a long time, making the platform extremely difficult to operate.**
    - Powerful and world-class IoT Analytics (As per presentation received on April 7, 2016): ***When we received the platform, we noticed there was not included in the system, and then we were told that this was an additional software***.
    - Fully virtualized solution (As per presentation received on April 7, 2016)
    - Hardware enough for 1M Devices (As per presentation received on April 7, 2016 and June 4, 2016) ***As you will see in the failures report, the hardware configuration is not holding more than 20 devices.***
    - License to manage 500k Devices, and expandable to 1MM. (As per presentation received on June 28, 2016 with the financial proposal). ***As you will see in the failures report, the hardware configuration is not holding more than 20 devices.***
    - Different partners already connected to the platform with DC's already included (As per presentation received on July 14, 2016) as: Trackimo, Trinetra, Atrack, IEM, BH technologies (For waste management and For Smart Lighting),  Sagecom (lora), Libelium, ZigBee Networks, Finsecure, Abeeway:  ***We have been working with several of these partners, and we have found that most of them doesn't have DC's included in the platform either.***
    - Installation in 8 weeks: Due on October 1st, 2016 (As per SOW received on July 26, 2016). ***Having this in consideration, we hired the entire developing and engineering team to be ready to start at that date, incurring in costs from day 1.***
    - A teaming agreement between HPE and Identidad IOT to target customers in CSP and SME segments in North America, South America and Caribbean, *Including the DIRECT support of one HPE IOT Specialist, and all the CMS sales team in LatAm and NORA.* (Offered by HPE on our meeting on July 14th 2016)

- On February 28th (5 months of delay) we signed the acceptance of the platform, trusting that it was functioning correctly, without a full backup and recovery, and a stress test, with the promise from HPE that it was tested before, and that we were going to be able to test it immediately after the training. Unfortunately, we found later that the backup and restore process didn't exist, and that the stress test was never performed on the platform.
- Since the acceptance, we have had several problems with the platform, including total failures. I have attached the list of tickets we have opened. Some of them have been solved, some others are still open.
- We also found that the hardware included in the solution is not enough to manage even the 500K devices in the platform, but HPE promised us, this issue was going to be addresses in the next version.
- We were promised that the new version was going to available to us on April 15, and we received a notice that the version is not ready yet, delaying even further the solution to some, but not all the problems we have found.

The following is the report received from my development and engineering team regarding the failures, and security issues found in the platform:

"Hi Andres,

Based on the conversation we had earlier today, the following is a list of issues we found in the UIoT platform during the process of developing new use cases and understanding the use cases provided by HPE. We agree that technically we can deploy a use case with the current platform version; however, we have some concerns about the feasibility of a commercial deployment.

- Once again, on Friday one of the components ran out of available free disk space, which completely freeze the UIoT platform. This is a big issue because the redundancy on the components us not working, therefore, the high availability of the platform is not working correctly, and don't have any redundancy in case of failure.
- We are concerned with the reliability, on the scenario described before, once the issue was resolved we had to restart every single component on the platform, we believe we should not have to do this on a production environment, as it would affect all the customers installed in the platform.
- In terms of time of resolution for this issue, we are not comfortable with the resolution times, as it takes too long and it will have a high impact on a production environment.
- Currently we are making configuration changes that should be addressed during the design phase. (For example: Partitions sizing, scripts for startup process, the number of process per user that the UIoT needs, permissions for critical files). We believe the sizing and architecture of the platform is not accurate with the high availability, and sizing of the system.
- We have found some differences between the behavior of the lab and production environments. As an example, uploading of devices fails in the Lab environment but not it production, debugging this issue consumed a lot of our development time, only to discover that it is a platform issue. This is a big concern because we don't feel confident developing in the lab environment and then having a smooth migration to production.
- We are concerned with the work being done by HPE team, as an example in the problem described in the case **#5317900669** where a view on the database disappeared suddenly. We agreed with HPE's engineers that this was a human error that could only being done by HPE as we don't have access to these tables.
- In the current version of the UIoT Platform there are very long and complex procedures to deploy new DCs, codecs, etc. This has created some issues. As a matter of fact, right now we have case open for an issue related to this, case **#5319006459** (*Auto provisioned failed*).
- We have found several breaches that raise big concerns regarding the impact to the **security**, that is a big topic in IOT:
  - It is not possible to use authentication for MQTT in current platform version, therefore, all

the information sent using MQTT to another MQTT clients is exposed and free to be hacked.

- Some web services are exposed without any kind of authentication. In general, all our solutions will be exposed over internet and we think that every single point of the platform that does not have at least a basic authentication method could represent a security flaw, particularly Device Controllers.
- In our point of view, any component or functionality that prevent DDoS attacks at the level of the DCs should be cover in some way by the platform. It is the most basic and popular attack.

- We believe that in production environment we could have a significant performance impact because SIS component is sharing resources with PRM – SGF. We are already facing issues with the platform performance without using SIS, and will affect even more when the SIS is installed and working.
- Some Manufacturers of sensors such as PNI only use OTAA as a Valid authentication method for their devices. In consequence, in a scenario with hundreds of sensors it is strongly recommended to use a KNS for activation on devices in a Lora network server. In our point of view, it is recommended the deployment of a KMS (key management System) for Lora Use Cases inside of UIOT platform to perform a proper activation of several Lora devices using the protocol OTAA. It is not efficient handle the activation manually or through ABP method.

Santiago Sanchez – Director of IOT"

Please let me know if you are available for a call tomorrow morning to discuss the following steps.

— Andrés S





**From:** "Sliter, David" <david.sliter@hpe.com>
**Date:** Tuesday, April 18, 2017 at 5:55 PM
**To:** Andres Sanchez <asanchez@identidadtelecom.net>
**Cc:** "Upton, Nigel" <nigel.upton@hpe.com>, German Castro <gcastro@hpe.com>, "Rodriguez Padron, Onofre" <onofre.rodriguez-padron@hpe.com>, Gabriel Sanchez <gabrielsanchez@identidadtelecom.net>, Santiago Sanchez <ssanchez@identidadtelecom.net>, Claus Hansen <claus.hansen@hpe.com>, "McNinch, Scott" <scott.mcninch@hpe.com>, "Raval, Kapil" <kapil.raval@hpe.com>, "Raza, Sarwar S. (VP Product Management, CSB)" <sarwar.s.raza@hpe.com>, "Kaser, Roy E." <roy.e.kaser@hpe.com>
**Subject:** RE: HPE Universal IOT platform still not suitable for production.

Andres. Thank you for reaching out. Let me quickly sync with team and we will circle back to you.
Dave

---

**From:** Andres Sanchez [mailto:asanchez@identidadtelecom.net]
**Sent:** Tuesday, April 18, 2017 2:44 PM
**To:** Sliter, David <david.sliter@hpe.com>
**Cc:** Upton, Nigel <nigel.upton@hpe.com>; Castro, German Eduardo (CMS MAP CACPR) <gcastro@hpe.com>; Rodriguez Padron, Onofre <onofre.rodriguez-padron@hpe.com>; Gabriel Sanchez <gabrielsanchez@identidadtelecom.net>; Santiago Sanchez <ssanchez@identidadtelecom.net>; Hansen, Claus (IoT Director WW) <claus.hansen@hpe.com>
**Subject:** HPE Universal IOT platform still not suitable for production.

Hello David,

I'm sorry to escalate this to you, but right now we are in a very complicated situation.

Today I had a very stressful conversation with my developers and platform engineers that are saying the platform is still not suitable to have clients on it, and that every day we found more and more errors. Yesterday the platform was down most of the day, and today is not completely stable.  In top of that, we were supposed to have the new version installed on the 15th of April, that supposedly will solve most the problems, but today we received an email that the release is still been tested, and that we will be able to have it installed in about two weeks.

We have been patient, and have work with what we got so far, but at this point I cannot allow HPE to continue spending time trying to solve something that Identidad IOT is already paying for. We started this project on September, and signed the delivery of the platform on February without knowing all the issues it had, and as of today, the platform is still not usable.

As you know, we are now paying 50k per month for this platform, plus our regular expenses that add up more than 100k per month in costs, and so far, we have not been able to start generating any revenue, and not even have a light that we will be able to do it soon. Having this in mind, I need HPE to stop charging us for this platform, hardware and services until all the issues are resolved and we have a stable platform in which we can work, and it's been tested and pass all the required standards. At this point, we are not comfortable with just upgrading to the new version, we need to install it, and be able to test it thoroughly before continuing with the payments.

I have a meeting tomorrow in the morning with my developers, and will have an entire list of the issues we have found in the platform so far, and would like to have a call with you to discuss further. Please let me know if you have available time tomorrow in the afternoon EST.

Best Regards,

— Andrés S

